```
 1                    IN THE UNITED STATES DISTRICT COURT

 2                     FOR THE DISTRICT OF NEW MEXICO

 3  _____
                                   )
 4  UNITED STATES OF AMERICA,      )     No. 19-CR-01086 MV
            Plaintiff,             )
 5                                 )
        vs.                        )     Aspen Courtroom
 6                                 )     Santa Fe, New Mexico
    EVERADO GARCIA-GUZMAN,         )
 7          Defendant.            )     November 15, 2019
    _____)     9:49 a.m.
 8

 9                     TRANSCRIPT OF PROCEEDINGS
                         MOTION TO SUPPRESS
10             BEFORE THE HONORABLE MARTHA A. VÁZQUEZ
                 UNITED STATES DISTRICT COURT JUDGE
11
    APPEARANCES:
12
    For the Plaintiff:  MARK PFIZENMAYER, ESQ.
13                      UNITED STATES ATTORNEY'S OFFICE
                        District of New Mexico
14                      P.O. Box 607
                        Albuquerque, New Mexico  87103
15
    For the Defendant:  ERLINDA JOHNSON, ESQ.
16                      620 Roma Avenue, NW
                        Albuquerque, New Mexico  87102
17
    Interpreter:        DINORAH GUTIERREZ
18

19

20
    REPORTED BY:        CARMELA V. McALISTER, CRR, RPR, NM CCR 308
21                      United States Court Reporter
                        106 S. Federal Place
22                      Santa Fe, New Mexico  87501
                        Phone:  505-992-3829
23                      Email:  Carmela_McAlister@nmd.uscourts.gov

24       Proceedings recorded by mechanical stenography; transcript
    produced by computer.
25
```

**INDEX**

| | |
|---|---|
| Court in Session | 3 |
| **JARRELL PERRY** | |
| Direct Examination by Mr. Pfizenmayer | 5 |
| Cross-Examination by Ms. Johnson | 45 |
| Redirect Examination by Mr. Pfizenmayer | 71 |
| Court's Examination | 74 |
| **REYDESEL ZAMARRON** | |
| Direct Examination by Mr. Pfizenmayer | 83 |
| Cross-Examination by Ms. Johnson | 104 |
| Redirect Examination by Mr. Pfizenmayer | 124 |
| Court's Examination | 127 |
| Further Cross-Examination by Ms. Johnson | 130 |
| Court's Examination | 131 |
| **EVERADO GARCIA-GUZMAN** | |
| Direct Examination by Ms. Johnson | 133 |
| Cross-Examination by Mr. Pfizenmayer | 150 |
| Redirect Examination by Ms. Johnson | 172 |
| Court's Examination | 173 |
| Certificate of Official Court Reporter | 179 |

**INDEX**

**Government's Exhibits:**

| | |
|---|---|
| 1.   Audio Recording | 5 |
| 2.   Photograph | 5 |
| 3.   Photograph | 5 |
| 4.   Photograph | 5 |
| 5.   Photograph | 5 |
| 6.   Photograph | 5 |
| 7.   Photograph | 5 |
| 8-1. PNR | 5 |
| 8-2. Ticket History | 5 |
| 9.   Email from Cervantes Institute | 5 |

**Defendant's Exhibits:**

| | |
|---|---|
| A.   Transcript | 5 |
| B.   Photograph | 5 |
| C.   Photograph | 5 |
| D.   Photograph | 5 |
| E.   Photograph | 5 |
| F.   Photograph | 5 |
| G.   Photograph | 5 |
| H.   Photograph | 5 |
| I.   Photograph | 5 |
| J.   Photograph | 5 |

1          THE COURT:  May I have appearances, please, in the

2    matter of United States v. Everado Garcia-Guzman.

3          MR. PFIZENMAYER:  Good morning, again, Your Honor.  Mark

4    Pfizenmayer on behalf of the United States.

5          MS. JOHNSON:  Good morning, Your Honor.   Erlinda

6    Johnson on behalf of Everado Garcia-Guzman, who appears before the

7    Court.  Hold on.

8          THE COURT:  Does everybody in the family have headphones

9    who needs them?

10         MS. JOHNSON:  I believe so, Your Honor.

11       Again, Your Honor, Erlinda Johnson on behalf of Everado

12   Garcia-Guzman, who appears before the Court, aided by a

13   court-certified interpreter.

14         THE COURT:  Thank you.

15       We are here this morning on Mr. Garcia-Guzman's motion to

16   suppress evidence and statements.  I have reviewed the motion, the

17   Government's response, and if the parties are ready to proceed...

18         MS. JOHNSON:  Yes, Your Honor.  I would invoke the rule,

19   even though I understand that the Rules of Evidence don't apply.

20   However, the Court may still exercise its discretion.  And in

21   order to engage in the fact-finding and truth-finding process, I

22   would ask that one or the other witnesses be excused from the

23   courtroom.

24         MR. PFIZENMAYER:  Yes, Your Honor.  The government would

25   ask Task Force Officer Zamarron to step out briefly.

1          THE COURT:  All right.  Thank you.  Good morning, sir.
2  Thank you very much.
3      The Government may call its first witness.
4          MR. PFIZENMAYER:  The United States calls Special Agent
5  Jerell Perry.
6          MS. JOHNSON:  Your Honor, before we proceed, I provided
7  the Court with a binder of all the exhibits.  The parties have
8  stipulated to the exhibits that are going to be used this morning.
9  It's Defendant's Exhibits A through J, and I believe the
10 government has the audio exhibit they will be introducing.
11         THE COURT:  Is that the government's only exhibit, the
12 audio?
13         MR. PFIZENMAYER:  No, Your Honor.
14         THE COURT:  Can I have the government's exhibits, too?
15 And I presume the government's exhibits have been stipulated into
16 evidence today.
17         MS. JOHNSON:  Actually, may I see?
18         THE COURT:  Good morning, Agent Perry.
19         THE WITNESS:  Good morning, ma'am.  How are you?
20         THE COURT:  Good, thank you.
21      While you're doing that, if you'll excuse me for a minute.
22  **(Counsel confer.)**
23         MS. JOHNSON:  Your Honor, I'm sorry, I have reviewed the
24 government's exhibits, and they are Exhibits 1 through 8-2, and
25 the defense doesn't have any objection.  We stipulate to those as

1    well.

2            THE COURT:  There's an Exhibit 9, too.

3            MS. JOHNSON:  I'm sorry, Exhibit 9.  That's fine, Your

4    Honor.

5            THE COURT:  Then all of these exhibits that have been

6    tendered, then, will be admitted into the record without

7    objection.

8    **(Government's Exhibit Nos. 1, 2, 3, 4, 5, 6, 7, 8 and 9 admitted**

9    **into evidence.)**

10   **(Defendant's Exhibits A, B, C, D, E, F, G, H, I and J admitted**

11   **into evidence.)**

12           THE COURT:  Agent Perry, if you could raise your right

13   hand to be sworn.  Thank you.

14           LAW CLERK:  Agent Perry, do you solemnly swear or affirm

15   that your testimony in this matter now before the Court will be

16   the truth, the whole truth, and nothing but the truth?

17           THE WITNESS:  Yes, ma'am, I do.

18                          **JARRELL PERRY**

19              **(being duly sworn, testified as follows:)**

20            **DIRECT EXAMINATION BY MR. PFIZENMAYER**

21   Q.   Special Agent Perry, who do you work for?

22   A.   I work for the Drug Enforcement Administration.

23   Q.   How long have you worked there?

24   A.   Just a little over 21 years.

25   Q.   Can you give us a brief overview of your career to date in

1  the DEA?

2  A.   I've been assigned to the Albuquerque district office for my

3  entire career, after I graduated from a 17-week academy.  20 of my

4  21 years, a little over 21 years, I worked in interdiction,

5  basically various means of public transportation in Albuquerque,

6  attempting to interdict or intercept drug and/or money carriers

7  transporting illegal narcotics throughout the country.

8  Q.   And the primary means of interdiction is either on Amtrak or

9  Greyhound buses?

10  A.   Yes.  That's currently the two places that I work.

11  Q.   On March 13th of 2019, were you conducting interdiction

12  operations on Amtrak trains in Albuquerque, New Mexico?

13  A.   Yes, sir, I was.

14  Q.   And in the process of interdiction operations on that date,

15  did you arrest an individual you've come to know as Everado

16  Garcia-Guzman?

17  A.   Yes, sir, I did.

18  Q.   And do you see that individual in the courtroom here today?

19  A.   Yes, sir, I do.

20  Q.   Would you please identify him based on where he is sitting

21  and what he is wearing?

22  A.   He's sitting beside his attorney Ms. Johnson, and he's

23  wearing glasses and has a red-colored jumpsuit with a white

24  T-shirt underneath, and has short black hair.

25  Q.   And in the --

1    MR. PFIZENMAYER:  Actually, Your Honor, let the record
2  reflect that Special Agent Perry has identified the Defendant.
3    THE COURT:  Thank you.  The record shall so reflect.
4  Q.  (By Mr. Pfizenmayer)  And during this operation on March
5  13th, were you recording it?
6  A.  Yes, sir, I was.
7  Q.  And you have reviewed that recording prior to coming here
8  today?
9  A.  Yes, sir, I have.
10  Q.  And you were also provided a copy of a transcript made by the
11  defendant's attorney or someone in her office; is that correct?
12  A.  Yes, sir, I was.
13  Q.  And is the audio recording a fair and accurate representation
14  of the audio on that tape?
15  A.  Yes, sir.
16  Q.  And with regard to the transcript, is that a
17  generally-accurate transcript?
18  A.  Yes, sir.
19  Q.  Now, I want to take your attention prior to you going to that
20  train.  Did the defendant become a person of interest to you prior
21  to you going to that train?
22  A.  Yes, sir, he was.
23  Q.  How so?
24  A.  I had reviewed a passenger -- Amtrak train passenger name
25  record -- we refer to it as a PNR -- that listed his name on that

1    passenger name record, and was an individual I wished to speak

2    with on that date.

3    Q.   What about that PNR made you want to talk to the defendant?

4    A.   It was paid for with cash, $1,275.  It was purchased one-way

5    from Los Angeles, California, as the origination point with a

6    destination of Philadelphia, Pennsylvania.  It was purchased

7    approximately 29 minutes prior to the train leaving, at the Amtrak

8    train station, at the ticket counter.  The various characteristics

9    of the way it was purchased, how, one way, and it was also for a

10   sleeper car 431, bedroom No. 9.  Those characteristics are

11   consistent with my experience of working interdiction, reviewing

12   numerous PNRs, of the way the passengers who are transporting

13   illegal narcotics or proceeds from illegal narcotics purchase

14   their tickets on the train.

15   Q.   So it was, in sum, the large amount of cash shortly before

16   the take off of the train for a one-way ticket?

17   A.   Yes, sir.  And, also, I forgot to mention that it didn't

18   list -- it listed -- did not list a contact telephone number for

19   the passengers.  When you purchase a ticket, you leave a number or

20   they ask for a number for various reasons, such as the train's

21   late, the train has been canceled, or just delayed due to

22   mechanical issues or whatever issues.  So this reservation did not

23   list a contact telephone number.

24   Q.   Did you preserve a copy of that PNR?

25   A.   Yes, sir, I did.

1    Q.   I want to show you on the screen in front of you what has

2    been marked as Government Exhibit 8-1.   What is this in front of

3    you?

4    A.   This is what I referred to as the PNR or the reservation that

5    I described earlier, has various information that I spoke about

6    earlier.

7    Q.   So if you would, can you please walk us through this?   I want

8    to ask you a few things here.   So you mentioned a price.   Where is

9    the price listed on this particular document?

10   A.   Well, it's listed in two different locations, but if you look

11   at the top right, it has 1275.00 with a slash, that stands for

12   $1,275.

13   Q.   That would be where I just circled, is what you're talking

14   about?

15   A.   Yes, sir.

16   Q.   Okay.   And how do you know who are the passengers on this

17   particular date?

18   A.   If you look at the top left, couple lines down, it lists

19   three different passengers.   The first one is first name.   It

20   lists last name first, which is Guzman-Garcia, would generally be

21   the first name of the passenger.   And then below that is an

22   infant, Ferardo-Cebreros, Santiago.   So it's Santiago

23   Ferardo-Cebreros.   And then underneath of that is another

24   passenger, Maria Cebreros-Lopez.   So it will be two adults

25   traveling with an infant.

1  Q.   And just to be clear, you are referring to the top left-hand

2  corner that I just circled?

3  A.   Yes, sir.

4  Q.   Now, where does it say where these people are going to on the

5  ticket, and coming from?

6  A.   If you look right at the bottom of that last circle you made,

7  it has LAX-CHI.  That origination point -- LAX is the origination

8  point of Los Angeles, California.

9  Q.   So right there where I just circled?

10  A.   Yes, sir.  The LAX stands for where they originated from.

11  Q.   And it looks like, below that, what are the two -- are those

12  the two legs of travel, I should say?

13  A.   Yes.  It has two different segments, which is Train No. 4,

14  the train that comes to Albuquerque.  It only runs from Los

15  Angeles, and its destination point is Chicago.  If you go beyond

16  that, you have to change trains.

17       So if you look down, a couple lines down, it has CHI, which

18  stands for Chicago, and has a dash, PGH, which stands for

19  Pittsburgh, and then below that, has PGH-PHL, which stands for

20  Philadelphia.  So basically the origination is Los Angeles,

21  California, and the final destination is Philadelphia,

22  Pennsylvania.

23  Q.   So you would start up here and work your way down

24  effectively?

25  A.   Yes, sir.

1    Q.   How do you know this was purchased in cash?

2    A.   If you look down -- do you want me to touch the screen?

3    Q.   Sure.  By all means.

4    A.   Makes it easier.  It shows the CA right here (indicating).

5    All these CA stands for cash.

6    Q.   And does this portion of the ticket show what time the ticket

7    was purchased?

8    A.   This portion doesn't.  There's another portion I was

9    referring to as the history.  It's a two part.  This one is

10   referred to as the reservation.  Then we have another part that's

11   referred to as the history of that reservation.  That will show

12   the purchase time, but this one does not.

13   Q.   So I want to get to that in just a second.  I forgot to ask

14   you one thing.  Does this indicate any contact information for the

15   individual?

16   A.   No.  Down here where it has -- I just circled, where it says

17   "none," that's where the telephone number would be listed.  But

18   this doesn't have a telephone number listed.

19   Q.   So you mentioned that can indicate to you that the person who

20   purchased the ticket may have contraband.  What about that

21   indicates to you that this person may have contraband?

22            MS. JOHNSON:  Objection; calls for speculation.

23            MR. PFIZENMAYER:  I'll rephrase, Your Honor.

24            THE COURT.  Go ahead.

25   Q.   (By Mr. Pfizenmayer)  Based on your training and experience

1    in the DEA, having encountered similar situations, what about this

2    gave you some sort of suspicion that this person may be carrying

3    contraband?

4    A.   Are you speaking about the one factor of the no telephone

5    number or all the --

6    Q.   Correct, just the no telephone number.

7    A.   That is consistent, either a no contact number or a false

8    telephone number.  Of course, people that are transporting

9    contraband often don't want to leave a contact telephone number.

10   Q.   Similarly, with the $1275, what about that particular number

11   indicated to you that this is -- raised your suspicions, I should

12   say?

13   A.   Without even looking at the history, that's a large amount of

14   money to pay for a one-way ticket across the country.  And you

15   could actually have flown cheaper than that price at the last

16   minute.  So that amount is indicative of a last-minute ticket,

17   which is also the way people transporting illegal narcotics will

18   often purchase their tickets.

19   Q.   So now I want to take you to Government Exhibit 8-2.  So you

20   said this is the history.

21   A.   Yes.  This is the second part of the PNR that I referred to

22   as the history of the ticket.

23   Q.   So what is the difference between the history and the

24   reservation?

25   A.   Basically, it's in two different sheets, but it's basically

1   the same PNR, the same reservation.  It's just listed in two

2   different segments.  It's all under -- I'm sure in the computer

3   for Amtrak, it's probably listed all under one thing, but when

4   it's printed out, it goes in two sheets.

5   Q.   Now, does this show when the ticket was purchased?

6   A.   Yes, it does.

7   Q.   And where does it show that?

8   A.   Down here where you see the word "purchase" and "printed" and

9   then it has the time.  It shows ticket receipt printed-purchased.

10  And then below that, it has 5:31 p.m., 12 March, LAX stands for

11  the Los Angeles Amtrak train station.  LAX stands for -- basically

12  is for the ticket counter.  In other words, this ticket was --

13  someone walked up to the ticket counter.  It wasn't reserved ahead

14  of time over the phone, on the Internet.  They walked up to the

15  ticket counter and paid for that ticket at 5:31 p.m.

16  Q.   So did they make the reservation at 5:31, or had they make

17  that online prior to this particular moment?

18  A.   No.  If you look at the top, up here at the top, this is the

19  first time, which is basically the same time the ticket was

20  purchased, that they walked up to the ticket counter.  It wasn't

21  purchased or called on ahead of time or online.  They walked up to

22  the ticket counter and purchased the ticket.  That's the very

23  first time that they had contact with Amtrak concerning this

24  reservation.

25  Q.   The first part here is kind of like a query to see the price

1    and the whole trip logistics.  And then the second part down here,

2    basically in the same minute, at 5:31 p.m., they put down $1275 in

3    cash?

4    A.   Yes.  Those times can fluctuate by a couple minutes, because

5    they ask -- you can ask about the ticket prices and where you're

6    going and maybe a different route.  But this time is actually the

7    same 5:31.  So they ask -- it looks like they asked some questions

8    about that travel and the price, and then it was purchased,

9    basically, at the exact same time.

10   Q.   Does this document say when the train was supposed to leave

11   LAX?

12   A.   Yes.  I don't know how to clear all that mess.

13        If you look here, Train No. 4, which is this train, is

14   scheduled to leave Los Angeles, California.  It has LAX-CHI, which

15   stands for Chicago.  At the very next -- over to the right, it has

16   6:00P, Tuesday, 12 March.  That stands for 6:00 p.m., Tuesday, 12

17   March.  So the train is scheduled to depart Los Angeles at 6:00

18   p.m.

19   Q.   So when you say there was approximately 29 minutes before

20   departure when he purchased this ticket, that is based on the 5:31

21   p.m. right here, and the scheduled departure of 6:00 p.m. right

22   there?

23   A.   Yes, sir.

24   Q.   Okay.  Now, on to -- change pace a little bit.  So eventually

25   you go to the Amtrak station to talk to this individual, right?

1  A.   Yes.  Actually, there will be two individuals and an infant,

2  yes, to speak with all of them.

3  Q.   And who is -- during the encounter, who is there with you?

4  A.   Task Force Officer Rey Zamarron boarded the train with me.

5  Two other individuals were on the platform and did not board the

6  train.  They work in our office.

7  Q.   So there are four individuals, but only you and Task Force

8  Officer Zamarron actually entered onto the train?

9  A.   Yes.

10 Q.   Okay.  And how were you two dressed on that date?

11 A.   I don't remember exactly what I was wearing.  From the

12 photographs, I think I was wearing a hoodie.  But wearing plain

13 clothes, probably jeans and a normal shirt, and it looks like I

14 was wearing a hoodie on that date.

15 Q.   Casual attire?

16 A.   Yes, sir.

17 Q.   Was Task Force Officer Zamarron dressed similarly?

18 A.   Yes, sir.

19 Q.   Did you both have firearms on your persons?

20 A.   Yes, we did.

21 Q.   How were those carried?

22 A.   Mine was concealed on my right side, attached to my belt

23 underneath of my shirt and underneath of a hoodie that I was

24 wearing, it was concealed.  I --

25 Q.   Sorry.

1    A.    I'm not exactly sure where Task Force Officer Zamarron

2    carries his weapon, but it was concealed.  It wasn't displayed.

3    Q.    You couldn't see his and yours was not visible either?

4    A.    Correct.

5    Q.    Did you ever, at any point in time on this date, display your

6    weapon?

7    A.    No, I did not.

8    Q.    How tall are you?

9    A.    5'8".

10   Q.    And not to pry too much, but how much do you weigh?

11   A.    That date, I think I weighed about 215.  I've probably gained

12   a little bit of weight since then.

13   Q.    Fair enough.  So now can you explain to the Court, sort of,

14   the general layout of one of these train cars, for some

15   perspective?

16   A.    Well, there's different cars.  There's numerous different

17   cars.  There's -- this reservation was for a sleeper car.  I don't

18   know if we reviewed that earlier, but he was -- I say "he," the

19   defendant and the other passenger and the infant was scheduled to

20   be traveling in sleeper car 431, bedroom No. 9.  There are coach

21   cars also that are laid out a little bit different.

22   Q.    For purposes of this hearing, can you describe the layout of

23   the car that you encountered the defendant on, on that date?

24   A.    Yes, sir.  It was a sleeper car, generally in the front

25   section of the train.  It has an exit or entrance door in the

1  middle of that car.  It's two levels.  When you board that

2  entrance and exit door, which the passengers have to do to board

3  the train, unless you board another car -- all the cars are

4  adjoining.  They have sliding doors that adjoin each car.

5      So when you walk on the entrance and exit door, you turn to

6  the right or the left.  There's a stairway in the middle of that

7  car that goes up to the second level.  There's bedrooms on the

8  first left.  Also, there's restrooms on the first level and a

9  shower.  When you go up the steps, that's where most of the

10 bedrooms are located for passengers to travel.

11     And there's a hallway that goes down the center of one side

12 of that car, and the other side, the bedrooms are larger, so that

13 the hallway is on the actual -- against the windows of one side of

14 that car.  But that section that Mr. Everado was traveling in had

15 a hallway in the middle and bedrooms on each side.

16 Q.  So I'm going to show you this fairly crude drawing, just sort

17 of try and capture what you just described to the Court.  If this

18 is just the top floor of the train, would it be accurate to say

19 that this right here is the stairwell in the middle of the train

20 that goes down to the first floor?

21 A.  Yes, sir.

22 Q.  And this would be the hallway?

23 A.  Yes, sir.

24 Q.  And there are doors at both ends of the hallway such that

25 they can get to adjacent cars?

1  A.   Yes, sir.  There's two sliding doors for this car and the
2  next -- there's a little walkway in between, and another sliding
3  door.
4  Q.   That's actually on both levels of the train, is that correct,
5  the doors to the adjacent cars?
6  A.   No, just on the second level.
7  Q.   So these are the only ways to get to adjacent trains?
8  A.   Yes, unless you go outside and board that specific car, yes.
9  Q.   And then there are rooms lining the hallway such like these
10  two right there.  These blue boxes, would those accurately
11  generally --
12  A.   Yes.  There's rooms on each side of those hallways.  That
13  blue box would be accurate of a sleeper room, yes.
14  Q.   So, now, on that specific date, where was -- in that specific
15  car, generally speaking, on the second floor, where was the
16  defendant's room?
17  A.   He was in bedroom No. 9, which is down at the end of the -- I
18  refer to it as the end of the train.  All the odd number rooms are
19  on one side, and all the even number rooms are on another side.
20  So this car that I touched here, or bedroom, that would be
21  representative of bedroom No. 9, and the one across the hallway
22  over here, would be bedroom No. 10.  And then there's other cars
23  or other sleeper rooms as you go down each of the hallway.
24  Q.   So the defendant was in the top blue box, and then was there
25  a room directly across the hall in the second box?

1  A.   Yes.  That would be bedroom No. 10.

2  Q.   And were there any occupants in that room?

3  A.   No.  That room was empty on that date.

4  Q.   So when you approached that room, did you end up starting to

5  speak with the occupants of the room?

6  A.   Yes, sir, I did.

7  Q.   Who was in the room?

8  A.   There were a total of three people.  Mr. Garcia-Guzman and

9  then a female was traveling with him who had an infant sitting on

10  her lap.  So total of two adults and a small child in the room.

11  Q.   Now, did you enter the room?

12  A.   Well, later on I did, but not initially, no.

13  Q.   Just initially, you didn't enter the room?

14  A.   No, sir.

15  Q.   Was the door open or closed?

16  A.   The sliding door was open.  There's a curtain, sliding

17  curtain, that's inside of that sliding door, and it was open a

18  little bit.  It was almost all the way shut.

19  Q.   So it's like a hard door, and then a soft curtain type door

20  behind that?

21  A.   Yes.

22  Q.   And the hard door was open and the curtain door was partially

23  opened?

24  A.   Yes.

25  Q.   And when you walked up and you began to talk with them, can

1  you describe to us where you were standing relative to that
2  opening?
3  A.   If you're looking at the doorway, which the doorway would
4  be -- I'll look at this as a doorway.  I was standing in the
5  hallway -- the doorway covers basically almost all the whole car,
6  but I was standing to the left of it in the hallway here, looking
7  through the doorway.
8  Q.   Were you blocking their ability to walk in or out of that
9  doorway?
10 A.   No.  I was not and I did that on purpose.
11 Q.   And with regard to the actual hallway itself, how wide would
12 you describe the hallway?
13 A.   I don't know the exact dimensions.  It's --
14 Q.   Relative to yourself, as far as -- can more than one person
15 walk down the hallway at the same time next to each other, or do
16 you have to go in line?
17 A.   I'd say one person could, but not side by side.  When you
18 meet someone, you'll have to turn your body sideways.  You can
19 pass in the hallway, but two people can't walk side by side.  So
20 if you meet someone, you have to turn, kind of, sideways to pass
21 them.
22 Q.   And throughout this encounter, were there other people on the
23 train?
24 A.   Yes, there were.
25 Q.   And did you have to move out of the way at points in time

```
 1   because these other people were trying to make their way through?
 2   A.   Yes.
 3   Q.   So I want to talk to you -- I'm going to, sort of, frame the
 4   next period of time I want to talk to you about.  So, eventually,
 5   you're going to have Special Agent Zamarron -- I'm sorry, Task
 6   Force Officer Zamarron come over and help you translate.
 7   A.   Yes, I did.
 8   Q.   Prior to that -- and if you would help by indicating on the
 9   diagram -- where was he?
10   A.   I don't know his exact position.  I know when I looked at him
11   and waved him to come up, he was standing in the hallway down here
12   in this area somewhere close by the steps area.  But I don't know
13   exactly where he was at, but when I -- I was concentrating on
14   speaking with the passengers.  When I waved him down, he was down
15   the hallway.
16   Q.   And from your vantage point in the hallway, would it have
17   been possible for the defendant or the other two occupants of that
18   room to be able to see Special Agent Zamarron down the hallway
19   down there.
20          MS. JOHNSON:  Objection; calls for speculation.
21          THE COURT:  Could you establish your foundation in terms
22   of where the other individuals were at the time that you're asking
23   your question.
24          MR. PFIZENMAYER:  Yes, Your Honor.
25   Q.   (By Mr. Pfizenmayer)  So when Special Agent Zamarron was down
```

1    the hallway, the defendant, the infant and his -- I believe you

2    said stepdaughter.

3    A.   I don't think I said that, but it was -- I believe it was his

4    stepdaughter.

5    Q.   His stepdaughter was in the room, correct?

6    A.   Yes.  They were seated inside of the room.  Mr. -- if you're

7    looking at the room, Mr. Garcia Guzman was seated on the left-hand

8    side, and then Ms. Cebreros-Lopez was sitting on the right-side

9    with the infant on her lap.

10   Q.   So the defendant was over there, and then his stepdaughter

11   was on the right-hand side?

12   A.   That's correct.

13   Q.   And you're standing, if the doorway's here, kind of over

14   here?

15   A.   Correct.

16   Q.   Now, from your vantage point right there, was Special Agent

17   Zamarron readily apparent to any of the individuals inside of the

18   room?

19   A.   No.  I was facing angled.  I couldn't see him unless I turned

20   around and looked either.  So, no, it wouldn't be possible from

21   where they were sitting to see Task Force Officer Zamarron.

22   Q.   So before he shows up and eventually helps you translate, can

23   you describe to us what occurs in your conversation with the

24   defendant and his stepdaughter?

25   A.   Yes.  I greeted them, showed them my bad badge, my DEA badge,

1    which I carry in my left rear pocket, asked them how they were

2    doing, greeted them in English.  They really didn't respond.  So

3    Ms. Cebreros said Chicago, which was odd because I didn't ask them

4    where they were going.  So I asked them if they spoke English, and

5    she said a little bit.  So in the Spanish language -- I displayed

6    my badge again, in Spanish, identified myself as a police officer

7    and asked for permission to speak with them.  And I did get

8    permission to speak with them.

9         Then I asked various questions about their travel, where they

10   were going to, where they were coming from, various questions

11   about their tickets, identification, where they lived, those type

12   of questions.

13   Q.   Did you ask them if they had any bags?

14   A.   I subsequently did ask if they had any luggage.  They stated

15   they had two bags below.  Earlier I forgot to describe the area

16   that's on the first car when you first board, when you turn right

17   or left, they have an area called the common luggage area --

18             MS. JOHNSON:  Objection; non-responsive.

19             MR. PFIZENMAYER:  We'll get to that in a little bit.

20             THE COURT:  Sustained.

21   Q.   (By Mr. Pfizenmayer)  In regard to just the bags in general,

22   what did they say about having bags?

23   A.   They said they had two bags below.

24   Q.   Okay.  Did they have any bags in the room?

25   A.   Yes.  Ms. Cebreros had -- what I refer to as a diaper bag or

1   an infant's bag, and then Mr. Garcia-Guzman had a backpack or

2   little satchel with him.

3   Q.   And did you ask for permission to search those bags?

4   A.   Yes, I did.

5   Q.   And that's both the bags downstairs and the ones in the

6   room?

7   A.   Yes, that's correct.

8   Q.   Did you search them immediately?

9   A.   The bags downstairs, no, but later on, I searched the bags

10  inside of the bedroom.

11  Q.   Just before they gave consent to search all of those bags at

12  that time, during that portion of the audio?

13         MS. JOHNSON:  Your Honor, I'm going to object.

14  Counsel's been leading the witness quite a bit.  I would object to

15  the leading.

16         THE COURT:  If you could refrain from doing so.

17         MR. PFIZENMAYER:  Yes, Your Honor.

18  Q.   (By Mr. Pfizenmayer)  Did the defendants consent to searching

19  the bags in the room?

20  A.   Yes, they did.

21  Q.   Did the defendants consent to a search of the bags

22  downstairs?

23  A.   Yes, they did.

24  Q.   So you said you identified yourself --

25         THE COURT:  Excuse me, you are asking about defendants,

1    plural?

2              MR. PFIZENMAYER:  I'm sorry, Your Honor.  Defendant and

3    his stepdaughter.

4              THE COURT:  Okay.

5              MR. PFIZENMAYER:  I apologize.

6    Q.   (By Mr. Pfizenmayer)  So I've got up on the screen what is

7    Defendant's Exhibit Alpha.  This is the transcript.  You've seen a

8    copy of this before, correct?

9    A.   Yes, sir.

10   Q.   And you've had an opportunity to review it?

11   A.   Yes, sir, I have.

12   Q.   So you mentioned in your testimony that you identified

13   yourself as a police officer.  Is that what you're referring to in

14   paragraph or line No. 9 of this transcript?

15   A.   Yes, sir.

16   Q.   And with regard to asking permission to speak with the

17   defendant, is that also on this particular page of the transcript?

18   A.   Yes, on line No. 11.

19   Q.   And for clarification of the record, this is page 2 of 13,

20   Defense Exhibit Alpha.  So line 9 was up here, and then with

21   regard to permission, will you circle where you asked for

22   permission to speak with them?

23   A.   On line No. 11.

24   Q.   And he gave you permission based on this transcript?

25   A.   Yes.  The next response is "yes" on No. 12.

1   Q.   Now, you also mentioned asking about luggage.  On this

2   transcript here, directing your attention to line 65, is that

3   where you begin to ask him about luggage?

4   A.   Yes, on 65, yes, sir.

5   Q.   And do you see anywhere on this page, which is page 4 of 13

6   of the transcript, where you ask him for permission to search his

7   bag?

8   A.   Yes, on line 75.

9   Q.   And what do you specifically ask him for permission to search

10  for?

11  A.   For contraband.

12  Q.   So I want to direct your attention to -- and this is page 5

13  of the transcript, line 77.  You ask him to search his bag for

14  contraband.  This is the second time in a relatively close period

15  of time.  What's the difference between those two asks, as you

16  recall it?

17  A.   The first time was for the bags down below, the two

18  suitcases, and this is for the bag that he had with him inside of

19  his bedroom.

20  Q.   And did he provide consent to search that bag based on the

21  transcript?

22  A.   Yes, he did.

23  Q.   And that's right below?

24  A.   On 78, yes, sir.

25           THE COURT:  Can you show me where?  I thought Cebreros

1    is his stepdaughter.

2              MR. PFIZENMAYER:  Oh, I'm sorry, Your Honor.

3              THE COURT:  Where does it say that Mr. Garcia-Guzman

4    says yes?

5              MR. PFIZENMAYER:  That does not occur here, I guess,

6    then.

7              MS. JOHNSON:  It does not, Your Honor, not at this

8    point.  Only Ms. Cebreros responded.

9    Q.   (By Mr. Pfizenmayer)  So this is approximately when Special

10   Agent -- or, sorry, TFO Zamarron, you ask him to come over.  How

11   do you do that?

12   A.   I motion for him with my left hand to -- motion for him to

13   come over to my area.

14   Q.   And why do you do that?

15   A.   Because Mr. Garcia-Guzman had shown me some paperwork in

16   Philadelphia, and I couldn't understand the paperwork, and he

17   was trying -- I could understand a little bit.  It was something

18   about trucks or semitrucks.  I just wanted to -- I couldn't

19   understand what he was saying about the purpose of their trip to

20   Philadelphia.  So I knew that Task Force Officer Zamarron was

21   fluent in Spanish, and I wanted him to assist me and translate and

22   ask questions for me about that.

23   Q.   Would you describe your basic fluency in Spanish?

24   A.   I'm not fluent.  I could ask specific questions for what I do

25   in interdiction, but I'm not fluent by any means.

```
1   Q.   And at the point TFO Zamarron comes over, had you searched
2   any of the bags?
3   A.   Yeah.  I believe I had already searched Ms. Cebreros' -- the
4   diaper bag or infant bag.  I'm not sure if I actually searched
5   Mr. Guzman's bag at that time.  I'm not exactly sure.
6   Q.   Did you go in the room to do that?
7   A.   No, they handed them to me.  I didn't go in the room at that
8   time.
9   Q.   So when Special Agent Zamarron comes over, can you show us a
10  rough approximation of where you were standing and where he was
11  standing when you began talking with these individuals?
12  A.   Yes.  I was standing here approximately in this area, and
13  then when Task Force Officer Zamarron walked up, I moved back over
14  to this area, and he stood where I was standing.  And I asked him
15  questions to translate to them.
16           THE COURT:  I'm sorry, it's not showing.  You'll need to
17  press a little harder, please.
18           THE WITNESS:  (Witness indicates.)
19           THE COURT:  So which is you?
20           THE WITNESS:  I moved from this area over here, over to
21  here, and Task Force Officer Zamarron was standing in this area
22  here, where I was originally standing.
23           THE COURT:  Okay.  And you searched both bags in the
24  hallway?  Is that what you're saying?
25           THE WITNESS:  The first bag I searched, the infant
```

1   diaper bag, prior to him showing up.  Yes, I searched them in the

2   hallway.

3           THE COURT:  Okay.

4   Q.   (By Mr. Pfizenmayer)  And when Special Agent Zamarron shows

5   up and he's positioned there, he's primarily serving as an

6   interpreter?

7   A.   Yes.

8   Q.   And are you in the room, in the hallway?  Are you blocking

9   the hallway?  How is your positioning relative to the flow of

10  traffic?

11  A.   I'm in the hallway.  This bedroom behind me has a doorway.

12  I'm partially standing in that -- basically kind of standing in

13  that doorway of the room, partially in the hallway and partially

14  in that bedroom.

15  Q.   Did you ever ask for permission to search the room?

16  A.   Yes, sir.

17  Q.   And were you provided permission to search the room?

18  A.   Yes, sir.

19  Q.   Can you describe how you went about searching the room, where

20  you and Task Force Officer Zamarron were positioned?

21  A.   All the people in the bedroom stepped out of the bedroom,

22  Mr. Guzman and his stepdaughter and she had the child with her.

23  They stepped out.  And then I entered -- I don't know exactly

24  where they stood.  I was searching the bedroom, but they were out

25  in the hallway.  They may have went in that bedroom across.  I'm

1    exactly not sure.  But I entered the bedroom by myself when I

2    received permission to enter the bedroom and search it.

3    Q.   And Task Force Officer Zamarron did not go into the room with

4    you?

5    A.   He did not.

6             MS. JOHNSON:  Objection, Your Honor; leading.

7             THE COURT:  I've already asked you not to lead, please.

8             THE COURT:  Yes, Your Honor.

9    Q.   (By Mr. Pfizenmayer)  Did Task Force Officer Zamarron go into

10   the room with you?

11   A.   He did not.

12            THE COURT:  You could have said, "Where was he at the

13   time?"  Please watch your form of the questions.  This part of the

14   questioning is the most important part for the Court's ruling.  So

15   please ask open-ended questions.

16            MR. PFIZENMAYER:  Yes, Your Honor.

17   Q.   (By Mr. Pfizenmayer)  So I forgot to ask this earlier.  When

18   you searched the individual bags that were in the room, did you

19   find any contraband?

20   A.   No, sir.

21   Q.   What contraband did you find when you searched the room?

22   A.   None.

23            THE COURT:  I don't think he said he searched them in

24   the room.

25            MR. PFIZENMAYER:  Sorry, Your Honor.  I asked what

1  contraband he found when he searched the actual room itself.

2              THE COURT:  No, you said when you searched the

3  individual bags in the room.  I don't think he searched the bags

4  in the room.  I thought he said he searched them in the hallway.

5              MR. PFIZENMAYER:  I'll rephrase.

6  Q.   (By Mr. Pfizenmayer)  When the bags that were in the room and

7  they handed to them to you, there was no contraband in those bags,

8  right?

9  A.   That's correct.

10 Q.   And then what contraband, when you actually went into the

11 room to search, did you find?

12 A.   There was no contraband inside of the room either.

13 Q.   So I have up on the screen now Defendant's Exhibit Alpha

14 again, page 7.  And so I want to ask you about lines 135 to

15 approximately 145 here.  I just want to give you a brief second to

16 review that.

17 A.   Yes, sir, I've read it.

18 Q.   So based on this transcript, can you -- and in your

19 recollection of the events, what occurred when you asked them for

20 permission to search the room?

21 A.   I asked permission to search the room for contraband, and

22 then asked permission to enter the room to conduct that search.

23 They stepped out and I went in the bedroom and searched it.

24 Q.   Did you have to ask them to leave the room?

25 A.   I don't believe I asked them to leave the room.  They stood

1    up and walked out.  I don't remember asking them to do that.

2    Q.   Did it appear to you they understood what was being asked of

3    them?

4              MS. JOHNSON:  Objection; calls for speculation.

5              THE COURT:  Sustained.

6    Q.   (By Mr. Pfizenmayer)  Did they --

7              MR. PFIZENMAYER:  Your Honor, I apologize, we appear to

8    be having some technical difficulties.  It's just the same stuff.

9    It dropped off the connection.

10   **(Equipment issues.)**

11             MR. PFIZENMAYER:  We are back up.

12   Q.   (By Mr. Pfizenmayer)  So when you asked for -- to just take a

13   step back and provide context because of that brief interlude --

14   actually, I'm just going to move on.

15        So you didn't find any contraband in the room.  What did you

16   start talking about next?

17   A.   To show me the bags that they had downstairs.

18   Q.   And what did you say in response to that request?

19   A.   I don't know if there was a response, but I know from

20   recollection, without reading the transcript, Mr. Garcia-Guzman

21   stood up and walked downstairs and showed me their two bags.  And

22   I asked questions about, also, if the two bags were together or if

23   one belonged to Ms. Cebreros or one belonged to him, and they

24   clarified they had one each.  And both gave permission to search

25   them.

1   Q.   So I want to draw your attention to line 160 of the

2   transcript, and this is on page 8.  Is that you asking -- it's a

3   little bit unclear from the transcript what you're asking for

4   permission to search there.  What was that in reference to based

5   on the context at that time?

6   A.   I'm speaking to Task Force Officer Zamarron, asking him to

7   ask Mr. Garcia-Guzman and Ms. Cebreros -- to ask both of them

8   permission to search the two bags downstairs.

9   Q.   So the "them" doesn't refer to them as a person but it refers

10  to the bags downstairs?

11  A.   Correct, search two bags downstairs.

12  Q.   What is their response through TFO Zamarron?

13  A.   Mr. Everado Garcia-Guzman says yes, and I believe Ms.

14  Cebreros also said yes.

15  Q.   And it's at that point in time, you said you go down to the

16  first floor to look at the luggage?

17  A.   That's correct.

18  Q.   Who goes with you?

19  A.   Mr. Garcia-Guzman was in front, I was behind him and then

20  Task Force Officer Zamarron also went downstairs.

21  Q.   Can you give us a brief description of the layout of that

22  first floor of that car?

23  A.   When you come on the train, you enter, it has a little

24  hallway and you can go right or left.  It's a similar hallway

25  that's upstairs.  One side has bathrooms, and then the other side

1   has the stairway.  And on the other side of the stairway is what
2   we refer to as the common luggage area, where you can store your
3   luggage you carry it on the train.
4   Q.   And how is the luggage storage section set up?
5   A.   It has shelves, like two shelves on it.  The bottom floor,
6   you can put your luggage on the floor or on the first shelf or on
7   the second shelf.  You can just store your luggage there.
8   Q.   What happens when the three of you got down to that first
9   floor?
10  A.   Mr. Garcia-Guzman identified their two forms of luggage.  I
11  searched them, no type of contraband.  There was clothing and
12  items inside.
13       I asked if he had any checked luggage -- or I asked -- Task
14  Force Officer Zamarron was asking Mr. Garcia-Guzman, he was
15  translating for me.  And he, Mr. Garcia, stated that his bags had
16  already been checked with a dog in Los Angeles, which I thought to
17  be odd.
18  Q.   So with regard to his bags being checked in Los Angeles, can
19  you describe more of what he said occurred there?
20  A.   He said they had been -- I believe he said they had been
21  searched, and they also had a dog in Los Angeles.
22  Q.   And drawing your attention to lines 203 to approximately 215
23  of this transcript.  It goes from page 9 to page 10.  Is this the
24  portion of the conversation where you just describe where you're
25  talking about his encounter with law enforcement in LA?

1  A.   Yes, sir, that's correct.

2  Q.   And I want to direct your attention to line 229 on -- sorry,

3  225 on page 10 of the exhibit.  What are you asking him through

4  Rey there?

5  A.   At line 225?  Is that what you said, sir?

6  Q.   Yes.

7  A.   I asked Rey, Task Force Officer Zamarron, to ask him if I can

8  he see his ticket one more time, please.

9  Q.   Why did you ask him that?

10 A.   Because I wanted to make sure that he didn't have any

11 checked-in luggage.  When you check your luggage on your ticket,

12 they staple your luggage claim check tickets to your actual ticket

13 folder with your tickets, and I didn't see any earlier when I

14 looked at his tickets.  So I wanted to confirm that he didn't have

15 any checked-in luggage, which wouldn't be the luggage that was

16 downstairs.  It would be on a checked-in car in the front of the

17 train.  So I wanted to see his tickets to see if there was any

18 checked-in luggage, to make sure he didn't have any other luggage

19 with him.

20 Q.   You asked him to see his tickets again.  What did he say in

21 response?

22 A.   I believe he said they were upstairs.

23 Q.   So what did you -- the three of you do in response to him

24 saying that?

25 A.   Asked him if he could show them to me, and then we went back

```
1   upstairs.  Mr. Garcia-Guzman led the way, went upstairs, followed
2   by myself and Task Force Officer Zamarron.  And we walked back up
3   to his room, and then Mr. Garcia-Guzman entered the bedroom.
4   Q.   Back up on the second floor, again using the diagram, as he's
5   showing you his tickets, can you give us the relative placement of
6   you, him and Task Force Officer Zamarron?
7   A.   He entered the -- I say "he."  Mr. Garcia-Guzman entered the
8   bedroom, and he went inside.  And this is the seating area.  He
9   had his backpack -- or it was like a satchel or a backpack, where
10  he originally had his tickets the first time.  He went inside and
11  he retrieved his tickets from that backpack.  He was inside the
12  bedroom.  I was standing over here in the position where I was
13  earlier, and Task Force Officer Zamarron was standing here.
14  Q.   And after you -- did you give him back his ticket?
15  A.   He did -- he exited the bedroom, came out and handed them to
16  me.  I looked at them and then gave them back to him, yes.
17  Q.   What did you do next?
18  A.   I asked him for permission to search his person for
19  contraband.  I asked Mr. Garcia-Guzman that question.
20  Q.   And that would have been through Special Agent Zamarron?
21  A.   I believe I asked that question.
22            MS. JOHNSON:  Objection; leading.
23            THE COURT:  Sustained.
24  Q.   (By Mr. Pfizenmayer)  I want to, sort of, take you back and
25  then bring you right back up to this point.  So when you first
```

1    encountered the defendant prior to Special Agent -- or Task Force

2    Officer Zamarron coming up to assist with translation and you

3    observed him, did you notice anything unusual about his behavior

4    that struck you that might be indicative that he's concealing

5    contraband?

6    A.    No, none whatsoever.

7    Q.    And when Task Force Officer Zamarron shows up, and up until

8    the point where you go downstairs, what, if anything, did you

9    notice about his behavior?

10   A.    Nothing.

11   Q.    And when you are downstairs checking the luggage, what, if

12   anything, did you notice about his behavior?

13   A.    Nothing.  It was normal.

14   Q.    And when he's handing you his ticket, during that time frame,

15   up on the second floor, what, if anything, did you notice about

16   his behavior?

17   A.    When he was handing me his ticket, nothing.

18   Q.    And then you asked to search him, correct?

19   A.    That's correct.

20   Q.    What was his response?

21   A.    He did give a verbal answer of yes.

22   Q.    Did he indicate not verbally in any way?

23   A.    Yes.  He turned away from me and he raised his hands above

24   his shoulders.

25   Q.    And what did that posture resemble to you?

1   A.   A posture of someone raising their hands for me to search

2   them, giving me permission to search him.

3   Q.   And did you then begin to pat him down?

4   A.   Yes, I did.

5   Q.   Can you describe his behavior while you were initially

6   patting him down?

7   A.   He was faced away from me facing -- I was partially in

8   bedroom No. 10 over here, and he was in the hallway.  Initially,

9   he was facing me this direction.  Then when he -- he turned around

10  and faced that direction and put his hands up.  But he was in the

11  middle of the hallway here.  Let me clear this.  He was standing

12  in the middle of this hallway here.  Maybe a little farther back

13  this way.

14  Q.   Just to make sure I understand this correctly, you're

15  partially in the room, and he's facing away from you as you pat

16  him down.  So you have to reach around him?

17  A.   Yes.  Initially, yes.

18  Q.   What is his behavior as you're doing that?

19  A.   As I'm trying to reach around the front of him and pat him

20  down, when I was doing that, he was turning his body side to side,

21  kind of when I was trying to pat the area in front of him, he was

22  moving -- kind of moving away from -- turning his body away from

23  where I was trying to pat him down in the front.

24  Q.   When you say "pat him down in the front," where specifically

25  were you trying to pat?

1    A.   Around his waist area, lower waist.

2    Q.   And why do you typically pat in that area?

3    A.   That's an area where you can conceal any type of contraband,

4    illegal narcotics or weapons.  So, basically, I search the entire

5    body.  But, initially, I start there -- that's the area I

6    generally start at is the front lower waist area.

7    Q.   Now, in response to that, what did you ask him to do?

8    A.   To unzip his jacket, so I could get a better -- he had,

9    like -- I referred to it like a fishing vest.  It was -- had it

10   on, and it was zipped all the way up, to unzip it so I could get a

11   better feel of what he had on his person.

12   Q.   Did you notice any change in behavior at that point in

13   time?

14   A.   Yes, a drastic change of behavior.

15   Q.   What did you notice?

16   A.   When he was unzipping his jacket, his hand was visibly

17   shaking.  He tried to zip his jacket very quickly, and his hand --

18   it was, like, caught.  The zipper was caught.  It wouldn't zip

19   very fast.  His hand was visibly shaking.

20   Q.   And did you complete the pat down after he unzipped his

21   jacket?

22   A.   Yes.

23   Q.   What did you find in the pat down?

24   A.   In his belt-waist-pants area, like where it met, where the

25   pants were zipped, I felt a hard bundle that was partially top of

1  his pants area, and it protruded down into the inside of his

2  pants.

3  Q.   What did you believe that bundle to be at that time?

4  A.   I believed, from my experience, immediately, that it was

5  bundles of illegal narcotics.

6  Q.   Why is that?

7  A.   Because of the way it felt, the size, the concealment method,

8  and, also, the numerous other passengers that I've patted down in

9  the past that had bundles of illegal narcotics concealed on their

10 person on the train and on the bus.

11 Q.   So I'm going to play a section of audio here for you from

12 your audio recording.  And you've reviewed that prior to coming

13 here today, right?

14 A.   Yes, sir.

15 Q.   So I'm starting to play at the 10 minute and 30 second mark

16 on Government Exhibit 1.

17 **(Government's Exhibit 1 played for the Court.)**

18 Q.   (By Mr. Pfizenmayer)  So based on your recollection of the

19 events in that audio, is that the basic section of audio where the

20 pat down occurs.

21            MS. JOHNSON:  Objection; leading.

22            THE COURT:  Overruled.

23            THE WITNESS:  Yes.

24 Q.   (By Mr. Pfizenmayer)  Now, drawing your attention to Defense

25 Exhibit Alpha, line 247, what is going on starting at that line?

1  A.   I'm asking Mr. Garcia-Guzman for permission to search his
2  person for --
3  Q.   Now, there's some stuff in parentheticals that are about
4  patting sounds.  Based on your recollection, what were those
5  sounds made by?
6  A.   By my hands hitting my body to show Mr. Guzman what I wanted
7  to do to his person when I was asking that question.  I patted my
8  own body down.
9  Q.   And in response to that non-verbal pat down on yourself, what
10 did he do?
11 A.   He basically -- that's when he turned around and raised his
12 hands above his head and said yes.
13           THE COURT:  Okay.  That part's not clear to me.  If we
14 could have -- only if you remember, Agent Perry, but I need to
15 have a description of the patting.
16           MR. PFIZENMAYER:  Yes, Your Honor.
17           THE WITNESS:  Of my body, ma'am?
18           THE COURT:  Whatever it is that you did to show the
19 defendant what it is you were asking permission to do.
20           MR. PFIZENMAYER:  Your Honor, can I request permission
21 for Special Agent Perry to stand up and demonstrate?  It may be a
22 little bit more effective to stand.
23           THE COURT:  Yes.  That's what I was asking.  And then
24 you're going to need to have, for the record, a description of
25 that.

1   Q.   (By Mr. Pfizenmayer)  Special Agent Perry, now that you're

2   standing, can you please show the Court the same general motions

3   that you demonstrated to the defendant?

4   A.   Yes.  I touched my body in this manner (demonstrates).

5            THE COURT:  Okay.

6            MR. PFIZENMAYER:  So let the record reflect that Special

7   Agent Perry made a two-handed patting motion, starting towards the

8   top of his chest and working down his torso towards his

9   waistline.

10            THE WITNESS:  Correct.

11            THE COURT:  Any objections to that description?

12            MS. JOHNSON:  No, Your Honor.

13            THE COURT:  Thank you.

14   Q.   (By Mr. Pfizenmayer)  Special Agent Perry, I put on the

15   screen Government's Exhibit 2.  Do you recognize this

16   photograph?

17   A.   Yes, sir, I do.

18   Q.   What is it?

19   A.   It's a photograph of Mr. Garcia-Guzman in the processing room

20   at the DEA office.

21   Q.   So this is after his arrest?

22   A.   Yes, after he was arrested and transported back to our

23   office.

24   Q.   Now, prior to his arrest, during the encounter, does this

25   photograph, Government's Exhibit 2, accurately reflect how he was

1   dressed at the time?

2   A.   Yes, sir, it does.

3   Q.   And then drawing your attention to Government's Exhibit 3,

4   what is this picture?

5   A.   It's a photograph of Mr. Garcia-Guzman at the DEA office with

6   his jacket unzipped showing his shirt underneath untucked with

7   his -- basically his body midsection.

8   Q.   And during the encounter, is this, particularly with regard

9   to the shirt and the jacket unzipped, how he appeared at the

10  time?

11  A.   Yes, sir.

12  Q.   And drawing your attention to the screen again.  This is

13  Government Exhibit 4.  What is this a picture of?

14  A.   It's a photograph of Mr. Garcia-Guzman's waist area showing

15  his belt, his pants, with the bundle protruding on the top of his

16  pants that was stuck in his waistband.

17  Q.   Would you please circle the bundle in the picture?

18  A.   (Witness indicates.)

19  Q.   And this picture was taken post-arrest?

20  A.   Correct.

21  Q.   From the moment you arrested him until this picture was

22  taken, had you removed the drugs prior to this?

23  A.   No, we left them on his person.

24  Q.   So this is a fair and accurate representation, at the time

25  you arrested him, of where the drugs were situated?

1    A.   Yes, sir.

2    Q.   And drawing your attention to Government Exhibit 5.   Again,

3    what is this picture?

4    A.    It's another photograph of Mr. Garcia-Guzman with his pants

5    partially down, showing the bundle concealed in his lower waist

6    area.

7    Q.   And then, finally, with regard to Government Exhibit 6, what

8    is this a picture of?

9    A.    That's a photograph of the black electrical tape -- actually,

10   there's three bundles taped together that was removed from

11   Mr. Garcia-Guzman.

12   Q.   And you ended up sending these bundles out for testing at the

13   DEA laboratory; is that right?

14   A.   Yes, sir.

15   Q.   What were the results of that?

16   A.   They came back with the presence of fentanyl and

17   acetaminophen.

18   Q.   Do you recall approximately what the weight was for that

19   quantity of drugs?

20   A.   The gross weight at the office was, I believe, 900 grams

21   or .9 gross kilograms, and I believe the lab came back, I want to

22   say 770 grams.   I'm not exactly positive on that.   That's what I

23   remember.

24   Q.   And, finally, this is Government Exhibit 7, just for

25   completeness.   What is this a picture of?

1   A.   This is a photograph of Amtrak train ticket folder containing

2   tickets for Mr. Garcia-Guzman and for Maria Cebreros-Lopez.

3   Q.   And this is the one he showed you on the train?

4   A.   Yes, sir.

5        MR. PFIZENMAYER:  Your Honor, those are all the

6   questions I have at this time.  Thank you.

7        THE COURT:  Thank you.  We're going to take a short

8   recess this morning before we proceed with cross.

9   **(In recess at 10:53 a.m. until 11:08 a.m.)**

10       THE COURT:  You may proceed with cross.

11       MS. JOHNSON:  Thank you.

12                   **CROSS-EXAMINATION BY MS. JOHNSON**

13  Q.   Good morning, Agent Perry.  I'm going to hand you Defendant's

14  Exhibit A, and if you can hold onto it for reference, so when I

15  refer to it, you have it there in front of you since we'll be

16  using my laptop.

17       MS. JOHNSON:  May I approach the witness, Your Honor?

18       THE COURT:  You may.

19  Q.   (By Ms. Johnson)  Agent Perry, when you read this passenger

20  manifest and you indicated that you wanted to have a contact with

21  the passengers in room No. 9, you testified that you noticed they

22  paid $1275 for their ticket?

23  A.   Yes.

24  Q.   But that was for three tickets, right?

25  A.   I don't believe the infant was actually charged, so it will

1 be for two. If you look at the reservation, it has a 2-F code on

2 there, which will be two adults. I don't believe the infant's

3 actually charged.

4 Q. So we have 949 and 326? Does that sound right?

5 A. I think that's for the different segments, like from LA to

6 Chicago, then Chicago to Philadelphia, it's three -- one of them's

7 900 and the other is 300 and some.

8 Q. So it's 949 for two tickets from LA to Chicago? Would that

9 sound right?

10 A. I believe so, yes, ma'am.

11 Q. And do you want to reference Government's Exhibit 8?

12 A. If you would like for me to look at it, that's fine. If

13 not --

14 Q. Does that sound right though?

15 A. That does sound right, yes.

16 Q. And 326 for two tickets from Chicago to Philadelphia?

17 A. I believe that's accurate, yes, ma'am.

18 Q. So 1275 is for two people?

19 A. Two adults, yes, ma'am.

20 Q. And you don't know if Mr. Garcia is the one who purchased

21 these tickets?

22 A. I do not.

23 Q. A lot of people, in your experience, pay cash for their

24 tickets on the bus and on the train, right?

25 A. The bus and train are a little bit different. More people on

1    the bus pay cash, and I would say probably less on the train.

2    Q.   But quite a few still pay cash on the train?

3    A.   For the whole -- I don't get the whole manifest.  All I get

4    is, like, a passenger name record.  That's one itinerary for the

5    whole manifest.  I don't know about every one.  But from the ones

6    that I review, the majority do not pay with cash.

7    Q.   But you have encountered people who have paid with cash and

8    have not been transporting contraband, right?

9    A.   Yes, ma'am.

10   Q.   Now, let's go to March 13th, around 5:30 is when the train

11   arrived, right?

12   A.   It might have arrived a few minutes earlier, but around 5:30,

13   yes, ma'am.

14   Q.   And I'm going to direct your attention to Defendant's Exhibit

15   H, which is on the screen.  That is the upper portion of car No.

16   431, correct?

17   A.   I'm not exactly sure, ma'am, what car that is.  But it is a

18   hallway on the train.

19   Q.   And you'd agree with me, I'm going to show you -- let me

20   direct your attention to Defendant's Exhibit D.  This is room No.

21   9, is it not?

22   A.   I have no idea if it's room No. 9.

23   Q.   You'd agree with me that's a 9 right there?  Can you see

24   that?

25   A.   I can see it, but it --

1   Q.   Well, let me show you the photograph itself.  Let me show you

2   Defendant's Exhibit D.

3              MS. JOHNSON:  May I approach, Your Honor?

4              THE COURT:  You may.

5   Q.   (By Ms. Johnson)  That is roomette 9, is it not?

6   A.   Yes.  It does have a No. 9 on it, yes, ma'am.

7   Q.   And that is what that roomette 9 on Train 431 looks like,

8   does it not?

9   A.   There's different cars.  There's three different sleeper

10  cars.  So I don't know if this is actually 431, but it is what a

11  room looks like, yes.

12  Q.   Do you have any reason to dispute that that is not the room

13  No. 9 where Mr. Garcia-Guzman was traveling?

14  A.   I do not know.  I don't have any reason to dispute it, no.

15  Q.   And so when you approached room No. 9 -- let's go back to

16  Exhibit H.  Room No. 9 would be this room right here, right?  If

17  this is car 431, room No. 9 would be the last one on the left.

18  A.   I would say yes, ma'am.

19  Q.   And the stairs are somewhere here in the middle?  Where would

20  the stairs be?

21  A.   If you look down at the very end of that hallway where

22  there's a little brown something hanging on the bottom of the

23  wall, if you look left, that would be the stairway.

24  Q.   If you can mark on the screen, Agent Perry, please.

25  A.   This area here.  That's the end of the hallway, the stairs go

1  down to the left downstairs that way.

2  Q.   Okay.  And so you came down this hallway, right?

3  A.   Yes, ma'am.

4  Q.   And the hallway's pretty narrow?

5  A.   It's not real wide, no, ma'am.

6  Q.   And you approached and you stood -- did you testify it was to

7  the right of the room or the left?

8  A.   The left.

9  Q.   And the hard curtain was mostly closed, right?

10 A.   Actually, it's not a hard curtain.  It's basically a curtain.

11 It's soft material, kind of like the curtains in here.  But it was

12 almost all the way closed.  It was a little bit open.

13 Q.   But the actual glass door was open?

14 A.   It was all the way open, yes, ma'am.

15 Q.   And you knocked, right?

16 A.   I knocked on the metal frame.

17 Q.   And you introduced yourself as a police officer?

18 A.   Yes, ma'am.

19 Q.   And if you direct your attention to page No. 1 of Defendant's

20 Exhibit A, you said, "We check the train here."  Right?

21 A.   Yes, ma'am.  I did say that.

22 Q.   But you didn't tell Mr. Garcia-Guzman and his daughter what

23 you check the train for, right?

24 A.   No, ma'am.

25 Q.   And so when you began talking to Mr. Garcia and his daughter,

1   Officer Zamarron was standing over somewhere in this hallway here,
2   in this area, right?
3   A.    I'm not exactly sure, ma'am.  He could have been in the
4   hallway or an empty bedroom.  He was down the hallway somewhere.
5   Q.    But you could see him, right?
6   A.    Not until I waved him over.  I didn't see him where he was at
7   until I waved him over, no.
8   Q.    And you were both armed, right, carrying your firearm?
9   A.    Yes, ma'am.
10  Q.    Now, there were also two other officers working with you that
11  day, right?
12  A.    Yes.  They were at the train.  They wasn't really working
13  with me, but they were there in case we needed help.
14  Q.    And those two other officers remained -- and I'm going to
15  direct you to Defendant's Exhibit B.  This is car 431, right?
16  A.    Yes.  It does list car 431.
17  Q.    And this is Defendant's Exhibit B.  And the other officers
18  were standing, approximately, right outside train 431, right?
19  A.    I have no idea where they were standing, ma'am.
20  Q.    But you know that they were in that area -- in the area?
21  A.    I know they were off the train on the platform somewhere.  I
22  don't know where.
23  Q.    Now, let's go back to Defendant's Exhibit H.  There are --
24  there is just one way to exit this train -- or this train car,
25  excuse me, and that is through the stairs down here, right?

1  A.   No, ma'am.

2  Q.   Well, there's another door at the end over here closer to

3  roomette 9, right?

4  A.   There's a doorway -- whoever took this photograph was

5  probably standing against that door, I'm guessing.

6  Q.   So let me direct your attention to Defendant's Exhibit F.

7  That would be that door, right?  It looks like the door that would

8  connect Train No. 431 to the next train, right?

9  A.   That is a sliding door that connects the train cars, yes,

10 ma'am.

11 Q.   And assume this is the train -- or car 431, room No. 9 would

12 be about this one right here, right?

13 A.   Yes, ma'am.

14 Q.   And this door does not lead to the outside.  It leads to the

15 next train, right, or the next train car?

16 A.   It leads to the next train car that does have an exit to the

17 outside, yes, ma'am.

18 Q.   But the only way to exit the second floor of car 431 would be

19 through the stairs at the end of the hallway, right?

20 A.   No, ma'am.  You can go through this door and then go out that

21 car.

22 Q.   But my question was:  The only way to exit car 431 would be

23 going out of room 9, down the hall, and down the stairs, if you're

24 exiting through car 431?

25 A.   Yes.  Unless you went into another car, yes, ma'am.

1  Q.   Right.  But this door was closed the day that you encountered

2  Mr. Garcia-Guzman, right?

3  A.   I'm not sure.  Generally, they are closed unless there's

4  something wrong with them.  You press that little button to open

5  it.

6  Q.   And the door does indicate that there is an exit sign on it,

7  right?

8  A.   Yes, ma'am.

9  Q.   But the sign is not in Spanish, so there's no indication in

10  Spanish that this is an exit, right?

11  A.   There's some small writing on there.  I can't -- I don't know

12  if that's in Spanish or not.  But the exit says -- looks like it's

13  in English.

14  Q.   You don't see any writing in Spanish, do you?

15  A.   No.  I can't make out what that explanation point underneath

16  in red is, the one below that.  I don't know if that's in Spanish

17  or not.

18  Q.   Now, you began to engage Mr. Garcia-Guzman and his daughter

19  by asking them if they spoke English, right?

20  A.   Initially, I spoke to them in English, and then later I asked

21  them if they spoke English.

22  Q.   And you asked them that because they didn't respond?

23  A.   Well, Ms. -- actually, Ms. Cebreros said Chicago.  She did

24  respond, but that's -- didn't make -- to me, didn't make sense.

25  Q.   And then you asked her if she spoke any English, and she said

1  a little bit, right?

2  A.   Yes, ma'am.

3  Q.   And you don't speak fluent Spanish?

4  A.   No, ma'am.

5  Q.   You know Mr. Garcia does not speak English, right?

6  A.   I didn't know that at the time, no, ma'am.

7  Q.   Well, he didn't respond to you in English, right?

8  A.   No, ma'am.

9  Q.   So let's go to page 4, line 13, of Defendant's Exhibit A.

10  And this is the first time you asked for permission to search

11  their luggage for contraband.  Do you recall that?

12  A.   What was the line?

13  Q.   Line 75, page 4.

14  A.   Yes.  For their luggage below, yes, ma'am.

15  Q.   And the only person who responded was Ms. Cebreros, correct?

16  A.   Yes.  According to the transcript, yes.

17  Q.   And then on page 5, line 77, you asked again, and according

18  to the transcript, based on the recording, the only person who

19  responded was Ms. Cebreros?

20  A.   Yes, that's correct.

21  Q.   Then you asked or waved Officer Zamarron to come to you,

22  right, shortly thereafter?

23  A.   Yes.  I did eventually do that, yes, ma'am.

24  Q.   And then Officer Zamarron told Mr. Garcia and his daughter --

25  basically, he said, "Hi, how are you?"  Or, "Hello, how are you?"

1    Right?

2    A.   Which line are you on, ma'am?

3    Q.   Line 91.

4    A.   Yes, ma'am.

5    Q.   He didn't ask them for permission to speak with them, did he?

6    A.   No, he did not.

7    Q.   Then let's go to page 7 of Defendant's Exhibit A.  You're now

8    asking for permission to enter the roomette, right?

9    A.   What line are you speaking of, ma'am?

10   Q.   Line 136 -- or, excuse me, 135?

11   A.   Yes, ma'am.

12   Q.   Now, at this point -- let's go back to Defendant's Exhibit H.

13   Now, at this point, you're standing right outside room No. 9,

14   right?

15   A.   At this point when I'm asking permission to search the

16   bedroom?

17   Q.   Yes.

18   A.   No, ma'am.  I'm standing -- I had backed up and was standing

19   partially in the bedroom across, and Task Force Officer Zamarron

20   was standing approximately where you made that circle.

21   Q.   And so you're standing, like, around here where I made the

22   X?

23   A.   That would be approximate, yes, ma'am.

24   Q.   And then Mr. Garcia and his daughter are still in the room,

25   right?

1  A.   Yes, ma'am.

2  Q.   And so the only exit off this car -- we're only talking about

3  431, not accessing the exit through another car -- would be going

4  past you and Officer Zamarron and down this hall, right?

5  A.   On that specific car, that's the only exit, yes.

6  Q.   And so --

7  A.   I take that back, unless you continue down -- that hallway

8  turns to the right, and you can continue and go out that car to

9  the next car, also.

10  Q.   But if we're only -- I'm only talking about how to exit just

11  car 431, right?

12  A.   Well, I can -- well, I consider there's three exits, because

13  you said exit that car.  The sliding door has the word "exit" on

14  it, so that is an exit.

15  Q.   All right.  But that takes you to another car, not off the

16  train at that point?

17  A.   Well, you have to go down the steps just like you do that

18  car.  So there would be, actually, three exits on each car.

19  Q.   But you have to go through a process to get out through

20  several other cars, right?  You'd agree with me, it's not going

21  down the stairs and you're automatically out?

22  A.   No.  You don't have to go through several other cars.  The

23  very next adjoining car has a stairway going downstairs, too.

24  Q.   Okay.  So you asked -- let me direct your attention now to

25  page 7, line 135.  You asked Officer Zamarron to ask Mr. Garcia if

1   he'll give you permission to search the room for contraband,

2   right?

3   A.   Yes, ma'am.

4   Q.   You have no idea what Officer Zamarron translated, do you,

5   because you don't speak Spanish very well?

6   A.   No.   I'm going by basically what he tells me that they said.

7   Q.   And when you look at line 136, his translation is:   "Can you

8   give him permission to search, uh, search?"

9   A.   That's what it states, yes, ma'am.

10  Q.   That doesn't indicate, "Can you give us permission to search

11  for contraband?"   You'd agree with me, right?

12  A.    If that's accurate, no.

13  Q.   Do you have any reason to believe that wouldn't be accurate?

14  A.   No, because I didn't -- I can't understand Spanish, and

15  that's not -- unless -- if the transcript is accurate, then it

16  doesn't ask for contraband.

17  Q.   And Mr. Garcia's response was, "Uh, I really don't know."

18  Line 137, right, page 7?

19  A.    It does state that, yes.

20  Q.   Then Mr. Garcia and his daughter step out of the way, and you

21  enter the room still and -- regardless, and you start searching,

22  right?

23  A.   Well, there's some conversation that you omitted there, it

24  looks like.

25  Q.   Mr. -- you're talking about Officer Zamarron says, "There,

1    your room."  Right?

2    A.    Yes.

3    Q.    And he says, "room," right, again?

4    A.    Yes, and then it has -- on 139, it has unidentified male

5    voice and women's laughter, yes.

6    Q.    But we don't know who that is, right?

7    A.    I don't know who that is, no.

8    Q.    And then on line 143, Officer Zamarron says, "Can we come

9    in?"  And Mr. Garcia's response is inaudible?

10   A.    According to the transcript, yes.

11   Q.    So you go into the room and you search it, right?

12   A.    Yes, I did, ma'am.

13   Q.    And that's -- Mr. Garcia stepped out of the way and you

14   walked in?

15   A.    Yes.  Actually, he did, and Ms. Cebreros and the infant came

16   out of the room.

17           MS. JOHNSON:  May I clear this?

18           THE WITNESS:  I did it, ma'am.

19           MS. JOHNSON:  Oh, Thank you.

20   Q.    (By Ms. Johnson)  So, then, at this point, Mr. Garcia-Guzman

21   and Ms. Cebreros are standing outside here in the hallway

22   somewhere?

23   A.    Yes, they're outside.  They could have went in that bedroom.

24   I'm not sure, ma'am.  I entered the bedroom and wasn't paying

25   attention to what was going on outside.

1    Q.   And so you go into this room and Officer Zamarron is standing

2    with Mr. Garcia-Guzman and his daughter?

3    A.   I'm not exactly sure where they were.

4    Q.   But he's standing nearby?

5    A.   Out in the hallway or in the bedroom, I'm not exactly sure.

6    Q.   So in this little space here, we have you in the room

7    searching, right?

8    A.   I did enter the room, yes, ma'am.

9    Q.   Mr. Garcia, Ms. Cebreros and Officer Zamarron, right, in this

10   little space, in this area right there?

11   A.   As I stated earlier, they may have went in that bedroom

12   across or went down the hallway.  I'm not exactly sure.

13   Q.   So you searched the room and you didn't find anything, any

14   contraband?

15   A.   No, ma'am.

16   Q.   Then you asked Officer Zamarron to ask Mr. Garcia if he could

17   show you guys his luggage that they have downstairs, right?

18   A.   Yes, ma'am.

19   Q.   And Mr. Garcia agreed?

20   A.   Yes, ma'am.

21   Q.   And then the three of you walked down the hall, this hall.

22   Can you clear it, Agent Perry, please?

23   A.   (Witness complies.)

24   Q.   You walked down this hall, right?

25   A.   Yes, ma'am.

1    Q.   And you can't walk next to each other, because it's too
2    narrow, right?
3    A.   No, ma'am.
4    Q.   So Mr. Garcia is in front, you testified?
5    A.   Yes, ma'am.
6    Q.   You and Officer Zamarron right behind him?
7    A.   Yes, ma'am.
8    Q.   And you both have identified yourselves as police officers,
9    right?
10   A.   I did.  I'm not sure if Task Force Officer Zamarron -- he
11   maybe introduced himself.  I'm not exactly sure.
12   Q.   And so you go down the stairs to the luggage compartment?
13   A.   The common luggage area, yes, ma'am.
14   Q.   Okay.  I'm going to direct your attention to Defendant's
15   Exhibit I.  These are the stairs, right, that you went down?  They
16   look like the stairs, right?
17   A.   Yes, ma'am.  They do look like the stairs on the train, yes,
18   ma'am.
19   Q.   And they're pretty narrow?
20   A.   Yes, ma'am.
21   Q.   And so I'm going to direct your attention to Defendant's
22   Exhibit J, and this is the luggage area, is it not?
23   A.   Yes, ma'am.  That's the common luggage area downstairs on one
24   of the train cars.
25   Q.   And the hallways are also very narrow, right?

1  A.   They're basically the same as the one upstairs.

2  Q.   And Mr. Garcia-Guzman is standing here in this luggage area

3  with you and Officer Zamarron, right?

4  A.   We're all three down there, yes, ma'am.

5  Q.   Could you tell us where each one of you was standing?

6  A.   I don't remember exactly where we were standing.  I know I

7  searched the luggage that was on the rack here, and I know I was

8  standing here.  Mr. Zamarron -- Task Force Officer Zamarron and

9  Mr. Garcia-Guzman was standing over here to the left, I believe,

10 by the exit.  I'm not exactly sure where they were standing when I

11 was searching the luggage downstairs.

12 Q.   And then you still had the other officers out on the tarmac

13 outside the train, right?

14 A.   I don't know where they were.

15 Q.   And you asked Mr. Garcia to -- for permission to search the

16 bags, or you asked Officer Zamarron to ask him, right?

17 A.   Yes, ma'am.

18 Q.   And Mr. Garcia, according to the transcript, said yes, right?

19 A.   Yes.  Can you tell me where you're located, ma'am?

20 Q.   I'll get to that in just a second.

21 A.   Looks like on page 8, line 160.

22 Q.   Right.  So -- I'm sorry.

23 A.   I think that's upstairs.

24 Q.   You asked Officer Zamarron to ask Mr. Garcia if you could

25 search them, and you're referring to the luggage downstairs,

1  right?

2  A.   Yes.  Actually Mr. Garcia and Ms. Cebreros.

3  Q.   Okay.  And Officer Zamarron translates and he says, "Can we

4  uh, uh, search you?"  Right?

5  A.   Can you repeat that, ma'am?  Sorry, I couldn't hear you.

6  Q.   Officer Zamarron says, "Can we search you?"  Right?  Line

7  161?

8  A.   That's what it says, yes.

9  Q.   But that's not what you asked him to translate?

10  A.   Yeah, I didn't say "you."  I asked him to search them, when I

11  was referring to the bags.  He may have been confused about

12  searching them, the persons.

13  Q.   But then you asked, "Can you ask them" -- line 165, "Can you

14  ask them to come show me which bags are theirs?"

15  A.   Yes, ma'am.

16  Q.   And then Officer Zamarron asked Mr. Garcia, "Can you show us

17  which ones they are?"  Right?

18  A.   Yes, ma'am.

19  Q.   Then line 167, we have Officer Chavez or another officer pose

20  a question:  "Did you just get here or."  Do you recall that?

21  A.   It shows UMV.  I think that's probably unidentified male

22  voice.  That's not another officer, because there's no officers up

23  there.  The only two officers up there was myself and Task Force

24  Officer Zamarron.

25  Q.   So you don't know who was speaking when this person says,

1    "Did you just get here or."

2    A.    I have no idea who that is.

3    Q.    Okay.  All right.  So then you guys go downstairs to this

4    luggage area, right?

5    A.    Yes, we did, ma'am.

6    Q.    And you searched the two bags that are in this area, and you

7    didn't find any contraband?

8    A.    Yes, ma'am.

9    Q.    Then you asked Officer Zamarron to ask Mr. Garcia to let you

10   see his ticket again.

11   A.    I did ask that, yes, ma'am.

12   Q.    And Mr. -- and Officer Zamarron asked Mr. Garcia, "Do you

13   have your ticket?"  That's line 226, on page 10?

14   A.    Yes, ma'am.

15   Q.    And Mr. Garcia responded, "Well, it's upstairs," or "it's up

16   there."

17   A.    Yes.

18   Q.    And then Mr. Zamarron or Officer Zamarron -- or, excuse me,

19   you asked if you guys can go back upstairs so that Mr. Garcia can

20   show you the ticket?

21   A.    Yes, I did ask that.

22   Q.    And then Officer Zamarron's translation is, to Mr. Garcia,

23   "Could we, uh, to see find the," line 232, right, and then

24   finishes on line 234 and says, "The ticket."

25   A.    Yes, ma'am.

1  Q.   And then Mr. Garcia agrees, according to the transcript,

2  right?

3  A.   Yes.

4  Q.   Okay.  And at this point, you're still in this luggage area

5  right here, right?

6  A.   Yes.  We're downstairs, ma'am.  I don't know the exact area,

7  but we're down -- actually, this picture doesn't -- it opens up,

8  if you come a little farther.  I don't know which way this is

9  facing, but if you come -- not going down that hallway, going the

10 other direction, it opens up.  We could have been standing there.

11 I'm not exactly sure.

12 Q.   And so then you guys go back up the stairs?

13 A.   Yes, ma'am.

14 Q.   And it's still you, Officer Zamarron, and Mr. Garcia?

15 A.   Yes, Mr. Garcia leading the way and we followed him.

16 Q.   All right.  And so you go back up the stairs to roomette No.

17 9.  Let's go back to Exhibit H.  Would you clear it?

18 A.   I'm trying to clear it.  It won't work.

19 Q.   Won't work for me either.

20 **(Equipment issues.)**

21 Q.   (By Ms. Johnson)  So you're back up here and now you're --

22 it's Mr. Garcia-Guzman, you, and Officer Zamarron, right?

23 A.   We did come down that hallway, yes, ma'am.

24 Q.   And Mr. Garcia asks his daughter -- she asked -- excuse me,

25 Ms. Cebreros asked Mr. Garcia, "What are you looking for?"  And

1    I'm going to direct you to page 11, line 242, 243 and 244.

2    There's a brief exchange that Mr. Garcia is telling Ms. Cebreros

3    that he's looking for the tickets, right?

4    A.   It appears that, yes, ma'am.

5    Q.   And Mr. Garcia gives you the tickets again?

6    A.   Yes.  He comes out of the room and hands them to me.

7    Q.   And then you look at them, and what do you do with the

8    tickets?

9    A.   Give them back to Mr. Garcia.

10   Q.   Okay.  And so now at this point, at 10 minutes, 40 seconds,

11   the baby starts crying, right?

12   A.   I don't know the exact time, but, yes, the baby does start

13   crying.

14   **(Audio played for the Court.)**

15   Q.   (By Ms. Johnson)  So while you're trying to say something to

16   Mr. Garcia, this baby's crying, right?

17   A.   Yes, ma'am.

18   Q.   And what we can hear on the audio is you patting yourself?

19   A.   And me asking a question, yes, ma'am.

20   Q.   But you agree with me that what you say isn't very clear?

21   Let's go back.  We're beginning at 10 minutes, 38 seconds.

22   **(Audio played for the Court.)**

23   Q.   (By Ms. Johnson)  You'd agree with me that this baby's

24   crying, and you say something, but it's not very clear what you

25   say.

1    A.    But I'm asking permission to search his person.  I can

2    understand what it's saying.

3    Q.    You said that, right?  But you don't know what Mr. Garcia

4    heard?

5    A.    I don't have his ears, so, no, I don't know what he heard.

6              THE COURT:  I'm sorry, what is it you said?  Because I

7    can't make it out.  Do you remember exactly what it is you said?

8              THE WITNESS:  I don't remember the exact words.

9              THE COURT:  But what did you hear?  Did you hear -- I

10   can't hear from the audio.  Did you hear from the audio what it is

11   you said?

12             THE WITNESS:  I can hear parts of it.  I can't hear

13   every single word that I -- I can understand me asking permission

14   to search him for contraband.  I know what I asked him, and I

15   know --

16             THE COURT:  No, but my question is:  What did you hear?

17   What did you recognize your voice as saying from the audio?

18             THE WITNESS:  I hear the word "search" and I hear the

19   word "contraband" on there.  I don't know if she can play it

20   again, I can tell you specifically what words I hear.

21             MS. JOHNSON:  May I, Your Honor?

22             THE COURT:  Yes, of course.

23             MS. JOHNSON:  Let me go back to 10:38.

24   **(Audio played for the Court.)**

25             THE WITNESS:  I hear the word "*mi permite*" and I hear

1   "contraband" and "search."

2            THE COURT:  Can you play it again?  I hear "*Gracias*."

3            THE WITNESS:  I hear that at the end.  Yes, ma'am.

4            THE COURT:  Let me see if I can hear.  And I do have my

5   hearing aids on, for the record.  I always have a hard time with

6   these audios.

7            MS. JOHNSON:  And I'll put it close to 100.

8            THE COURT:  What is that?

9   **(Audio played for the Court.)**

10           THE WITNESS:  I also hear the word "*persona*."

11  Q.   (By Ms. Johnson)  All right.  Well, that's what you hear.

12  You'd agree with me that what you said wasn't very clear, right,

13  because this baby's crying?

14  A.   Well, if you're there in person, it might be different than

15  listening to it now.  So I don't know what he heard.

16  Q.   Exactly.  You don't know what Mr. Garcia-Guzman heard,

17  right?

18  A.   All I know is from his response.

19  Q.   And then you began to search his body, right?

20  A.   Yes.  After he turned around and put his hand up, yes, ma'am.

21  Q.   Okay.  And you grabbed one of his arms, right, so that you

22  can begin to search?

23  A.   No, ma'am.  I didn't grab his arm.

24  Q.   Now let's go to 11 minutes, 3 seconds.  Then tell me who

25  says, "Aye, aye, aye, aye, aye."  Okay?

1      THE COURT:  Where are you on the transcript?

2      MS. JOHNSON:  It's not reflected in the transcript, Your

3  Honor, for some reason, but I'm going to play it now.

4  **(Audio played for the Court.)**

5  Q.   (By Ms. Johnson)  Did you just hear "Aye, aye, aye, aye,

6  aye"?  Did you hear that?

7  A.   I didn't, ma'am.  If you play it again, I'll listen closer.

8  Q.   Let me go back to as close to 11 minutes, 3 seconds.

9  **(Audio played for the Court.)**

10      THE WITNESS:  I hear something that sounds like, "eee".

11  That's what I hear.

12  Q.   (By Ms. Johnson)  Right.  "Aye, aye, aye, aye, aye," right?

13  A.   I didn't hear what you said.  I hear -- to me, it sounds

14  like, "eee."

15  Q.   That was Mr. Garcia, was it not?

16  A.   I have no idea.

17  Q.   Okay.  So then you told Officer Zamarron, page 11, line 251,

18  "Can you ask him to unzip his jacket?"  Right?

19  A.   Yes, ma'am.

20  Q.   Now, what Officer Zamarron translated was, "Can you take off

21  the" -- and it does not appear he finishes his sentence, right?

22  A.   According to the transcript, that's what it says, ma'am.

23  Q.   And then line 255, you can't hear what Officer Zamarron says

24  except that you hear, "You can take it off."

25  A.   That's what it says on the transcript, yes, ma'am.

1    Q.   But you don't know what Officer Zamarron said because you're
2    not fluent in Spanish, right?
3    A.   Yes, ma'am.
4    Q.   Now, by this point, before you made these patting sounds and
5    asked what you hear on the audio, you had searched the roomette,
6    right?
7    A.   Prior to searching Mr. Garcia?
8    Q.   Yes.
9    A.   Yes, ma'am.
10   Q.   You had searched the two bags downstairs?
11   A.   Yes, ma'am.
12   Q.   And you asked to look at his ticket twice?
13   A.   Yes, ma'am.
14   Q.   And this whole time, Mr. Garcia-Guzman is accompanied by you
15   and Officer Zamarron?
16   A.   No, not the whole time.  Initially Task Force Officer
17   Zamarron was down the hallway.  He didn't come up till I waved him
18   up.  So it wasn't the whole time.
19   Q.   Well, let me rephrase this.  When you asked to go into the
20   room, Officer Zamarron was already present?
21   A.   Yes, ma'am.
22   Q.   When you asked to search the two bags downstairs, Officer
23   Zamarron was already present?
24   A.   That's not correct.  I initially asked them during the first
25   part of the encounter, without him being there, about the bags

1  downstairs.  He wasn't there during that time, no.

2  Q.   But you asked again when Officer Zamarron was already there?

3  A.   Yes, ma'am.

4  Q.   And then you guys went downstairs, and it was you and Officer

5  Zamarron with Mr. Garcia?

6  A.   Yes, ma'am.

7  Q.   And at no time did you tell Mr. Garcia that he was free to

8  decline your requests?

9  A.   No, ma'am, I did not.

10  Q.   So when you patted yourself and you demonstrated with your

11  hands, you testified that Mr. Garcia said, "Yes."  You don't know,

12  because you're not in Mr. Garcia's head, what he was saying yes

13  to, right?

14  A.   I can't speak for Mr. Garcia.  All I know is what he said and

15  what he did.

16  Q.   But you didn't clarify your question about whether or not he

17  would allow you to search his person.  You didn't ask it again,

18  right?

19  A.   No, I didn't ask it twice.  I just asked it once.

20  Q.   And you didn't ask Officer Zamarron to translate your

21  question in Spanish?

22  A.   No, ma'am, I did not.

23  Q.   And when Officer Zamarron asked Mr. Garcia if he could take

24  something off, which we don't know what he was referring to,

25  according to the transcript, page 11, lines 252 and 255,

1  Mr. Garcia didn't unzip his vest all the way, correct?

2  A.   He didn't unzip it all the way down, no.  It was partially --

3  at the bottom, it was partially still zipped.

4  Q.   And it's your testimony that he's the one who unzipped his

5  vest?

6  A.   Yes, that's correct.  He did unzip it.

7  Q.   And then you began to search his waist area, right?

8  A.   I'd done that -- I attempted to do that earlier, and then I

9  did it again, yes, ma'am.

10 Q.   But in order to access his waist area, you had to go

11 underneath his vest, right?

12 A.   No.  I didn't have to go underneath his vest.

13 Q.   So your testimony is that you actually just touched over his

14 vest?

15 A.   Yes, ma'am.

16 Q.   And felt the hard bundles?

17 A.   Yes, ma'am.

18 Q.   And you -- I believe you wrote in your report that they were

19 oblonged shaped, right?

20 A.   Yes.

21 Q.   But you didn't pull it out?

22 A.   Not -- no, I didn't take it off his person until we got to

23 the DEA office.

24 Q.   And you didn't confirm whether it was a colostomy bag?

25 A.   After he was handcuffed, I confirmed what it was, yes, I did.

1  Q.   But at the time, when you are patting him, you feel it, you
2  don't confirm whether it's some type of medical device, right, or
3  medical equipment?
4  A.   I knew from my experience it wasn't medical equipment, no,
5  ma'am.
6  Q.   But my question is:  You didn't try to confirm or ask if it
7  was some type of colostomy bag or an oxygen tank, right?
8  A.   I didn't ask that question, no, ma'am.
9  Q.   And, instead, you immediately handcuffed Mr. Garcia?
10 A.   Yes, ma'am.
11          MS. JOHNSON:  Can I have a moment, Your Honor?
12          THE COURT:  You may.
13 **(Counsel confers with client.)**
14          MS. JOHNSON:  Your Honor, at this time, I have no
15 further questions.  Thank you.
16          THE COURT:  Thank you.
17      Redirect?
18          MR. PFIZENMAYER:  Yes, Your Honor.
19               **REDIRECT EXAMINATION BY MR. PFIZENMAYER**
20 Q.   Would you please change it over to the Elmo.  I think that
21 might be faster.
22      So you mentioned earlier that there was a 2-F code that
23 indicated there were only two adults.  Is that on the reservation
24 or the history?
25 A.   It's on the reservation, this page you have up there.

1        THE COURT:  What exhibit is that, that you're putting on

2   the Elmo, please?

3        MR. PFIZENMAYER:  Your Honor, this is Exhibit 8-1.

4        THE COURT:  Thank you.

5   Q.   (By Mr. Pfizenmayer)  So displaying Government Exhibit 8-1,

6   is that code reflected here?

7   A.   Yes, sir, it is.

8   Q.   Okay.  Would you please circle it?

9   A.   (Witness indicates.)

10  Q.   And just for clarification, what does that 2-F stand for?

11  A.   2 stands for two passengers.  F stands for full adults,

12  full-paying adults.  F, it's a code for paying adult.

13  Q.   Now, moving back to your -- the start of your encounter with

14  the defendant, you said he had a backpack?

15  A.   It was a backpack or a satchel.  I can't remember which.

16  Q.   And you searched that?

17  A.   Yes, sir.

18  Q.   How did you come to search that?

19  A.   He handed it to me out of the bedroom.

20  Q.   So this is Defense Exhibit Alpha, and I want to show you

21  lines 75 and 76.  As you recall, is this you initially asking them

22  for permission to search their bags?

23  A.   Yes.  The bags below, yes, sir.

24  Q.   And then on the next page, 77 to 78, what is -- what bags are

25  referenced there?

A.   Can you move it over a little bit?  It's hard for me to see
the English.   77?  That's referencing the bags in the room.
Q.   And, here, it looks like only Ms. Cebreros responds?
A.   Yes.
Q.   But you said the defendant was able -- he handed you his bag
willingly?
A.   That's correct.
          MS. JOHNSON:  Objection; leading.
          THE COURT:  Sustained.
Q.   (By Mr. Pfizenmayer)  Did the defendant hand you his bag
willingly or unwillingly?
          MS. JOHNSON:  Objection, Your Honor; assumes facts not
in evidence, willingly, unwillingly.  That's a conclusion for the
Court to make.
          THE COURT:  Sustained.
Q.   (By Mr. Pfizenmayer)  Did you have to ask the defendant to
hand you his bag?
A.   I did not.
Q.   And then the final set of questions I have for you is, in the
end -- taking you back to the end of the search where you're doing
the pat down and there was a bunch of conversation about what was
said in the recording.  So you previously said that you have
fairly limited Spanish; is that correct?
A.   Yes, sir.
Q.   Do you have a set of phrases that you generally use when

1  interacting with people?

2  A.    Yes.

3  Q.    Do you have one for when you ask permission to pat someone

4  down?

5  A.    Yes.  I do it pretty much on a daily basis.

6  Q.    And what phrase do you typically use?

7  A.    Do you want me to say it in English or in Spanish?

8  Q.    First in Spanish, please.

9  A.    *Mi permite registrar por contrabando on su persona*.

10  Q.    And what is your understanding of what that means in English?

11  A.    Will you give me permission to search your person for

12  contraband?

13  Q.    Do you recall saying that to the defendant during that

14  portion of the encounter?

15  A.    Yes, sir, I did.

16  Q.    And did you have to repeat it?

17  A.    No, sir.

18  Q.    What was the defendant's response to that question?

19  A.    He said yes.  He turned around and faced away from me and put

20  his hands up above his shoulders and raised them up.

21        MR. PFIZENMAYER:  Thank you, Your Honor.  That's all I

22  have.

23        THE COURT:  Thank you.

24     I have a few questions.  At the point in time, Agent Perry,

25  when you were downstairs and you determined that you needed to

1   look at Mr. Garcia's ticket once again.

2            THE WITNESS:  Yes, ma'am.

3            THE COURT:  And then you went upstairs and you reviewed

4   it, and he gave it to you.  That's the point in time where I'm

5   going to ask you some questions.

6       It was at that point in time when you then asked if you could

7   pat him down, and that's the point in time when you told me that

8   you, with your hands, patted your chest to show him what you

9   wanted to do.  What I want to know is, between those two periods

10  of time, did you still have his Amtrak ticket?

11           THE WITNESS:  No, ma'am.  I had already returned it.  I

12  returned it to him --

13           THE COURT:  When?

14           THE WITNESS:  As soon as he showed it to me, I looked at

15  it, looked -- basically, I flipped his ticket.  If you look at the

16  ticket folder, it has tickets stapled to it.  I flipped those over

17  to see if there was any luggage claim check tickets stapled to it.

18  And then I immediately handed it back to him before I asked him

19  any more questions.

20           THE COURT:  Okay.  And then what I want to know also is

21  before we're talking about the zipper being -- on the jacket or on

22  the vest being unzipped, can you tell me what it is that you

23  had -- what it is you had patted down, what it is you had

24  searched, and from that, what it is you had gleaned or learned?

25           THE WITNESS:  Prior to having him unzip it or after?

1          THE COURT:  Prior.  Prior to you asking Agent Zamarron

2   to tell him to unzip it.

3          THE WITNESS:  Yeah.  I asked him -- prior to asking him

4   to unzip it, when I was attempting to pat him down, around him, he

5   was facing away from me.  It was difficult because he was moving

6   his body away from me.  So that's when I asked him to unzip his

7   jacket to do that.

8          THE COURT:  Yes.  But my question is:  What did you

9   learn from that patting?  What did you know?  What had you

10  determined?

11         THE WITNESS:  I hadn't determined anything, because I

12  couldn't complete the pat down because he was turning his body

13  away from me.

14         THE COURT:  Okay.

15         THE WITNESS:  I didn't actually do a pat down of his

16  person.  That's why I wanted to ask him to unzip his jacket, so I

17  actually could complete it.

18         THE COURT:  Okay.  So at no time, then, did you ask him

19  to face you, so that you can do a pat down with him facing you?

20         THE WITNESS:  No, ma'am.  I don't believe I asked him to

21  turn around and face me.  When he unzipped his jacket, he did

22  that.  He did turn around -- when I patted him down, he did turn

23  around and face me as he unzipped his jacket.

24         THE COURT:  Okay.  And did you pat him down while he was

25  facing you before he unzipped his jacket?

1          THE WITNESS:  No, ma'am.  I watched him unzip his
2     jacket.
3          THE COURT:  Okay.  So when he unzipped his jacket, I
4     understand that he was unable to unzip it all the way open; is
5     that right?
6          THE WITNESS:  Yes.  He unzipped it the majority of the
7     way.  There was a small portion on the bottom that wasn't
8     unzipped.
9          THE COURT:  And at that point, if you could describe
10    whether you unzipped it -- whether you patted him down over his
11    jacket or whether you patted him down underneath his vest.  I'm
12    sorry, I keep calling it a jacket, but it's, in fact, a vest.
13         THE WITNESS:  Yes.  The vest was long, and the bottom
14    portion was not unzipped.  I patted him down inside of the vest,
15    down around his waist.  The bottom portion of it wasn't unzipped,
16    so I didn't pat down that area that wasn't unzipped because it was
17    hanging below his waist area.
18         THE COURT:  So your hands were inside the vest over his
19    shirt?
20         THE WITNESS:  His shirt was untucked.  Over the top of
21    his shirt.  Yes, ma'am.
22         THE COURT:  Okay.  And it was only at that point, as I
23    understand it, that you were able to conclude that, in your
24    opinion, what he had was contraband?
25         THE WITNESS:  Yes, ma'am.  At that exact point, when I

1   felt that very hard bundle inside of his pants protruding out,

2   that's when I determined, from my experience, it was hard bundles

3   of illegal narcotics.

4           THE COURT:  And your hands were underneath the vest, but

5   over his shirt?

6           THE WITNESS:  Well, they wasn't really underneath the

7   vest.  The vest was unzipped and opened, so my hands went straight

8   to his shirt.  The vest was hanging down below his waistline.

9           THE COURT:  But --

10          THE WITNESS:  My hands wasn't -- the vest was opened.

11  It -- my hands wasn't inside of the vest, because it was -- it was

12  opened.  I could see his shirt.

13          THE COURT:  Okay.  I'm going to stand up and show you

14  what I mean.

15          THE WITNESS:  Yes, ma'am.

16          THE COURT:  And you guys can establish the record.  In

17  other words, you were doing this.  Not this (demonstrating).

18          THE WITNESS:  His vest was further open than your vest

19  is.

20          THE COURT:  Okay.

21          THE WITNESS:  Like that, yes, ma'am.  I was patting his

22  waist area lower than that.  Yes, ma'am.

23          THE COURT:  So you weren't doing this (demonstrating).

24          THE WITNESS:  No, ma'am.

25          THE COURT:  You were doing this (demonstrating).

1          THE WITNESS:  Yes, ma'am.

2          THE COURT:  Are we all clear?  That's what I needed to

3    visually understand.

4          MR. PFIZENMAYER:  Your Honor, would you like me to

5    describe that for the record?

6          THE COURT:  Yes, please.

7          MR. PFIZENMAYER:  So the Honorable Judge Vázquez,

8    underneath her judicial robe, has on what appears what to be a

9    blazer.  And the way she had it on -- open at that point in time,

10   was that if the edges of the blazer were running parallel to about

11   the outside of her neck, down her center line.  And she indicated

12   that -- to the portion of the questioning to which Special Agent

13   Perry responded in the affirmative of how he patted down, was in

14   the area in between the two portions of her blazer on top of the

15   shirt.

16         THE COURT:  Okay.  Now, the only part that I'm still

17   wondering about is:  Was his vest zipped to his waist?

18         THE WITNESS:  I don't know --

19         THE COURT:  I'm sorry, unzipped to his waist?

20         THE WITNESS:  He was a little -- it was a little bit

21   lower than his waist.

22         THE COURT:  Okay.  All right.  It's been years since

23   I've been on an Amtrak train.  So you said that the curtain -- the

24   sliding door was open, but the curtain was open just a little bit.

25   Are these curtains see-through?

1          THE WITNESS:  No, ma'am.  They're blue in color, and

2     they're not -- well, they're not meant to be see through, but if

3     the sun is shining through the window on the other side of the

4     car, you can see through it and see bodies and stuff.  But,

5     generally, you can't see through them, no.

6          THE COURT:  Okay.  They're meant to provide some privacy

7     then?

8          THE WITNESS:  Yes, ma'am.

9          MS. JOHNSON:  Your Honor, just for the record, I think

10    that some of the curtains are reflected on Defendant's Exhibit G

11    and E, if the Court would like to reference those with Agent

12    Perry, because I understand that those are the type of curtains

13    that are also on the door.

14         THE COURT:  It's just that they're closed there, so I

15    can't tell when they're -- I mean, they're open completely there,

16    so I couldn't tell whether they're closed --

17         MS. JOHNSON:  Oh, but they're reflected in the --

18    they're shorter curtains.

19         THE COURT:  Oh, okay.  They're the ones -- same

20    material, Agent Perry, on Exhibit E, I guess?  And you don't have

21    Exhibit E in front of you.

22         THE WITNESS:  I don't, ma'am.

23         THE COURT:  Counsel, you're saying that the ones on the

24    window are the same material as the ones on the door?

25         THE WITNESS:  Yes.  I believe they are the same

1  material.  The ones -- this is kind of a very bright blue.  I

2  don't know if that's just the shade of the photograph.  But the

3  ones on the -- I moved those curtains open many a times, and I

4  want to say the ones on the doorway may be -- they're similar to

5  the ones on the doorway, maybe a little bit thicker.

6          MS. JOHNSON:  Your Honor, on Defendant's Exhibit H, you

7  can actually see a part of the ones on the door.  You can see just

8  a little bit.  The door is open.  It's the roomette on the right,

9  that's No. 9, and you can see a little bit of the curtain.

10         THE COURT:  Okay.  Let me see if I have any other

11 questions, Agent.

12      Now, after Mr. Garcia was arrested, do you have anything in

13 your report that would indicate -- or, if not, do you recall --

14 how much time elapsed from the time that he was handcuffed and

15 arrested at the train, and then later when he gave a statement to

16 you?

17         THE WITNESS:  The time wasn't -- the exact time wouldn't

18 be in my report, but it would be on the audio and video recording.

19 You would have a time that should have been read, but I'm not

20 exactly sure.  But it wouldn't be in my report.  It would be --

21 generally, we do a statement of what time he was interviewed, but

22 it's not in my report.  And I don't -- I wasn't the one that

23 interviewed him, so I don't know the exact time.

24         THE COURT:  Okay.  And was he taken over to the DEA

25 office directly?

1          THE WITNESS:  We went out on the platform, and there was

2     a few -- subsequently, but there was a few minutes when he -- he

3     gave some money to Ms. Cebreros to travel and the infant, and they

4     went back into the station.  So there was a little bit of a time

5     lapse.  But I don't know exactly how long.  But then he was

6     transported directly to the office.

7          THE COURT:  Thank you for answering all of my questions.

8          THE WITNESS:  Yes, ma'am.

9          THE COURT:  And for the demonstrations.

10    Counsel, do you have anything else based upon my questions

11    that you wish to pursue with Agent Perry before he is excused?

12         MS. JOHNSON:  Not from the defense, Your Honor.

13         MR. PFIZENMAYER:  Your Honor, just I would add a comment

14    that, to reference the length of the vest in question, you can see

15    in Government's Exhibit 2.

16         THE COURT:  Yes.  Thank you.

17    Agent Perry, thank you very much.  Any objection to Agent

18    Perry being excused?

19         MS. JOHNSON:  No.  If I can just get my exhibit back.

20         THE COURT:  Okay.

21         MR. PFIZENMAYER:  No, Your Honor.  Thank you.

22         THE COURT:  Thank you very much for your testimony, sir.

23    You may be excused.

24    The government may call its next -- actually, it's lunchtime.

25    So let's go ahead and break, and we'll be back in an hour, please.

1  So it's about ten after.  Let's be back at 1:10, please.

2  **(In recess at 12:04 p.m. until 1:11 p.m.)**

3          THE COURT:  You may proceed with cross, Ms. Johnson.

4          MS. JOHNSON:  I think we were on the government's next

5  witness.

6          THE COURT:  Oh, sorry.

7          MR. PFIZENMAYER:  Yes, Your Honor.  The United States

8  calls Task Force Officer Rey Zamarron.

9          THE COURT:  If you could come forward, sir, and raise

10  your right hand to be sworn.  Thank you.

11      Do you solemnly swear or affirm that your testimony, which

12  you are about to give, will be the truth, the whole truth and

13  nothing but the truth, so help you God?

14          THE WITNESS:  Yes, Your Honor.

15          THE COURT:  Thank you.  Please be seated.

16                      **REYDESEL ZAMARRON**

17              **(being duly sworn, testified as follows:)**

18          **DIRECT EXAMINATION BY MR. PFIZENMAYER**

19  Q.   Sir, would you please give us your full name and spell your

20  last name for the record.

21  A.   My full name is Reydesel Zamarron.  Spelling of my last name

22  is Z-A-M-A-R-R-O-N.

23  Q.   And I think just for clarity, can you please spell your first

24  name as well?

25  A.   R-E-Y-D-E-S-E-L.

1   Q.   What do you currently do for employment?

2   A.   I'm currently employed with the Rio Rancho Police Department

3   assigned to the Drug Enforcement Administration.

4   Q.   You're a Task Force Officer?

5   A.   Yes, sir.

6   Q.   Can you give us a brief overview of your law enforcement

7   career?

8   A.   I went to the police academy in 1998 in Silver City, New

9   Mexico.  I then transferred to the University of New Mexico Police

10   Department in Albuquerque.  From there, I transferred to the Rio

11   Rancho Police Department in 2006, where I tested and there was an

12   opening with the Drug Enforcement Administration, where I applied

13   and successfully got in.

14   Q.   And how long have you been a DEA TFO?

15   A.   Since February of 2017.

16   Q.   Check my math.  You have been a law enforcement officer for

17   roughly 11 years, or is it 10 -- 20, sorry.

18   A.   Coming up on 20 years.

19   Q.   So now I want to talk to you before we get into certain

20   substance of this case about your Spanish language proficiency.

21        Where were you born?

22   A.   I was born in Chihuahua, Mexico.

23   Q.   When did you leave Mexico to come to the United States?

24   A.   Approximately when I was around five years old.

25   Q.   When you were in Mexico, what was your primary language

1  there?

2  A.   My primary language was Spanish.

3  Q.   Do you consider Spanish your first language?

4  A.   Correct.  Spanish is my first language.

5  Q.   Is English your second language?

6  A.   English is my second language.

7  Q.   And growing up in the United States from five onward, how

8  much Spanish did you speak at home?

9  A.   Primarily it was the primary language of my residence with my

10  parents and my siblings.

11  Q.   And with regard to you outside of the home, socially with

12  friends and at school and things like that, how much did you speak

13  Spanish?

14  A.   It was a combination of both Spanish and English.

15  Q.   Would you describe yourself as a native speaker?

16  A.   Yes, sir.

17  Q.   Have you ever done any testing to get -- that granted you a

18  proficiency in Spanish?

19  A.   That is correct.  In, I believe, 2015, I took a proficiency

20  test that allowed me to -- the Rio Rancho Police Department, from

21  the Cervantes School Institute, which allowed me to essentially go

22  to calls and translate patrol officers, in court also, and --

23  correct, yes.  I took a proficiency test to pass.

24  Q.   And you passed that test?

25  A.   Yes, I did.

1    Q.   So I want to show you what's been marked as Government
2    Exhibit 9, and what is this?
3    A.   I believe that is the email that was sent to the -- to myself
4    and to the department congratulating me on the passing of that
5    particular test.
6    Q.   So the test we were just talking about, this is a
7    confirmation that you had passed it?
8    A.   Yes, sir.
9    Q.   Does it say anything about the level at which you passed it?
10   A.   It said that I aced the test, the proficiency level.
11   Q.   Thank you.
12   A.   Yes.  I aced the test.
13   Q.   Now, moving on to March 13th, 2018.  Were you conducting
14   interdiction operations at the Amtrak station on that date?
15   A.   At that date, I was assigned to Agent Perry to assist him in
16   interdiction.
17   Q.   And on that date, did you arrest a person you had come to
18   know as Everado Garcia-Guzman?
19   A.   Yes.
20   Q.   Would you please identify him based on where he's sitting and
21   what he's wearing?
22   A.   He is sitting over there in the jumpsuit.
23          MR. PFIZENMAYER:  Let the record reflect, Your Honor,
24   please, that he has identified the defendant.
25          THE COURT:  The record will make that reflection.

1      Did you say 2018 March 13th?

2           MR. PFIZENMAYER:  I thought I said 2019, but I could be

3  wrong, Your Honor.

4           THE COURT:  All right.  I think the record indicates

5  2018, so it's 2019.

6           MR. PFIZENMAYER:  Yes, Your Honor.

7  Q.   (By Mr. Pfizenmayer)  So before we get a little bit more into

8  that encounter, I just want to have you give a general description

9  of the train car that you were in during that arrest.  How many

10 floors did it have?

11 A.   It had two floors.

12 Q.   And where is the -- are there any exits on the first floor?

13 A.   On the first floor, there was the entrance we came up on, but

14 I don't recall the other exits on the first floor.

15 Q.   And how does -- how did you get to the second floor?

16 A.   To the second floor, I went up the center aisle stairs up to

17 the second floor.

18 Q.   And on the second floor, can you give us a general

19 description of what is on the second floor?

20 A.   On the second floor, there is several rooms, sleeper rooms.

21 There's approximately three exits, one on each end of the car and

22 one in the center of the car.

23 Q.   And the center would be the stairs that you came up?

24 A.   Yes, sir.

25           MR. PFIZENMAYER:  If you would please change over from

1   the Elmo to the computer screen.   Thank you.

2                 LAW CLERK:   Are you using the HDMI or VGA?

3                 MR. PFIZENMAYER:   VGA.   Thank you.

4   Q.   (By Mr. Pfizenmayer)   So I'm showing you a diagram -- it's

5   merely demonstrative -- with regard to the second floor of the

6   train.   Is this a fairly accurate or is this a representative

7   picture of the second floor of the train?

8   A.   That is fairly accurate.

9   Q.   So just to be clear, the stairs are in the center there?

10  A.   Yes.

11  Q.   And then there is an exit to adjacent train cars at the end

12  of each aisle?

13  A.   That is correct.

14  Q.   And then there are the two rooms at the end that have been

15  identified?

16  A.   Closer to the other exit.

17  Q.   So what you have in front of you is a touch screen.   Can you

18  just circle which room the defendant was occupying on that date?

19  A.   He was occupying this room (indicating).

20  Q.   Can you make a bigger circle, please?

21  A.   (Witness complies.)

22  Q.   Thank you.   And do you know if there's anybody in the room

23  across from him?

24  A.   No.   I believe it was empty.

25  Q.   So I want to break this up into sections to make it a little

1    more digestible.  With regard to this first portion, I want to
2    talk to you about from the time you went up on the second floor
3    until the time Special Agent Perry came over to talk to you --
4    A.    Okay.
5    Q.    -- or motioned you over to come over and talk to him.
6    A.    Yes, sir.
7    Q.    Can you indicate on the diagram, roughly, where you were
8    standing during that time period?
9    A.    Well, when we went up the stairs, he went towards that room
10   where Mr. Garcia was occupying.  I was approximately right here by
11   the stairs, just so that I can have a view -- I could not see
12   neither the female or Mr. Eduardo (sic) Garcia.  I could not see
13   them.  But I was standing, for officer safety, so I can have a
14   view of Special Agent Perry.
15   Q.    You said you could have a view of Special Agent Perry.  Can
16   you please indicate on the diagram roughly where he was during
17   that portion of the encounter?
18   A.    Yes, sir.  He was approximately at the doorway contacting the
19   occupants of that room.
20   Q.    Do you recall if he was closer to the left side or the right
21   side of the doorway.  Actually, let me rephrase that, because the
22   directions there are probably confusing.  Was he close to the part
23   of the doorway close to you or away from you, as you recall?
24   A.    I don't recall, but he wasn't, like, blocking the doorway.
25   He was just standing, peeking in, and talking to them.

1   Q.   So at some point in time, Special Agent Perry motioned you

2   over?

3   A.   That is correct.

4   Q.   Can you indicate again on this diagram how your positions

5   changed when you walked over to that particular room?

6   A.   When I walked over to Agent Perry, he essentially stepped

7   away, and then I went towards the doorway, so I can peek myself in

8   and introduce myself.  And Agent Perry introduced him -- or the

9   occupants of that room to -- to them.

10  Q.   And during this portion of the encounter, were either of you

11  two blocking their exit from that room?

12  A.   No, not at all.  Agent Perry, again, stepped out of the way

13  and I was able to peek in to talk to them.  And he was just asking

14  me questions to ask them.

15  Q.   So in general terms, so I guess to -- again, I want to frame

16  this a little bit so you don't run away.  Between this portion of

17  the encounter until the time you guys go to the first floor of the

18  train, can you give us a rough summary of what conversation

19  occurred in that room?

20  A.   The conversation was merely about their travels, where they

21  were coming from, where they were going, the luggage they were

22  carrying, their ticket and whatnot.

23  Q.   Did you, at any point in time, ask them where the luggage

24  was?

25  A.   Yes.  Well, I was pretty -- I was merely translating the

1  questions that Agent Perry was asking me.  So he, at one point,

2  did ask me to ask them where their luggage was, and I translated

3  that to they were downstairs.

4  Q.   Through you, did Special Agent Perry ask for consent to

5  search those bags?

6  A.   Yes.

7  Q.   Did he, at any point in time, ask for, through you again,

8  consent to search the room?

9  A.   Yes.

10 Q.   Were you provided consent to do both of those actions?

11 A.   That is correct, yes.

12 Q.   So when you -- when you asked for consent to search the room,

13 what occurred?  Specifically, what did the defendant and the woman

14 he was with do?

15 A.   From my recollection, I believe agent -- I asked if it was

16 okay to -- for Agent Perry to search the room, and they said, yes,

17 it's okay.  They then stepped out in the hallway, and then that's

18 it.  Agent went inside and checked the room accordingly.

19 Q.   Did you ever go in that room during that portion of the

20 encounter?

21 A.   No.

22 Q.   Did you ever go in the room at all in the encounter?

23 A.   I -- maybe to let people pass by, because it was very tight

24 quarters area.  But not fully in the room, just to scoot out of

25 the way for people to pass by and then back out.

1    Q.   Do you recall where the defendant and the lady he was with
2    went while Special Agent Perry was searching the room?
3    A.   I believe the female entered the empty room.  Yeah, she
4    entered the empty room and sat there with the baby, and then
5    Mr. Eduardo (sic) stayed in the hallway, as I was kind of
6    conversating with him.
7    Q.   And just to be clear, the empty room is the one directly
8    across from them?  That's the one you're referring to?
9    A.   Yes, sir.
10   Q.   Now, when you were talking with -- so after the search, where
11   did everybody go?  The search of the room, I should say, where did
12   everybody go?
13   A.   After the search, the -- we went -- we asked if we could
14   locate -- or see if we can get permission to search the luggage.
15   He said yes.  We asked him if he can show us.  And then we went
16   downstairs.  I believe I went downstairs first, then Mr. Garcia,
17   and then behind, Agent Perry.
18   Q.   With regard -- so between when you went to the room and then
19   when you went downstairs with everybody, did you have the
20   opportunity to observe the defendant's behavior?
21   A.   Yes.  He was very calm, collective, and was fine.
22   Q.   And in your conversations with him in Spanish, did it appear
23   that he was having any trouble communicating with you or
24   understanding what you were saying in Spanish?
25   A.    No, not at all.  He was very calm and friendly.  And, yeah, I

1    felt that he was trusting me because I did speak Spanish and --

2              MS. JOHNSON:  Objection; speculative.

3              THE COURT:  Sustained.

4    Q.   (By Mr. Pfizenmayer)  So now I want to go down to the first

5    floor.  Can you describe, generally, what happened when you,

6    Special Agent Perry and the defendant were on the first floor?

7    A.   When we were on the first floor, we did receive consent to

8    search the luggage.  Agent Perry searched the luggage, which he

9    did not find any contraband.  We then asked him questions about if

10   he had any additional luggage, and I asked him in Spanish that

11   question.  And he said that he -- the luggage was already checked,

12   but I -- my question was more of if he had any additional luggage

13   checked into the car in itself, not necessarily had been checked

14   by other individuals, which is what he took it as.

15   Q.   What did he say with regard to other individuals checking his

16   bags?

17   A.   He said that somebody -- they had already checked his bag in

18   Los Angeles.

19   Q.   And what did they do to check his bag, do you recall?

20   A.   From what I recall, he said that there was a -- a dog had

21   passed by and checked the bags.  I asked him if it was a uniform

22   like us.  He said, yes, but they didn't search as how we were

23   searching.  More of the dog search.

24   Q.   Did Special Agent Perry ask the defendant to see his ticket

25   again?

1   A.    That is correct.  Based on that question, Agent Perry asked

2   to -- asked me to ask him if we could see the ticket one more

3   time, which he, you know, agreed and voluntarily escorted us back

4   upstairs to the room.

5   Q.    So did he say the ticket was in the room upstairs?

6   A.    Correct.  He said it was in his room upstairs.

7   Q.    So before going upstairs, while you're downstairs, did you

8   have the opportunity to observe the defendant's behavior?

9   A.    That is when it particularly changed.  He seemed a little

10  more nervous.

11  Q.    Can I stop you just for a second?  When you say "that," can

12  you clarify what you mean by "that" when you say, "That is when it

13  particularly changed."  Is there a particular moment in time?

14  A.    Correct.  What I mean by that is whenever he was asked to

15  check the ticket itself, again, to verify whatever questions Agent

16  Perry was going to have, he seemed to be, you know, get nervous.

17  He got nervous.

18  Q.    And prior to asking that ticket question while you were

19  downstairs, particularly during the search of the luggage, did you

20  have the opportunity to observe his behavior?

21  A.    Yes.

22  Q.    And what, if anything, did you notice about his behavior?

23  A.    There was nothing noticeable.  He was answering the questions

24  very calmly and correct -- or calm and, you know, easily.

25  Q.    Now, other than the mix-up about checking bags, during that

1   time period, was there any indication he didn't understand what

2   you meant using your Spanish?

3          MS. JOHNSON:  Objection; calls for speculation.

4          THE COURT:  Could you --

5          MR. PFIZENMAYER:  I'll rephrase, Your Honor.

6          THE COURT:  Thank you.

7   Q.   (By Mr. Pfizenmayer)  Other than the check-bag scenario, did

8   he ask any follow-up questions about what you guys were talking

9   about for clarification purposes?

10   A.   I don't recall.  I don't -- I don't recall.

11   Q.   Now, going back -- or going up the stairs.  So he said the

12   ticket was upstairs and you guys went upstairs with him?

13   A.   Yes, that's correct.

14   Q.   And you went back to the same room?

15   A.   That is correct.

16   Q.   Can you show, again, on this diagram where the three of you

17   were positioned when you got back to the room for the ticket?

18   A.   For the ticket, I believe he went and got the ticket from

19   inside the room.  I was here, and Special Agent Perry was about

20   here (indicating).  And he went inside the room to get the ticket

21   and give it back to us.

22   Q.   So now after Special Agent Perry inspected the ticket, what

23   did he ask the defendant?

24   A.   He then asked the defendant if he could -- I recall Agent

25   Perry lift up his own arms and demonstrated what he wanted to do

1  with the -- and if we could get permission to pat him down.

2  Mr. Garcia said yes.  But he physically showed him what he wanted

3  to do.

4  Q.   So --

5          MR. PFIZENMAYER:  Your Honor, with your permission, I'd

6  like to have the witness stand up just to demonstrate the patting

7  motion.

8          THE COURT:  Sure.

9  Q.   (By Mr. Pfizenmayer)  Task Force Officer Zamarron, would you

10  please stand up.  And would you please show the Court, kind of

11  generally, what you saw Jay Perry indicate was going to be done?

12  A.   Agent Perry lifted his own arms and asked him if "I can pat

13  him down."  So then I translated, you know, can he get permission

14  to pat him down in Spanish.  He said yes.

15  Q.   Thank you.  And --

16          THE COURT:  Could you tell us in Spanish how you said

17  that, please?

18          THE WITNESS:  *Le dije que si podia esculcar a la persona*

19  *de el, le podia esculcar.*

20  Q.   (By Mr. Pfizenmayer)  For my purposes, if no one else's,

21  would you please translate that for me?

22  A.   The translation is, "Can he search you?"  Can he --

23          MR. PFIZENMAYER:  And for purposes of the record, the

24  witness initially put up his hands probably adjacent to his

25  shoulders on the outside, and then brought them into his chest and

1  made a patting motion up and down his torso to indicate the

2  patting that was demonstrated to the defendant.

3      Please have a seat.  Thank you.

4  Q.  (By Mr. Pfizenmayer)  Can you describe what the defendant was

5  wearing at this point in time?

6  A.  He was wearing, like, a light vest, a jacket, like a flannel

7  undershirt, long sleeve.

8  Q.  I want to show you a picture, and this is Government Exhibit

9  2.  At the start of the pat down, is this an approximate picture

10  of what he looked like or how he was dressed, I should say?

11  A.  Yes, sir.  That's correct.

12  Q.  So, now, at the start of the pat down, can you again show on

13  this diagram where the three individuals were?

14  A.  At the start of the pat down, Mr. Eduardo (sic) Garcia was

15  standing in the hallway.  Special Agent Perry was midway on the

16  doorway, kind of between the empty room and the hallway.  And, you

17  know, I was just standing on the -- his left side.

18  Q.  Did you have a view of the defendant from that position?

19  A.  Yes.

20  Q.  And what direction was he facing at this point in time?

21  A.  He was facing his own room at that time.

22  Q.  In response to Special Agent Perry's question, what did you

23  observe the defendant do?

24  A.  I'm sorry, one more time?

25  Q.  Sorry.  In response to Special Agent Perry asking for

1  permission to pat him down, what did you see the defendant do?

2  A.   The defendant then, I guess, cooperated and lifted his hands

3  and allowed Mr. -- or Agent Perry to pat him down.

4  Q.   At that point in time, did you observe the defendant's

5  behavior?

6  A.   I did.

7  Q.   Did you notice anything?

8  A.   Yes.  At that time -- so he began to, kind of, sweat

9  profusely more than -- he was sweating a lot.  I could see,

10  actually, the sweat coming down his forehead.  When Agent Perry

11  began patting down his waist area, I observed Mr. Garcia kind of

12  move his body in the opposite direction of his hands as

13  Mr. Perry -- or Agent Perry attempted to pat down the center

14  portion of the -- of Mr. Garcia's body.  Mr. Garcia began to sway

15  or move away and whatnot.

16  Q.   And move away from Special Agent Perry's hands?

17  A.   Yes.

18        MR. PFIZENMAYER:  Your Honor, with your permission, I'd

19  like to have him stand up again and demonstrate that.

20        THE COURT:  Sure.

21  Q.   (By Mr. Pfizenmayer)  So using your hands as, kind of,

22  Special Agent Perry's hands, can you show what you observed the

23  defendant doing?

24  A.   So me being Agent Perry's hands, as he was searching this

25  area, as I could see his hands approaching the center, Mr. Garcia

1    would then move his hands the opposite of the hand -- or where the

2    hands were going, and would move essentially back and forth

3    several times to, you know, avoid getting patted down in that

4    area--

5            MS. JOHNSON:  Objection; speculative.

6            THE COURT:  Sustained.

7            MR. PFIZENMAYER:  And, for the record, Task Force

8    Officer Zamarron put his hands approximately at waist level, as

9    representing Special Agent Perry's hands, and then made patting

10   motions and then demonstrated moving his hips to the side away

11   from those hands.

12           THE WITNESS:  That is correct.

13   Q.   (By Mr. Pfizenmayer)  Please have a seat.  Thank you.

14        So in response to that, what did Special Agent Perry ask you

15   to ask the defendant?

16   A.   He asked me to see if he can unzip his jacket.

17   Q.   And did you ask him that?

18   A.   Yes.  He -- I did ask him that.  He said, you know -- go

19   ahead.

20   Q.   Sorry.  And in response to you asking that, what did he do?

21   A.   He said yes, and began to take off -- unzip the jacket.

22   Q.   And did you observe any behavior --

23   **(Computer beeping noise.)**

24           MR. PFIZENMAYER:  I apologize, Your Honor.

25   Q.   (By Mr. Pfizenmayer)  -- behavior of his while he was

1  unzipping the jacket?

2  A.   Yes.  His -- I could see that when he was attempting to unzip

3  the jacket, his hands were shaking profusely, like overwhelming

4  shake, and he was having a hard time, kind of, unzipping it.  Yes.

5  Q.   And what did that indicate to you?

6  A.   It indicated to me that he was very nervous of us finding

7  something.

8  Q.   How far down, if you recall, did he unzip his jacket?

9  A.   He -- it looked like he was trying to unzip it all the way

10  but couldn't.  So it went halfway, a little lower than halfway.

11  Q.   So I want to just finish up.  I'm going to play the portion

12  of this audio starting around 10 minutes and 30 seconds.  I want

13  to listen to that, and then I want to discuss that with you using

14  the transcript?

15  A.   Okay.

16  **(Audio played for the Court.)**

17  Q.   (By Mr. Pfizenmayer)  Now I want to show you -- this is

18  Defense Exhibit Alpha.  It is a transcript.  Have you seen this

19  before?

20  A.   Yes.

21  Q.   And you've reviewed it?

22  A.   Yes.

23  Q.   So I want to direct your attention to line 252.  There, you

24  ask the defendant, "Can you take off the..."  Do you remember,

25  because there's a lot of noise going on there, what that -- if you

1   were able to finish that sentence or what occurred there, why that

2   trails off?

3   A.   Yes.  I do rem -- I recall that instance.  Like, he was,

4   again, having a hard time trying to take -- it looked like he was

5   trying to take off the jacket to unzip it as we requested, but he

6   had a hard time.  So as people were passing by, I allowed people

7   to kind of pass by while we were doing this.  I asked him -- like,

8   because he wanted to -- it seemed like he wanted to take it off.

9   I asked him, as a question, as, like, a, "Can you take it off?"

10  *Si la puede quitar?*

11  Q.   So it was less of -- it was more -- was he physically

12  incapable of taking it off at that point in time?

13  A.   Correct.

14  Q.   And that was because his hand was shaking so badly?

15  A.   Correct.

16          MS. JOHNSON:  Objection; leading.

17          THE COURT:  That's going to be sustained again.

18  Q.   (By Mr. Pfizenmayer)  And with regard to --

19          THE COURT:  Counsel.

20          MR. PFIZENMAYER:  Yes, Your Honor.

21          THE COURT:  Again, you've got to watch the form of your

22  question, unless you want to be the one testifying.

23          MR. PFIZENMAYER:  Yes, Your Honor.

24  Q.   (By Mr. Pfizenmayer)  Drawing your attention to line 255, do

25  you recall if this was a -- so line 255.  Is this a separate

1    question, or is this the first part of the question based on the

2    transcript and the audio recording you heard?

3    A.    It is -- it -- pretty much what it is, is a separate question

4    basically me asking if he was physically able to take off the

5    jacket because of how he was shaking so badly.

6    Q.    And just take one step back, a question I forgot to ask.

7    When Special Agent Perry asked -- posed the question to the

8    defendant to take off his jacket, did he do that in English or

9    Spanish, as you recall?

10   A.    He asked me.

11   Q.    No.   Did he ask the defendant?

12   A.    He asked me to ask the defendant.

13   Q.    Okay.   And then as the -- after the defendant unzipped his

14   jacket, what happened?

15   A.    After the defendant unzipped his jacket, I was facing the

16   defendant, and I could physically see the -- I guess I know now to

17   be the contraband.

18   Q.    When you say physically, could you see the actual bundles, or

19   what did you see?

20   A.    I'm sorry, the -- so when the -- as the belt is -- I could

21   see, like, a box-looking item that's -- I would normally not --

22   you know, it would not be there.

23   Q.    Where did you see that on his person?

24   A.    I saw that whenever the jacket came off.

25   Q.    Not when.   Where on him?

1  A.   Oh, on the center portion, kind of on the belt line of

2  Mr. Eduardo (sic) Garcia.

3  Q.   I'm showing you Government Exhibit 3.  Is this the

4  approximate view that you had on that date, at that time?

5  A.   That is correct.

6        THE COURT:  Okay.  But, excuse me, wasn't that already

7  at the DEA office, or where was this photo?

8        MR. PFIZENMAYER:  Yes, Your Honor.  This is at the DEA

9  office.

10       THE COURT:  This was later?

11       MR. PFIZENMAYER:  Yes.  This is later, but this is an

12 approximation of that.  This is the angle at which he viewed the

13 defendant.

14       THE COURT:  Okay.  But is that when you're talking

15 about, or are you talking about on the train?

16       THE WITNESS:  On the train, ma'am.  Yes, ma'am.

17       THE COURT:  I didn't think that this was unzipped

18 completely on the train.  Could you get that clarification for me?

19       MR. PFIZENMAYER:  Yes, Your Honor.

20 Q.   (By Mr. Pfizenmayer)  So comparing this picture to what you

21 saw on the train, what are the differences?

22 A.   The difference is when Agent Perry was patting down

23 Mr. Garcia, I was able to -- you could see the bulge of the item,

24 you know, when the jacket was halfway already.  I could already

25 see it.  But when he fully took it off, it was obvious that

1  something was there.

2        MR. PFIZENMAYER:  Those are all the questions I have for

3  you.  Thank you.

4        MS. JOHNSON:  May I proceed, Your Honor?

5              **CROSS-EXAMINATION BY MS. JOHNSON**

6  Q.   Good afternoon, Officer Zamarron.

7  A.   Yes, ma'am.

8  Q.   So on March 13th, you went to the train with Agent Perry,

9  right?

10 A.   That is correct, yes, ma'am.

11 Q.   And you were both dressed in civilian clothing?

12 A.   Yes, ma'am.

13 Q.   But you're both carrying firearms, right?

14 A.   That is correct.

15 Q.   And then you boarded Train 431, right?

16 A.   That's correct.

17 Q.   Let me direct your attention to Defendant's Exhibit B.  That

18 would be Train 431, right?

19 A.   Yes.

20 Q.   And you went in through this door right here, right?

21 A.   That is correct.

22 Q.   And in order to exit Train 431 out to the platform, without

23 going to the other trains, this would be the only door, right?

24 A.   You know, I don't know the whole layout of the train, so I'm

25 not sure if, on the other side, there's additional doors.  But I

1  do remember that there was three, approximate, exits indicating

2  exits on the train.

3  Q.   You're talking about the two on the second floor that go to

4  adjoining cars, right?

5  A.   I'm talking about that, and then also on the other side of

6  the train, I'm not sure if there's other doors there.

7  Q.   You don't recall another door on the other side of the

8  train?

9  A.   I didn't look, so I don't know if there is or not.

10 Q.   You went in through this door, though, right?

11 A.   Yes, sir -- yes, ma'am.

12 Q.   So then you proceeded to the second floor, right?

13 A.   Yes, ma'am.

14 Q.   And then roomette No. 9 would be approximately this room

15 right here, right, at the end?  It's the very end one on the

16 left-hand side.

17 A.   I -- you know, I don't know as far as the layout where it is

18 in relation to what I'm looking at now.  I just know that it was

19 closer to the exit, the far north exit, yes.

20 Q.   And when you say "exit," you're talking about the door that

21 leads to the adjoining car?

22 A.   Correct.  And the -- correct.

23 Q.   Okay.  So let me direct your attention now to Defendant's

24 Exhibit D.  This is roomette No. 9, right?  You'll see the No. 9

25 right here.

```
1   A.    Yes.
2   Q.    And so let me direct your attention now to Exhibit H, and
3   this is the hallway you were talking about when you were
4   testifying on direct examination, right?
5   A.    Yes.
6   Q.    And so the stairs are about -- right around here, this area,
7   would that be fair to say, roughly around there (indicating)?
8   A.    I can't say that that's where it would be.  I mean, without
9   actually approaching them.  It's another room or the stairs, it
10  could be.
11  Q.    Well, you were on car 431 on March 13th, right?
12  A.    Yes, of course.
13  Q.    And you'd been working the train for quite some time with
14  Agent Perry, right?
15  A.    Yes.
16  Q.    And you boarded car 431 several times, right?
17  A.    I wouldn't say several times, but more than once, yes.
18  Q.    And so this is consistent and appears to be the hallway
19  leading up to room 9 of car 431.  Do you have any reason to
20  dispute that that --
21  A.    No, not at all.
22  Q.    So then Agent Perry is walking in front of you, right?
23  A.    Yes.
24  Q.    And you're behind him?
25  A.    Yes.
```

1   Q.   And his intention -- or he's approaching room No. 9 to

2   encounter the people in room No. 9, right?

3   A.   Yes.

4   Q.   And room No. 9 is roughly about here (indicating).  If the

5   door that leads to the other car is about here, this would be room

6   No. 9, right?

7   A.   Yes.

8   Q.   So tell me exactly where you stood when Agent Perry

9   approached room No. 9.

10   A.   Let's see, I -- can you point out where room No. 9 in this

11   picture would be?

12   Q.   So this is room No. 9 right here.  You can barely see the No.

13   9 up here.

14   A.   Okay.

15   Q.   Where would you be standing?  Where did you stand?

16   A.   I -- I stood, I guess, way on the -- on the -- closer to the

17   stairs, way back there.

18   Q.   Okay.  And then Agent Perry stood where?

19   A.   Agent Perry stood --

20   Q.   Let me clear those circles.  Go ahead.

21   A.   Again, I don't recall which side of the doorway he was at,

22   because I was at a distance where I could see him, but I couldn't

23   tell which side of the door he was at.  But he was either to the

24   left or right of the door, peeking in with his head, yeah, talking

25   to them.

1    Q.   Okay.  So at some point, Agent Perry motioned you to go over

2    to where he was standing, right?

3    A.   Yes, ma'am.

4    Q.   And let me give you a copy of Defendant's Exhibit A, which is

5    the transcript --

6            MS. JOHNSON:  If I may approach, Your Honor?

7            THE WITNESS:  Thank you.

8    Q.   (By Ms. Johnson)  -- so you may reference it when we discuss

9    it.

10       So directing your attention to Exhibit A, page 5, line 91.

11   Is this the first time you approached the passengers in room No.

12   9?

13   A.   Yes.

14   Q.   And you said -- you greeted, "Hello, how are you?"  Right?

15   A.   Yes.

16   Q.   And you did not ask them for permission to speak with you,

17   right, or for them to be able to speak with you, right?

18   A.   Me, myself, no, I did not.

19   Q.   Okay.  And then you began to ask them questions about their

20   travel, right?

21   A.   I began to translate the questions that was asked by Agent

22   Perry to translate to ask them.

23   Q.   And those questions were about travel?

24   A.   Correct.

25   Q.   Okay.  Then let me direct your attention to page 7, line 136.

1    Agent Perry had just asked you, in line 135, "...can you ask him

2    if he'll give me permission to search their room for contraband?"

3    Right?

4    A.    Yes.

5    Q.    And your translation was, "...can you give him permission to,

6    uh, search?"

7    A.    Correct.

8    Q.    You did not indicate that it was permission to search for

9    contraband, right?

10   A.    I did not finish the complete sentence of contraband.  Again,

11   from what I remember, people were passing by and sometimes they

12   didn't allow me to finish such questions.  But he understood.

13   Q.    So the answer is, no, you did not ask for permission to

14   search for contraband specifically?

15   A.    Correct.

16   Q.    And then Mr. Garcia said, "...I really don't know."  Line

17   137, page 7, right?

18   A.    Correct.  You know, per my upbringing, my schooling --

19   Q.    I'm sorry, Officer Zamarron.  My question was simply yes or

20   no.  Mr. Garcia's response was, "...I really don't know."  You'd

21   agree with me.  That's what it says, right?

22   A.    No, it does not.

23   Q.    It doesn't say that?

24   A.    My translation is, again, different.  *La verdad*, it means

25   truth, the truth.

1  Q.   "*Uh, no se la verdad.*"   "Uh, I really don't know the truth.

2  I really don't know."   You disagree that what Mr. Garcia's saying,

3  "I really don't know."

4  A.   Correct.   *No se la verdad,* the translation is, "I don't know

5  the truth," you know, correct, "the truth" translation.   *No se la*

6  *verdad.*

7  Q.   You're not a court-certified interpreter?

8  A.   I was certified to testify in court, yes.

9  Q.   You're an actually federally court-certified?

10 A.   Federally, no.

11 Q.   You're talking about this little email that was sent to you

12 saying you passed the Cervantes class, right, or test?

13 A.   Yes.

14 Q.   Did you get an actual certificate saying you're a certified

15 interpreter?

16 A.   I got a certificate.   It is -- again, last-minute, I asked

17 for this, something they could give to me last-minute, and they

18 sent me that.

19 Q.   And so they sent you this November 6th, 2015?

20 A.   Correct.

21 Q.   So that's not, like, last week or last-minute, right?

22 A.   No, no, no.   I asked -- they sent me an email of that

23 particular date that they sent it to me, but they sent it to me

24 yesterday, yes.

25 Q.   So you're not certified to do translations in court for

1   actual court proceedings, right?

2   A.   I have -- I am, but I have not been called to do so, is what

3   I understand that I'm --

4   Q.   Which court has certified you?

5   A.   The Thirteenth Judicial District Attorney's Office -- or

6   District Court.

7   Q.   And so you said you reviewed this transcript, Exhibit A,

8   right?

9   A.   Yes, ma'am.

10  Q.   Let me direct you to page 13 of 13.  You'd agree with me that

11  the person who interpreted or translated this is a federally

12  court-certified interpreter?

13  A.   Yes.

14  Q.   According to her certification?

15  A.   Yes, ma'am.

16  Q.   So let's go back to your questions of Mr. Garcia.  You --

17  after Mr. Garcia said, "I really don't know," you asked:  "Can we

18  come in?"  Line 143, page 7, right?

19  A.   Yes.

20  Q.   And you'd agree with me that Mr. Garcia's response is not

21  audible?

22  A.   Yes.

23  Q.   And -- but he stepped out of the way, right?

24  A.   Yes.

25  Q.   And you didn't enter the room or did you also enter the

1  room?

2  A.   From what I recall, it was more to can we come in to allow

3  people to pass by because it was getting crowded.  I don't recall

4  if I entered the room, but I think we all moved out of the way of

5  the hallway.

6  Q.   So are you saying that now Mr. Garcia's in the hallway at

7  this point?

8  A.   No.  I was.  I was and then Agent Perry, so we wanted to get

9  out of the way.  So I don't recall who entered the room.

10  Q.   But when you ask, "Can we enter the room?" you asked it in

11  the plural, right?

12  A.   Yes, ma'am.

13  Q.   Okay.  And so Agent Perry says, "Thank you, sir," but there's

14  no response from Mr. Garcia prior to that?

15  A.   Yes, ma'am.

16  Q.   Then Agent Perry asked you to ask for permission to show you

17  both the bags that they had downstairs, right?

18  A.   Yes, ma'am.

19  Q.   And Mr. Garcia said okay.  He said, "Yes," right?

20  A.   Yes, ma'am.

21  Q.   And then did you, at that point, proceed downstairs or not

22  yet?

23  A.   I did proceed downstairs with -- yes.

24  Q.   Okay.  But prior to that, Agent Perry actually searched the

25  roomette before you went downstairs, right?

1   A.   Pardon me?

2   Q.   Prior to going downstairs, Agent Perry did search the room,

3   room No. 9, right?

4   A.   Yes, ma'am.

5   Q.   And was that around -- on page 7, around line 136 and on.  Is

6   that when the roomette was being searched?  Let's go to the --

7   A.   Yes.

8   Q.   I'm sorry?

9   A.   Yes.  I see it here, yes.

10  Q.   Let's go to the recording.  We'll go to 4 minutes, 59

11  seconds.

12  **(Audio played for the Court.)**

13  Q.   (By Ms. Johnson)  At this point, you're asking for permission

14  to go into the room, right?

15  A.   Correct.

16  Q.   And we don't hear a response from Mr. Garcia, right?

17  A.   No, we don't.

18  Q.   And that squeaking noise we hear is Agent Perry moving the

19  bed -- the seats up, right?

20  A.   I don't recall what that noise was, or I don't know.

21  **(Audio played for the Court.)**

22  Q.   (By Ms. Johnson)  Sounds like Agent Perry is searching,

23  right?

24  A.   It sounds like it, yes, ma'am.

25  Q.   So would it be fair to say that that squeaking noise we heard

1    was the bed -- or the chair being moved?

2            MR. PFIZENMAYER:  Objection; speculation, asked and

3    answered.

4            MS. JOHNSON:  I'll move on.

5            THE COURT:  Sustained.

6    Q.   (By Ms. Johnson)  All right.  So then you guys didn't find

7    any contraband in the room, right?

8    A.   That's correct, ma'am.

9    Q.   And then you asked about -- or Agent Perry asked you to ask

10   about the luggage downstairs?

11   A.   Yes, ma'am.

12   Q.   And let's go to page 8, line 160.  Agent Perry asked you if

13   you could ask Mr. Garcia for permission to search them, and he's

14   referring to the bags downstairs, right?

15   A.   That's correct.

16   Q.   And you asked Mr. Garcia in Spanish, right, if you could

17   search the bags?

18   A.   Yes, ma'am.

19   Q.   But you actually said, "*Podemos esculcarlo*," meaning can we

20   search you?

21   A.   Correct, yes.

22   Q.   But you didn't ask -- but what Agent Perry had asked you to

23   ask was, "Ask him for permission to search the bags downstairs,"

24   right?

25   A.   Correct.  It was in the context of the bags, yes.

1    Q.    And you did not tell Mr. Garcia that you wanted to search the

2    bags for contraband.  Page 8, line 161, right?

3    A.    Correct, not for contraband.  I did not mention the word

4    "contraband."

5    Q.    Okay.  Then you, Agent Perry and Mr. Garcia walked down the

6    stairs to the luggage area, right?  Correct?

7    A.    Correct, yes.

8    Q.    And so you're all three walking down this hallway, right?

9    A.    Yes, ma'am.

10   Q.    Who's in front?

11   A.    I am in front.

12   Q.    And who's behind you?

13   A.    Behind me is Mr. Eduardo (sic) Garcia.

14   Q.    And who's behind Mr. Garcia?

15   A.    Special Agent Perry.

16   Q.    So he's sandwiched in between the two of you?

17   A.    Yes.

18   Q.    So then you go down the stairs.  And let me -- these look

19   like the stairs that you all went down, right?

20   A.    Yes, ma'am.

21   Q.    And then that's referring to Defendant's Exhibit I.  And let

22   me direct your attention to Defendant's Exhibit J.  That is the

23   luggage area in the downstairs portion, right?

24   A.    Yes.

25   Q.    Where were -- where was everybody standing?  If you can,

1    please indicate on the photograph.

2    A.    Yeah.   I don't really recall where I was standing or where

3    Mr. Eduardo (sic) Garcia was standing, but I know Agent Perry was

4    grabbing the luggage, and then getting the luggage that was

5    pointed out by Mr. Eduardo (sic) and searching it.   I'm not sure

6    if I was on which side of the hallway.

7    Q.    Okay.   So -- but Mr. Garcia was standing, would it be fair to

8    say, somewhere in this area, this luggage area, right?

9    A.    Yes, ma'am, predominantly in the center of the aisle.

10   Q.    And then it was you and then Agent Perry who started

11   searching the bags?

12   A.    Correct, yes.   Well, Agent Perry was searching the bags.

13   Q.    Okay.   Then no contraband was found in the bags, right?

14   A.    That's correct, no.

15   Q.    And then, at that point, Agent Perry asked you, page 10, line

16   225 of Exhibit A, "Rey, can you ask him if I can see his ticket

17   one more time, please?"   And your question to Mr. Garcia, line

18   226, was, "Do you have the ticket?"   Right?

19   A.    Si -- yes.

20   Q.    All right.   And then there was no response -- well, I'm

21   sorry, excuse me.   Mr. Garcia said, "It's up there."   Right?

22   A.    That's correct.

23   Q.    And then you ask, line 232, "Okay, can we, ah, to see, find

24   the..."   And then you finish it looks like, on line 234, "The

25   ticket."   Right?

1   A.   Correct.  Possibly, again, people passing in front of us.

2   Q.   Okay.  And so, then, Mr. Garcia-Guzman agrees, right?

3   A.   Yes, ma'am.

4   Q.   And then do you guys all head back upstairs?

5   A.   Yes, ma'am.

6   Q.   Okay.  And who is going first?  Do you recall?

7   A.   I believe, from what I remember, it was Mr. Eduardo (sic)

8   Garcia, because I think I told him, you know, "*Pasale*," go ahead.

9   Q.   So he was leading the way?

10  A.   Yes, I believe so.

11  Q.   And so, then, you guys went back up to the second floor.  And

12  let's go back to Exhibit H.  And using this exhibit, can you tell

13  us where Mr. Garcia went once you went back up to the second

14  floor?

15  A.   He went back to room -- his room.

16  Q.   And then what happened when he went back in?

17  A.   I believe he went and, you know, grabbed the tickets that we

18  asked and gave it -- gave it to Agent Perry, who then looked at

19  them.

20  Q.   So then what happened with the ticket once Mr. Garcia gave it

21  to Agent Perry?

22  A.   I don't know.

23  Q.   And at this point, though, you're standing right there with

24  Agent Perry and Mr. Garcia, right?

25  A.   Yes, ma'am.

1   Q.   And let me direct your attention to 10 minutes, 40 seconds of

2   the recording.   And that would be approximately page 11, line 246.

3   **(Audio played for the Court.)**

4   Q.   (By Ms. Johnson)   We hear a baby crying, right?

5   A.   Yes, ma'am.

6   Q.   Then we hear Agent Perry asking Mr. Garcia something in

7   Spanish?

8   A.   Yes.

9   Q.   And you didn't translate that, did you?

10  A.   Translate the --

11  Q.   Or you testified on direct examination that you actually

12  translated when Agent Perry asked Mr. Garcia-Guzman if he could

13  search his person.   Do you recall that?   You even told us in

14  Spanish what you translated.

15          MR. PFIZENMAYER:   Objection; this is misleading at this

16  point.

17          MS. JOHNSON:   We can go back to the transcript.   He

18  stood up and he actually said it in Spanish what he actually

19  translated.

20          MR. PFIZENMAYER:   Your Honor, I would like to direct the

21  Court's attention to line 251.   I think that's the reference on

22  direct.

23          MS. JOHNSON:   Actually, if we could go back with the

24  transcript, Your Honor.

25          THE COURT:   That's fine.   Why don't you go ahead.   Well,

1   why don't we have the witness answer the question first.  I don't

2   think he's answered the question, did he?

3              MS. JOHNSON:  No.

4              THE COURT:  Or did he?

5   Q.   (By Ms. Johnson)  Officer Zamarron, you did not -- or Agent

6   Perry did not ask you to translate his question to

7   Mr. Garcia-Guzman about searching his body?

8   A.   From what I recall, I believe the -- I did mention, you know,

9   asking him if he could, you know, check him.  Again, there were so

10  many people walking by, the baby crying, so that's --

11  Q.   Where is that in the transcript?

12  A.   It was not audible -- able to -- intangible, maybe.  I

13  couldn't tell you.  I don't know.

14  Q.   Let's go back to when Agent Perry is discussing this or

15  patting himself.  Okay?  We'll go back to 10 minutes, 40 seconds.

16  I'll just do ten minutes.

17  **(Audio played for the Court.)**

18  Q.   (By Ms. Johnson)  You'd agree with me that that is Agent

19  Perry's voice, right?

20  A.   Yes, ma'am.

21  Q.   He's making patting sounds on himself, right?  We hear the

22  baby crying, 10 minutes, 46 seconds, right?

23  A.   Correct.

24  Q.   We don't hear your voice, right?

25  A.   You don't hear my voice, no.

1    **(Audio played for the Court.)**

2    Q.   (By Ms. Johnson)  And --

3    A.   You hear the --

4    Q.   You say, "*Pasale.  Pasale.*"  "Go ahead.  Go ahead," right?

5    And that's somebody passing by?

6    A.   Yes, ma'am.

7    Q.   But you're not speaking to Mr. Garcia?

8    A.   No, ma'am.

9    Q.   Other than saying, "Go ahead.  Go ahead," we don't hear your

10   voice right now, right?

11   A.   That is correct.  I believe Agent Perry might have moved out

12   of the way to let the people pass by, also, which is when I was

13   telling him if I could -- if Agent Perry could pat him down and

14   check him.

15   Q.   So it's your testimony under oath that you actually asked

16   Mr. Garcia-Guzman in Spanish if Agent Perry could pat him down?

17   A.   From what I recall, "*Puede checarlo, puedes?*"

18   Q.   But we don't hear that on the audio, right?

19   A.   That's correct.

20   Q.   And we don't see that on the transcript?

21   A.   That is correct.

22   Q.   But we do hear your voice say, "Go ahead.  Go ahead," to

23   someone passing by?

24   A.   Yes, ma'am.

25   Q.   Then Mr. Garcia -- excuse me, Agent Perry began to search

1  Mr. Garcia's person, right?

2  A.   Yes, ma'am.

3  Q.   And Agent Perry asked you, "Can you ask him to unzip his

4  jacket?"  Right?

5  A.   Yes, ma'am.

6  Q.   And your question to Mr. Garcia was, could you take off

7  the -- and we don't hear the rest?

8  A.   That's correct.

9  Q.   So let's go 10 -- well, we'll continue on.

10  **(Audio played for the Court.)**

11  Q.   (By Ms. Johnson)  You end with, Can you take off... -- we

12  don't hear your voice after that?

13  A.   That's correct.

14  Q.   But then we hear, "Aye, aye, aye, aye, aye."  Right?  Do you

15  want me to play the recording again?

16  A.   Yes, ma'am, please.

17  **(Audio played for the Court.)**

18  Q.   (By Ms. Johnson)  Did you hear that?

19  A.   I do.

20  Q.   And that was Mr. Garcia, right?

21  A.   I don't know who that was.

22  Q.   But at this point, it's you, right?

23  A.   Yes, ma'am.

24  Q.   Agent Perry, right?

25  A.   Yes, ma'am.

1   Q.   And Mr. Garcia?

2   A.   Yes, ma'am.

3   Q.   You didn't say, "Aye, aye, aye, aye, aye," right?

4   A.   No.  No, I did not.

5   Q.   Agent Perry didn't say, "Aye, aye, aye, aye, aye."

6   A.   No.

7   Q.   Okay.  Then Agent Perry continued to search Mr. Garcia's

8   person, right?

9   A.   Yes, ma'am.

10  Q.   And you told us on direct examination that Mr. Garcia took

11  off his jacket?

12  A.   I remember he -- because when I asked him, "*se la puede*

13  *quitar*," I made a motion with my own hands, you know, with the

14  jacket.  And he understood that.  He then began to unzip it.  I

15  don't recall if said -- I don't recall if he completely took it

16  off or unzipped it all the way.  I do -- I do remember he unzipped

17  it halfway, a quarter of the way off.

18  Q.   And then Agent Perry checked and searched around his

19  waistline, right?

20  A.   Yes, ma'am.

21  Q.   And then without removing what was in Mr. Garcia's waistline,

22  Agent Perry handcuffed Mr. Garcia, right?

23  A.   That's correct.

24  Q.   And then he was transported to the office, to the DEA office?

25  A.   Yes, ma'am.

1    Q.    And, approximately, what time was this, the arrest?

2    A.    I don't recall the specific time, no.

3    Q.    And, well, the train arrived around 5:00 in the afternoon,

4    right?

5    A.    Yes, ma'am.

6    Q.    And would it be fair to say between 5:00 and 5:30?

7    A.    Yes, approximately.

8    Q.    And then you wrote a report in this case, right?

9    A.    Yes, ma'am.

10   Q.    And in your report, you stated that around 7:08 p.m., you and

11   Officer Chavez conducted a post-arrest interview of

12   Mr. Garcia-Guzman?

13   A.    Yes, ma'am.

14   Q.    So if the encounter lasted about 13 minutes, according to the

15   recording, then Mr. Garcia was transported to the DEA office --

16   was he transported right away?

17   A.    I don't recall how he was transported or what time that was.

18   No, I don't remember.

19   Q.    Did you guys stay in the train area, the station, for awhile?

20   A.    No.  I think we went right back, yeah.

21   Q.    And there was also another officer with you and Agent Perry,

22   right?

23   A.    Yes, ma'am.

24   Q.    And who was that?  Was that Officer Chavez?

25   A.    No.  I believe there was a -- Officer Biff Kellum was also

1   there.  And Officer Chavez was -- I'm not sure if Officer Chavez

2   was already there or en route.

3   Q.   And where were they when you and Agent Perry are speaking

4   with Mr. Garcia-Guzman prior to searching his person?

5   A.   I'm not sure specifically where they were.  I don't know.

6           MS. JOHNSON:  I have no further questions, Your Honor.

7           THE COURT:  Redirect?

8           MR. PFIZENMAYER:  Yes, Your Honor.

9               **REDIRECT EXAMINATION BY MR. PFIZENMAYER**

10  Q.   So, TFO Zamarron, you still have the transcript, a copy of

11  it, in front of you?

12  A.   Yes.  Yes, sir.

13  Q.   So I want to direct your attention to -- back to line 136.

14          THE COURT:  On what page?

15          MR. PFIZENMAYER:  And that would be page 7, Your Honor.

16          THE COURT:  Thank you.

17          THE WITNESS:  Okay.

18  Q.   (By Mr. Pfizenmayer)  And in response to the question that

19  you pose on line 136, what did the defendant and the woman he was

20  traveling with do?

21  A.   What did they what, sir?

22  Q.   What did the defendant and the woman he was traveling with

23  do?  What was their physical response as opposed to verbal?

24  A.   Correct, it was verbal.

25  Q.   No.  No.  What was their -- what did they do, physically?

1        Let me ask it to you another way.  During this string of the

2   encounter when you asked them to search, but you don't really say

3   a room, it's kind of like an incomplete sentence in 136, right?

4   A.   Yes.

5   Q.   What did they do in response to that question?

6   A.   They essentially -- they gave consent.  I mean, they allowed

7   us to -- verbally said yes.

8   Q.   And then, physically, what did they do, though?

9   A.   And then they just, you know, stepped out of the room, and --

10  they physically stepped out of the room and Agent Perry was able

11  to search.

12  Q.   And now jumping to line 247, this is on page 11 of 13,

13  Defense Exhibit Alpha.  It's Special Agent Perry speaking and he

14  says something in Spanish.  Just to be clear, did you -- were you

15  translating -- did you feel any need to translate his Spanish

16  question?

17            THE COURT:  Where are you?

18            MR. PFIZENMAYER:  I'm sorry, line 247 on page 11.

19            THE COURT:  Thank you.

20  Q.   (By Mr. Pfizenmayer)  Did you need to translate the Spanish

21  question that Special Agent Perry posed?

22            MS. JOHNSON:  Objection; relevance.

23            THE COURT:  Okay.  I don't see a question on line 247.

24  It just says, "Okay, gracias señor," and then there's two words,

25  "Me permite" and "gracias."

1          MR. PFIZENMAYER:  I'm looking at the translation, Your

2     Honor, and that may be my deficiency.  But it says, "May I?"

3     Which would be indicative of a question at that point in time.

4     And this is when the audio is jumbled.  This is him asking to

5     search the defendant or pat down the defendant.  And this is the

6     jumbled audio.

7          THE COURT:  So you're asking the witness why he didn't

8     translate, "May I?"

9          MR. PFIZENMAYER:  No, Your Honor.  What I'm asking is

10     why he didn't translate a Spanish question.  Because on cross --

11     and maybe I misheard the point -- Ms. Johnson asked why he wasn't

12     translating certain things.  Particularly, I believe she asked

13     about this question, said she wanted to bring it to the Court's

14     attention.

15          THE COURT:  So the question is:  Why he didn't -- why

16     you didn't translate --

17          MR. PFIZENMAYER:  The Spanish question.

18          THE COURT:  -- "*me permite*."

19          THE WITNESS:  The -- it came across clearly what the

20     intent was, and he said it was okay.

21          THE COURT:  I'm sorry, who said it was okay?

22          THE WITNESS:  The --

23          THE COURT:  Mr. Garcia?

24          THE WITNESS:  No, the -- me, I said it was -- like the

25     question itself, the Spanish question, was okay, the translation

1    itself.

2              THE COURT:  Okay.

3              THE WITNESS:  Him asking, *"me permite,"* when Agent Perry

4    said that, to me, you know, it seemed okay for him to -- for me

5    not to necessarily translate it.

6              THE COURT:  All right.  I'm completely confused.  Was he

7    asking you, *"Me permite"*?  Is that what you're saying?

8              THE WITNESS:  No, no, no, no.  Potentially, I guess,

9    the -- was -- go ahead.

10             MR. PFIZENMAYER:  I think this may help clarify it, Your

11   Honor.

12             THE COURT:  Because there's nothing on the translation,

13   so I don't know what is clear, because there's no question that

14   was heard on -- that I heard on the audio.  So I don't know what

15   is being asked, and I don't know what can possibly be clear about

16   that.

17             MR. PFIZENMAYER:  Yes, Your Honor.  I think we've gone a

18   little bit far afield, so I'm just going to avoid that.

19          That's all I have, Your Honor.  Thank you.

20             THE COURT:  On that page 11, on line 260, Agent Perry

21   says, "Turn around, señor.  Rey, tell him to relax."  Do you

22   remember that point in time when that happened?

23             THE WITNESS:  Yes, ma'am.  Yes, Your Honor.

24             THE COURT:  Okay.  Can you tell me where -- what

25   direction Mr. Garcia was facing when he was told to turn around?

1          THE WITNESS:  He was facing -- I believe he was facing

2     Agent Perry.

3          THE COURT:  Okay.  And when he told you to tell him to

4     relax, what was Mr. Garcia doing, if you recall?

5          THE WITNESS:  From what I recall, the -- Agent Perry was

6     then going to handcuff Mr. Eduardo (sic) Garcia.  So Mr. Eduardo

7     (sic) Garcia was -- wasn't really, you know, stiffing up, himself

8     up, but he was not, you know, relaxed to be able to handcuff him.

9     I mean, still did, but he wasn't relaxed.

10         THE COURT:  So he was nervous?

11         THE WITNESS:  He was nervous, yes, ma'am.

12         THE COURT:  Okay.  You said on line 247 -- no, let's

13    see.  Let's see if that's where I was going to ask you.  Was it

14    page 7?  I'm sorry, it was on page 7.

15         You indicated in a question to Mr. Pfizenmayer that they gave

16    you permission -- and I can go back and see where it was.  And I

17    didn't see where.  I was wondering if you can show me where on

18    page 7 it says that you had permission to search the room for

19    contraband.

20         Okay.  Yes.  You were asked in response to the question, "On

21    line 136, what did the defendant and the woman he was traveling

22    with do?"

23         And then your question was, "What did the what, sir?"

24         And then you were asked, "What did the defendant and the

25    woman he was" -- I think that means "traveling with do.  What was

1    their physical response as opposed to verbal?"

2       And then you said, "Correct, it was verbal."

3       And the question, again, "Well, what did they do physically?"

4       And then he tries to ask you another way.  "During the string

5    of the encounter when you asked him to search," but you didn't

6    really say a room.  It was kind of like an incomplete sentence in

7    136 -- in 136, it says.  I think it means 136.

8       What did they do in response to that question?

9       "They essentially gave consent.  I mean, they allowed us

10    to -- verbally said yes."  That was your answer, that they

11    "verbally said yes."

12       Can you show me where they verbally said yes?

13          THE WITNESS:  I don't see it here, Your Honor.

14          THE COURT:  Okay.  And when you say that you were --

15    that you interpreted in the Thirteenth Judicial District, have you

16    ever taken the State of New Mexico written and oral exam?

17          THE WITNESS:  No, I have not.

18          THE COURT:  Okay.  So then you're not certified to be a

19    court interpreter?

20          THE WITNESS:  They haven't called me to do so.  I

21    believe --

22          THE COURT:  They don't call people.  The test is usually

23    just given on certain dates.  So you've -- did you testify maybe

24    in a Magistrate Court or --

25          THE WITNESS:  I have before, yes, ma'am.

1         THE COURT:  So that's why.  Magistrate Court doesn't

2    require certification.

3         THE WITNESS:  Okay.

4         THE COURT:  I understand your answer now, sir.

5      All right.  As a result of my questions, anyone have anything

6    additional that they'd like to ask?

7         MR. PFIZENMAYER:  Nothing from the Government, Your

8    Honor.  Thank you.

9         MS. JOHNSON:  I do, Your Honor.

10        THE COURT:  All right.  Go ahead.

11        MS. JOHNSON:  May I have the HDMI, please?

12        LAW CLERK:  Yes.

13            **FURTHER CROSS-EXAMINATION BY MS. JOHNSON**

14   Q.   Officer Zamarron, the Court asked you about page 11, line

15   260, where Agent Perry tells you, "Rey, tell him to relax."

16   Right?

17   A.   Yes, ma'am.

18   Q.   But by that point, Agent Perry had already handcuffed or

19   started to handcuff Mr. Garcia, right?

20   A.   Yes, I believe so, yes.

21   Q.   And, in fact, if you look at line 257 --

22   A.   Okay.

23   Q.   -- we hear the sounds of handcuffs.  And we can listen to the

24   audio, if you'd like.

25   A.   No, no.

1    Q.   So when he says just, "Rey, tell him to relax," he's

2    referring to the handcuffing process, right?

3    A.   Yes, ma'am.

4    Q.   Okay.

5         MS. JOHNSON:  That's all I have, Your Honor.

6    **(Court confers with law clerk.)**

7         THE COURT:  Agent -- oops, I turned off my mic.

8    When the patting first started --

9         THE WITNESS:  Yes, ma'am.

10        THE COURT:  I'm a little confused about the direction

11   that Mr. Garcia was facing.  Were you present at that time when

12   the patting was going down?

13        THE WITNESS:  Yes, ma'am, I was.

14        THE COURT:  Do you recall the position of Mr. Garcia at

15   the time?

16        THE WITNESS:  The position of Mr. Garcia was his hands

17   up facing his own room.

18        THE COURT:  Okay.  And relative to Agent Perry?

19        THE WITNESS:  Agent Perry was behind Mr. Garcia midway

20   between the empty room and the hallway.

21        THE COURT:  Empty room and the hallway.  Okay.  So then

22   Mr. Garcia had his back -- if I'm picturing this correctly, had

23   his back to Agent Perry.

24        THE WITNESS:  Yes, ma'am.

25        THE COURT:  Okay.  And -- let's see, there's one more.

1     Okay.  I think that's everything.  Thank you very much for

2  answering all of our questions and answering mine as well, sir.

3          THE WITNESS:  Thank you, Your Honor.

4          THE COURT:  I appreciate your attendance here.

5     Any objection to this witness being excused?

6          MR. PFIZENMAYER:  No, Your Honor.  Thank you.

7          THE COURT:  Thank you, sir.  You may be excused.

8          MS. JOHNSON:  Just for the record, for clarification, I

9  have no objection to him being excused.

10     But when counsel for the government made the objection during

11  my cross-examination of this officer about the questioning with

12  Agent Perry patting himself, and he -- counsel for the government

13  objected that it was misleading or assumed facts not in evidence.

14  I just wanted to direct your attention to the transcript, page 92,

15  and it is lines 12 through 14.  And that's during direct

16  examination of this officer by the AUSA, where the officer says,

17  "Agent Perry lifted his own arms and asked him if I can pat him

18  down, so I -- then I translated, you know, can you get permission

19  to pat him down in Spanish?"  He said, "Yes."

20     I just wanted to make sure the record is clear, because that

21  was said during direct examination.

22          THE COURT:  Yes, I did recall that.  Thank you.

23     Okay.  Any other witnesses for the Government?

24          MR. PFIZENMAYER:  No, Your Honor.  The Government rests.

25          THE COURT:  Okay.  Thank you.

1          MS. JOHNSON:  The defense calls Everado Garcia-Guzman.

2          THE COURT:  Sir, if you could please come forward to be

3    sworn?

4          LAW CLERK:  Do you solemnly swear or affirm that your

5    testimony in this matter now before the Court will be the truth,

6    the whole truth, and nothing but the truth?

7          THE WITNESS:  Yes, I do.

8          THE COURT:  Please be seated, sir.

9          MS. JOHNSON:  May I have the HDMI, please?

10   **(Technical setup.)**

11         MS. JOHNSON:  May I proceed, Your Honor?

12         THE COURT:  You may.  Thank you.

13                   **EVERADO GARCIA-GUZMAN**

14            **(being duly sworn, testified as follows:)**

15      **DIRECT EXAMINATION BY MS. JOHNSON (Through Interpreter)**

16   Q.   Mr. Garcia -- did you need something?  I thought you were

17   trying to reach for something.

18        Would you please introduce yourself for the Court?

19   A.   Your Honor, I am Everado Garcia-Guzman.

20   Q.   And how old are you, sir?

21   A.   I'm 53 years old.

22   Q.   And how much school do you have?

23   A.   Eight years.

24   Q.   And when you went -- when you went to school, when you were

25   going to school, did you struggle with learning at all?

```
1    A.   Yes.

2    Q.   How?

3    A.   Because I couldn't pronounce the R.  I struggled.

4    Q.   And can you read well?

5    A.   Yes, but slowly.

6    Q.   And where have you lived?

7    A.   In Mexico.

8    Q.   All your life?

9    A.   Yes, all my life.

10   Q.   And have you ever lived in the United States?

11   A.   No.

12   Q.   At any time in your life, have you ever had encounters with

13   law enforcement prior to March 13th, 2019?

14   A.   No.

15   Q.   In Mexico?

16   A.   No.

17   Q.   In the United States?

18   A.   No, neither.

19   Q.   Are you familiar with the rights people have in the United

20   States?

21   A.   No.

22   Q.   Are you familiar or have any knowledge of the justice system

23   in the United States?

24   A.   No.

25              MR. PFIZENMAYER:  Objection; relevance.
```

```
1            MS. JOHNSON:  Your Honor, I think these are -- although

2   they're not determinative, these are factors that the Court may

3   consider in determining voluntariness.  The defendant's

4   educational level, his knowledge of the system.  But this is the

5   last question of that nature I'm going to ask.

6            THE COURT:  Okay.  Go ahead.

7   Q.   (By Ms. Johnson)  Mr. Garcia, let's talk about what happened

8   on March 13th, 2019.  Do you remember that day?

9   A.   Yes.

10  Q.   And where were you?

11  A.   In the Amtrak train.

12  Q.   And did you arrive in Albuquerque that afternoon?

13  A.   Yes.

14  Q.   And had you entered the United States legally or illegally?

15  A.   Legally.

16  Q.   With a visa?

17  A.   Visa.  I have had a visa for 20 years.

18  Q.   Do you remember which train car you were traveling in?

19  A.   The 431 one.

20  Q.   I'm going to direct your attention to Defendant's Exhibit B.

21  Do you recognize that?

22  A.   Yes.  That's the train where I was.

23  Q.   And do you recall what room you were traveling in?

24  A.   Room No. 9.

25  Q.   And how did you board car 431?
```

1   A.    Through the middle door.

2            MS. JOHNSON:  Your Honor, I would ask the Court allow

3   Mr. Garcia-Guzman's, at least one hand to be freed because I am

4   going to need him to demonstrate.

5            THE COURT:  Yes.  If you don't mind, Marcus.  Thank you,

6   Bernadette.

7            THE WITNESS:  Thank you.

8   Q.    (By Ms. Johnson)  Mr. Garcia, I'm going to direct your

9   attention to Defendant' Exhibit C.  Do you recognize that?

10  A.    Yes.

11  Q.    What is it?

12  A.    It's the door where I enter -- where I entered.

13  Q.    Did you know there were any other doors that you could enter

14  or exit, wagon -- excuse me, car, train 431?

15  A.    No, just that one.

16  Q.    That you knew of, right?

17  A.    Well, no.  I didn't know.

18  Q.    But you knew -- you thought it was only that one?  Is that

19  what you're saying?

20  A.    Yes.

21  Q.    Were you traveling by yourself?

22  A.    No, I was with my daughter.

23  Q.    And who else was traveling with you and your daughter?

24  A.    My grandson.

25  Q.    Okay.  And so you said you were traveling in room No. 9?

1  A.   Yes.

2  Q.   Let me direct your attention to Defendant's Exhibit D.  Do

3  you recognize that?

4  A.   Yes.

5  Q.   What is it?

6  A.   That's room No. 9.

7  Q.   Does it look like the room that you were traveling in that

8  day on March 13th?

9  A.   It looks like the one that -- that day.

10 Q.   And is it a large room, or is it a very small room?

11 A.   It is small.

12 Q.   And where were you seated?

13 A.   On the left side.

14 Q.   And your daughter?

15 A.   On the other side.

16 Q.   And so when you all arrived in Albuquerque, do you remember

17 Agent Perry coming to your room?

18 A.   When I arrived in Albuquerque, no.

19 Q.   But once you had been in Albuquerque, the train had been in

20 Albuquerque, do you remember Agent Perry coming to your room?

21 A.   Oh, yes.

22 Q.   And where were you at that point when Agent Perry came to

23 your room?

24 A.   I was inside the room.

25 Q.   Let me direct your attention to Defendant's Exhibit G.  Do

1   you recognize that?

2   A.   Yes.

3   Q.   What is it?

4   A.   That is where I was seated, see, with the towel there.

5   Q.   And so your daughter, then, was in the seat right in front of

6   that?

7   A.   Yes.

8   Q.   And so when Agent Perry got to your room, was the door opened

9   or closed?

10  A.   The first door was open, and the curtain was closed.

11  Q.   Okay.  And what did Agent Perry do?

12  A.   He showed a police badge.  He knocked on the door.

13  Q.   Okay.  Did you understand what he had said?

14  A.   No.

15  Q.   Okay.  Now, let me show you Defendant's Exhibit H.  Do you

16  recognize that photograph?

17  A.   Yes.

18  Q.   And how do you recognize it?

19  A.   The hallway and the door on the left.

20  Q.   And what is it?  What is Exhibit H?  What photograph is this

21  of?  What hallway?

22  A.   That's the second floor.

23  Q.   Is that the car you were traveling in, or it looks like the

24  car you were traveling in?

25  A.   It looks the same.

1   Q.   And where was your room?  If you can draw on the screen,
2   please.
3   A.   I came in through the right, and my room was -- my room was
4   on the left side.
5   Q.   And when Agent Perry approached, do you recall where he
6   stood?
7   A.   In front, because he knocked.
8   Q.   Okay.  And at some point, do you recall Agent Perry trying to
9   speak to you in Spanish?
10  A.   No.
11  Q.   So how far was Agent Perry from you when he began to try to
12  speak to you and your daughter?
13  A.   I was still inside and he was standing outside.
14  Q.   Okay.  When Agent Perry began to speak with you at some
15  point, he tried -- do you recall hearing the recording? -- to
16  speak to you in some broken Spanish?
17  A.   Yes.
18  Q.   And let me ask:  Do you recall Agent Perry asking you in
19  Spanish, "May I speak with you?"
20  A.   No, I do not recall.
21  Q.   And if you heard the recording, would that help you remember?
22  A.   Yes.
23  **(Audio played for the Court.)**
24  Q.   (By Ms. Johnson)  Do you remember Agent Perry asking if he
25  can speak with you?

1    A.    Yes, I did, but I told him that I didn't know.

2    Q.    Well, let's listen to it again.  Do you recall saying yes?

3    A.    No.

4    Q.    Okay.  But at some -- you continued to speak with Agent

5    Perry, right?

6    A.    Yes.  It was my daughter who answered him.

7    Q.    Okay.  Well, did you know that you could say no, you didn't

8    have to speak with Agent Perry?

9    A.    No.

10   Q.    At some point, let me ask you, you -- did you see a second

11   officer?

12   A.    A short time later, Zamarron arrived.

13   Q.    And were you still in the room or had -- were you outside the

14   room?

15   A.    I was there.  I was inside.

16   Q.    Could you have walked out of that room if you would have

17   wanted?

18   A.    No, because both officers were there.

19          THE INTERPRETER:  Interpreter's correction.  "He was

20   already inside," as opposed to "I was still inside the room."

21          MS. JOHNSON:  I'm sorry, may I have clarification as to

22   which -- I guess I'll --

23          THE INTERPRETER:  When counsel asked if defendant was --

24   witness was still inside the room, where was he?  And the answer

25   is he was already -- he was already inside the room.

1          MS. JOHNSON:  He meaning Mr. Garcia?

2          THE INTERPRETER:  That's correct.  Agent Perry.

3          MS. JOHNSON:  That's not what I understood.  May I ask

4    that again, Your Honor?

5          THE COURT:  Go ahead.

6    Q.   (By Ms. Johnson)  All right.  So when Officer Zamarron --

7    Zamarron, excuse me, approached, where was Agent Perry?  If you

8    can look at Exhibit H and show us where Agent Perry was.

9    A.   He was standing here (indicating).

10   Q.   And where was Officer Zamarron?

11   A.   Here (indicating).

12   Q.   And where were you?

13   A.   I was inside still.

14   Q.   Okay.  So at some point, did Agent Perry go in and search

15   your room?

16   A.   Yes.

17   Q.   And did you give him permission to search your room?

18   A.   No, my daughter did.

19   Q.   Okay.  So at some point, if you recall the testimony of the

20   officers today, you accompanied the officers to go downstairs.  Do

21   you remember that?

22   A.   Yes.

23   Q.   Okay.  And were you aware that Officer Zamarron was also a

24   law enforcement officer?

25   A.   Yes.

1   Q.   Would you have been able, when you were going downstairs, to

2   just walk off the train if you would have wanted to?

3   A.   No.

4   Q.   After you guys were downstairs, let's talk about when you

5   guys went back upstairs.  Do you remember that?

6   A.   Yes.

7   Q.   So once you went back upstairs, after coming back from

8   downstairs, where did you go?

9   A.   To the room.

10  Q.   And for what?

11  A.   For the ticket.

12  Q.   And who did -- did you retrieve your ticket?

13  A.   No.  My daughter had it in the diaper bag.

14  Q.   But did she give it to you?

15  A.   Yes, she gave it to me.

16  Q.   And what did you do with it?

17  A.   We gave it to the officer.

18  Q.   And then do you recall if he returned it to you?

19  A.   No, he returned it to my daughter.

20  Q.   Okay.  And so, at that point, do you -- let's listen to the

21  recording.  I'm going to direct your attention to 10 minutes, 40

22  seconds.

23  **(Audio played for the Court.)**

24  Q.   (By Ms. Johnson)  Do you remember when Agent Perry did that,

25  what we just heard?

1  A.   Can you do it again, please?

2          THE COURT:  What page are you on?

3          MS. JOHNSON:  Your Honor, this is page 11, line 246, and

4  it is -- begins at 10 minutes, roughly, 38 seconds or 40 seconds.

5          THE COURT:  Thank you.

6  **(Audio played for the Court.)**

7  Q.   (By Ms. Johnson)  Do you remember -- after you showed Agent

8  Perry your ticket for the second time, do you remember Agent

9  Perry's doing this, patting himself?

10 A.   Yes, I do.  That's when he asked me if he could -- if he

11 could pat me down, and he was making these kind of gestures.  And

12 my son was crying a lot, but I don't recall what he told me.

13         MS. JOHNSON:  Your Honor, I think that the interpreter

14 forgot up here.  So may I --

15         THE COURT:  Why don't you have the witness repeat his

16 answer.  And it's been a long day.  Tell me anytime you need a

17 break, okay?

18         THE INTERPRETER:  Thank you, Your Honor.

19         THE COURT:  Please.

20 Q.   (By Ms. Johnson)  Let me ask you the question again.  What

21 did you see Agent Perry do?  Let's start with that.  Okay.  You

22 heard the recording, right, just now?

23 A.   Yes.

24 Q.   Did you hear some, like, sounds like this?  Do you recall

25 that?

1    A.    Yes.

2    Q.    What do you remember seeing Agent Perry do?  If you can show

3    the Judge, please.

4    A.    That if he could touch me up here.

5    Q.    Did you hear Agent Perry ask you if he could search your

6    person?

7    A.    No.  He just -- I just saw that he motioned like this.

8    Q.    Could you hear him over the baby crying?

9    A.    No, I didn't hear.

10   Q.    And so what did you say when you saw?  Were you looking at

11   Agent Perry at that time?

12   A.    Yes.

13   Q.    And what did you say?

14   A.    No.  He just did like this, and I just kept -- stayed there

15   standing.

16   Q.    Now, did you -- do you remember saying the word "yes"?

17   A.    No.

18   Q.    Now, let's play the recording.  Let's go back to 10 minutes,

19   40 seconds, okay?  If you can listen.

20          MS. JOHNSON:  It might help, Your Honor, if, during the

21   recording, he can remove his audio set or his earphones, so he can

22   hear the recording.

23          THE COURT:  Okay.  That's fine.  Okay.

24   **(Audio played for the Court.)**

25   Q.    (By Ms. Johnson)  Do you remember someone saying "Yes"?

1   A.   No, I don't remember.

2   Q.   Mr. Garcia, let's listen to the recording, okay?  If you can

3   listen to the recording carefully, okay?

4   **(Audio played for the Court.)**

5   Q.   (By Ms. Johnson)  Did you hear yourself say yes?

6   A.   I did say, "Yes."

7           THE COURT:  It didn't get translated yet.  Okay.  Now we

8   can hear you.

9           MR. PFIZENMAYER:  It was asked and answered.

10          THE COURT:  Well, I think it was asked and answered, but

11  he wasn't -- what counsel is trying to do is give him an

12  opportunity to see if he can hear it.  And, honestly, I need a

13  bunch of times to be able to decipher this audio, too.  I'm having

14  trouble hearing it myself.

15      Has this ever been enhanced?  No?

16          MS. JOHNSON:  No, I don't think so, Your Honor.

17          MR. PFIZENMAYER:  Your Honor, I inquired about that, and

18  they didn't seem to think -- they wouldn't be able to do anything

19  about that.  It's not a dual track recording system.

20          THE COURT:  I see.  It just really is hard.  I mean, you

21  guys, I'm sure, have heard it so many times, but it is hard to

22  make out what people are saying on it.

23      I'm sorry to interrupt.  Go ahead.

24  Q.   (By Ms. Johnson)  Mr. Garcia, what did you say yes to?

25  A.   Because I understood that he was going to check me here, up

1   here on my chest.

2   Q.   Were you giving him permission to search your entire body?

3   A.   No.   Only that he was going to touch me here.

4   Q.   Were you able to hear any of the words that Agent Perry

5   actually spoke to you at that moment?

6   A.   No, because the baby was crying a lot.

7   Q.   And so when you said yes, do you remember what you did next?

8   A.   Yes.

9   Q.   And what was that?

10  A.   I just gave him permission to touch me up here.

11  Q.   And what did you do?  Did you move?  Did you walk away?  What

12  did you do?

13  A.   I just stood to the side.

14  Q.   Were you -- where was Agent Perry -- how far was he from you?

15  A.   He was about a meter away.

16  Q.   Where was Agent -- or Officer Zamarron?

17  A.   He was behind me.

18  Q.   So was Agent Perry in front of you?

19  A.   Sort of like in front of me, but I was to the side, kind of.

20  I was to the side, and I was next to the room.

21  Q.   After you saw Agent Perry tap his chest, did you move?  Did

22  your body move?

23  A.   No.

24  Q.   Did you, at any point, turn around?

25  A.   No.

1    Q.   So you said you were to the side, though.  What do you mean

2    by that?

3    A.   He was in front of me, but the -- the hallway is very narrow,

4    so I was sort of sideways.

5    Q.   Did he then begin to search you?

6    A.   Yes.  That's when he began to search me.

7    Q.   All right.

8          THE INTERPRETER:  Your Honor, may the Interpreter

9    approach?

10         THE COURT:  Yes.

11   **(Court confers with interpreter off the record.)**

12         THE COURT:  We need to take a recess at this time, okay.

13   So we'll take a 15-minute recess at this time.  Thank you.

14   **(In recess at 2:58 p.m. until 3:13 p.m.)**

15         THE COURT:  You may proceed.

16         MS. JOHNSON:  May I proceed?

17         THE COURT:  Yes.

18   Q.   (By Ms. Johnson)  Mr. Garcia, let's go back.  Before we

19   broke, we were talking about when Agent Perry began to search your

20   person.  Do you remember that?

21   A.   Yes.

22   Q.   And so before he started searching you, we heard on the

23   recording you said, "Yes."  Right?

24   A.   Yes.

25   Q.   And after you said that -- okay, if you can look at the

1  photograph in front of you, can you show us where -- approximately

2  where were you standing and where Agent Perry was standing?

3  A.  I was here and Agent Perry was on this side (indicating).

4  Q.  Did you move before he started searching you?

5  A.  Yes, because I was sort of sideways.

6  Q.  So you moved sideways?

7  A.  Yes, because the hallway is very narrow.

8  Q.  And so let's listen to the recording around that time when

9  Agent Perry begins to search your body?

10  **(Audio played for the Court.)**

11  Q.  (By Ms. Johnson)  Did you hear somebody say, "Aye, aye, aye,

12  aye, aye"?

13  A.  Yes, that was me.

14  Q.  Why did you say "aye, aye, aye, aye, aye"?

15  A.  Because at that moment, he grabbed my arm.  He twisted my

16  left arm.  And he started unzipping -- he started unzipping me and

17  he stuck his hand inside.  He could not unzip it all the way down

18  because the vest had buttons.

19  Q.  Do you remember hearing Officer Zamarron say, "Could you take

20  off the" --

21  A.  No.  The baby was crying a lot, so I couldn't hear.

22  Q.  Did -- at any point, did you unzip your vest?

23  A.  No.  It went all -- just halfway down.

24  Q.  And how did Agent Perry then continue to search your body?

25  A.  He had my arm like this, and he stuck the other hand inside

1   the vest.

2   Q.   Had you given him permission --

3           THE COURT:   I'm sorry, before we go on.   I think we need

4   to put on the record how his hand --

5           MS. JOHNSON:   Oh, thank you.

6   Q.   (By Ms. Johnson)   Mr. Garcia, can you stand up and show the

7   Court how your hand was being held at the time that Agent Perry

8   was searching -- putting his hand in your vest?

9   A.   (Witness demonstrates.)   I was like this sideways.   Sideways

10  my hand was -- my hand was -- my hand was like this, and then with

11  the other hand, he stuck his hand inside my vest.   He tried -- he

12  tried to open it.   It only went halfway down.   And the biggest --

13  the zipper got stuck.   And at that moment, that's when he

14  handcuffed me.

15  Q.   What did the zipper get stuck on?

16  A.   Because it has a zipper and it has buttons.

17          MS. JOHNSON:   And so for the record, Your Honor,

18  Mr. Garcia-Guzman put his arm behind his back -- his -- I can't

19  recall which arm.

20          THE WITNESS:   The left one.

21          MS. JOHNSON:   Does the Court want further description

22  for the record?

23          THE COURT:   No.   Is there any objection to the

24  description being given?

25          MR. PFIZENMAYER:   No, Your Honor.

```
1              THE COURT:  Okay.  Thank you.

2          No, go ahead.  You may be seated, sir.

3              THE WITNESS:  Thank you.

4    Q.   (By Ms. Johnson)  At any point, did you, yourself, remove

5    your vest?

6    A.   No.

7    Q.   At any point, did you give Agent Perry permission to search

8    your waist?

9    A.   No.

10   Q.   Did you feel when he searched your waist area?

11   A.   No, because he did it from -- he stuck it inside this way.

12   Q.   When he stuck his hand inside your vest, did he go all the

13   way down to your waistline?

14   A.   I think so, because that's when he handcuffed me after that.

15             MS. JOHNSON:  I have no further questions.  Thank you,

16   Mr. Garcia.

17             THE COURT:  You may cross-examine.

18             MR. PFIZENMAYER:  Thank you, Your Honor.

19             CROSS-EXAMINATION BY MR. PFIZENMAYER

20   Q.   Is it okay if I just call you Mr. Garcia?

21   A.   Yes.

22   Q.   Thank you.  Mr. Garcia, during this encounter, up until the

23   point you were at the DEA office, you had drugs strapped to your

24   midsection?

25             MS. JOHNSON:  Objection, Your Honor.  This is beyond the
```

1   scope of direct examination.  And on behalf of my client, I direct

2   him to decline to answer that question pursuant to the Fifth

3   Amendment.

4           MR. PFIZENMAYER:  Your Honor, that's been waived because

5   he's testifying.

6           THE COURT:  Hold on a second.  Let me go back to your

7   question.

8       I'm sorry, I'm way at the part before the break.  Here we go.

9   Question is:  During this encounter, up until the point where you

10  were at the DEA office, you had drugs strapped to your midsection?

11      Okay.  It's beyond the scope.

12          MR. PFIZENMAYER:  Your Honor, if I may respond?

13          THE COURT:  Yes, please.

14          MR. PFIZENMAYER:  It does go to the voluntariness

15  portion of this in that it helps to address the subjective factors

16  as to, in particular, why certain reactions were --

17          THE INTERPRETER:  The interpreter is having a hard time.

18          MR. PFIZENMAYER:  It helps -- this line of questioning

19  will address the defendant's reactions, physical reactions, to

20  questions and as well as the searches.  To the extent that there's

21  a concern with regard to the Fifth Amendment, this can't be

22  entered in against him for purposes at trial.  It can only be used

23  for impeachment.

24          THE COURT:  I'm not following the voluntariness issue.

25          MR. PFIZENMAYER:  With regard to voluntariness, the

```
 1   subjective characteristics of the defendant come into play.  And
 2   as Ms. Johnson has brought out on her direct, she's going to his
 3   mental state throughout this.  His knowledge of the drugs being at
 4   his midsection go to that same element and help explain why he
 5   acted the way he did throughout this encounter.
 6            THE COURT:  Okay.  I'm sustaining the objection.
 7   Q.   (By Mr. Pfizenmayer)  Mr. Garcia, Special Agent Perry
 8   found --
 9            THE COURT:  I'm sorry, just to be clear, I'm sustaining
10   it on the fact that it is beyond the scope.  Go ahead.
11            MR. PFIZENMAYER:  Yes, Your Honor.
12   Q.   (By Mr. Pfizenmayer)  Mr. Garcia, Special Agent Perry found a
13   bundle in your midsection?
14            MS. JOHNSON:  Your Honor, I'm going to object as to what
15   this -- asking this witness what Agent Perry found or what Agent
16   Perry did.  I would say that that's speculative.
17            THE COURT:  How is that speculative?
18            MS. JOHNSON:  Well, he's asking did -- Agent Perry found
19   something in your midsection.  It's unclear as to when that
20   happened, and, also -- I guess I'll wait to see where this line of
21   questioning is going, but it's unclear as to when he's saying
22   Agent Perry found this.
23            THE COURT:  Overruled.  You may proceed.
24            MR. PFIZENMAYER:  Thank you, Your Honor.
25   Q.   (By Mr. Pfizenmayer)  Mr. Garcia, Special Agent Perry found a
```

1   bundle along your waistline, correct?

2   A.   Yes.

3   Q.   And that bundle contained drugs?

4           MS. JOHNSON:  Objection, Your Honor.  Again, I would

5   instruct my client to not answer that question.  He still retains

6   his Fifth Amendment rights, even in a suppression hearing.

7           THE COURT:  Sustained.

8   Q.   (By Mr. Pfizenmayer)  Throughout the encounter where you were

9   speaking with Special Agent Perry, that bundle was present in that

10  same spot, correct?

11  A.   Yes.

12  Q.   You're the one who placed it there?

13          MS. JOHNSON:  Objection, Your Honor.  It's going beyond

14  the scope.

15          THE COURT:  Sustained.

16  Q.   (By Mr. Pfizenmayer)  When Special Agent Perry first came to

17  your room, the bundle was at your midsection?

18          MS. JOHNSON:  Objection, again; beyond the scope and,

19  also, relevance.

20          THE COURT:  Overruled.  You may answer.  You may ask

21  that question.  And, sir, you may answer that question.  You

22  probably have to ask it again, since we --

23  Q.   (By Mr. Pfizenmayer)  Mr. Garcia, when Special Agent Perry

24  first came to your room, you had the bundle along your waistline,

25  correct?

1   A.   Yes.

2   Q.   And he asked you to search the backpack you had, correct?

3   A.   Yes.

4   Q.   And in response to that, you gave him the backpack?

5   A.   My daughter did give it to him.

6   Q.   And you weren't nervous about that because the bundle was at

7   your waistline and not in the bag?

8   A.   No, I was normal.

9   Q.   Then later on, Special Agent Perry and Task Force Officer

10  Zamarron asked for permission to search your room, correct?

11  A.   Yes.

12  Q.   And you let them search your room?

13  A.   I told him that I didn't know.

14  Q.   You left your room and went across the hallway?

15  A.   Well, yeah.

16  Q.   You followed your daughter there or your stepdaughter there?

17  A.   No, I went down with the -- with the agents.

18  Q.   Let me rephrase that.  When they searched your room, you had

19  to leave it, right?

20  A.   That's right.  But I did not give them permission.  It was my

21  daughter who did.

22  Q.   And you followed her out of the room when she left the

23  room?

24  A.   We were in the hallway, no.

25  Q.   So when your daughter left the room for them to search it,

1  you went with her?

2  A.   Yes, because Agent Perry wanted to check it.

3  Q.   So you consented to the search -- sorry, your daughter

4  consented to the search and you went with her?

5          MS. JOHNSON:  Objection; calls for a legal conclusion as

6  far as consent.

7          THE COURT:  Sustained.  Rephrase.

8  Q.   (By Mr. Pfizenmayer)  Your daughter agreed to the search and

9  you went with her?

10  A.   Yes, the room.

11  Q.   And when you left the room so they could search it, the

12  bundle was still in your waistline?

13  A.   Yes.

14  Q.   So you knew they wouldn't find anything in the room?

15          MS. JOHNSON:  Objection; calls for speculation.

16          THE COURT:  Overruled.  You may answer the question,

17  sir.

18          MR. PFIZENMAYER:  I'll ask it again, Your Honor.

19  Q.   (By Mr. Pfizenmayer)  You knew they would not find the bundle

20  or drugs in the room because it was in your waistline when you

21  left the room?

22          MS. JOHNSON:  Your Honor, I'm going to object as to the

23  characterization of bundle of drugs, again, pursuant to the Fifth

24  Amendment.

25          THE COURT:  Sustained.  Please rephrase your question.

1          MR. PFIZENMAYER:  Yes, Your Honor.

2   Q.   (By Mr. Pfizenmayer)  Mr. Garcia, when you left the room with

3   your daughter so that the agents could search it, you had the

4   bundle with you in your waistline?

5   A.   Yes.

6   Q.   So you knew they would not find the bundle in the room?

7   A.   Well, yes.

8   Q.   And that's why you weren't nervous?

9   A.   I wasn't nervous yet.

10  Q.   So like I said, that's why you weren't nervous at that point

11  in time.

12  A.   Same agent stated that.

13  Q.   That's not the question I asked you.  What I asked you was:

14  The reason you weren't nervous about the search of your room is

15  because you knew you had the bundle with you?

16          MS. JOHNSON:  Asked and answered.

17          THE COURT:  Overruled.  You may answer the question,

18  sir.

19          THE WITNESS:  Yes.

20  Q.   (By Mr. Pfizenmayer)  Later on, you agreed to go with the

21  officers to the first floor to look at your luggage, correct?

22  A.   Yes.

23  Q.   And you knew they wanted to search your luggage?

24  A.   Yes.

25  Q.   And you gave them permission to search your luggage?

```
1    A.    My daughter did.
2    Q.    And you went with them to show them where the luggage was
3    that she agreed to search?
4    A.    Yes, sir.
5    Q.    But just like when you left the room, you went along with
6    it?
7    A.    Yes.  They were going to go to check the -- search the
8    luggage.
9    Q.    Your daughter agreed to the search of the luggage, correct?
10   A.    Yes.
11   Q.    You then helped the agents find the luggage for the purposes
12   of that search?
13   A.    Yes.
14   Q.    They then searched your luggage.
15   A.    Yes.
16   Q.    While they were searching the luggage, the bundle was still
17   on your waistline?
18   A.    Yes.
19   Q.    And that is why you were not nervous about them searching the
20   luggage?
21   A.    Yes.
22   Q.    And then they asked to see your ticket again.
23   A.    Yes.
24   Q.    And you said, "Of course"?
25   A.    Yes.
```

1  Q.  You didn't say, "Yes."  You said, "Of course."

2  A.  Yes.  Well, yes, it's the same.

3  Q.  And then you went with them back upstairs?

4  A.  Yes.

5  Q.  You got the ticket from your daughter?

6  A.  Yes.

7  Q.  You showed it to Special Agent Perry?

8  A.  Yes.

9  Q.  He gave it back to you?

10  A.  I think so.  He gave it back.

11  Q.  He gave it back to your daughter?

12  A.  Yes.

13  Q.  And then he asked you if he could search you?

14  A.  No.

15  Q.  So your testimony is right now that Special Agent Perry never

16  asked to search you?

17  A.  No, because I didn't understand him.  The baby was crying a

18  lot.

19        MR. PFIZENMAYER:  Your Honor, I'd like to direct the

20  Court and counsel's attention to the current transcript that is

21  being recorded for this particular proceeding, page 142, starting

22  at line 11, and then moving on through the defendant's answer on

23  line 14.  And he specifically states that Special Agent Perry

24  asked to pat him down.

25        THE COURT:  You're saying in the court transcript?

1          MR. PFIZENMAYER:  Yes, Your Honor.

2          THE COURT:  I'm sorry, so give me the reference again.

3          MR. PFIZENMAYER:  It is page 142.  The question starts

4     at line 11 on page 142, and the defendant's answer starts at line

5     14 on page 142.

6          MS. JOHNSON:  Your Honor, I would object.  This is

7     improper cross.  I'm not sure who's testifying.

8          THE COURT:  Okay.  So is that what you're doing?

9     Because you just said you wanted to direct my attention.

10         MR. PFIZENMAYER:  Yes, Your Honor.  So for purposes of

11    this cross-examination, I don't have a hard copy of that.

12         THE COURT:  Well, you can just refer to -- you can go

13    back to the counsel table and refer to -- use the microphone at

14    counsel table and ask him a question from counsel table.  That's

15    fine.

16    Q.   (By Mr. Pfizenmayer)  Mr. Garcia, when you were talking with

17    your attorney, Ms. Johnson, she asked you the following question

18    on page 142:  "Do you remember -- after you showed Agent Perry

19    your ticket for the second time, do you remember Agent Perry's

20    doing this, patting himself?"

21         Your response immediately after that to her is:  "Yes, I do.

22    That's when he," in reference to Special Agent Perry, "asked me if

23    he could -- if he could pat me down and he was making these kind

24    of gestures."

25         Did you say that?

1  A.   Yes.  That he patted himself over here, yes.

2  Q.   You specifically said, "He asked me if he could pat me down."

3  Did you say that?

4  A.   No, it was the other body.

5        MS. JOHNSON:  I'm sorry, correction.  I believe he said,

6  "It was not the entire body."

7        THE COURT:  Right.  Yes, that is correct.  Maybe the

8  witness needs to restate his answer, so that we can get the

9  correct translation.

10 Q.   (By Mr. Pfizenmayer)  So, again, the answer that was recorded

11 in this courtroom that you gave just minutes ago was:  "That's

12 when he asked me if he could -- if he could pat me down."

13     Did you say that, yes or no?

14 A.   No.

15 Q.   Special Agent Perry made gestures showing you what he wanted

16 to do, correct?

17 A.   Yes, but up here.

18        THE COURT:  And if you could indicate for the record,

19 guys, I hate to keep telling you this, but...

20        MS. JOHNSON:  I'm sorry, it's been a long day.  Your

21 Honor, for the record, the witness used both hands to make a

22 patting sound on his upper chest.

23 Q.   (By Mr. Pfizenmayer)  And you are currently looking at a

24 potential conviction along with jail time, correct?

25        MS. JOHNSON:  Objection; relevance.

1          THE COURT:  Overruled.

2  Q.   (By Mr. Pfizenmayer)  Mr. Garcia, you are aware that you are

3  currently facing a conviction and jail time to follow most likely,

4  correct?

5          MS. JOHNSON:  I'm sorry, Your Honor.  I believe that

6  kind of is misleading.  He's facing a conviction.

7          THE COURT:  Why don't you rephrase, "if convicted."

8          MR. PFIZENMAYER:  Yes, Your Honor.

9  Q.   (By Mr. Pfizenmayer)  Mr. Garcia, you realize you could be

10  convicted and then sentenced to jail time in this case, correct?

11  A.   Yes.

12  Q.   And you do not want to go to jail?

13  A.   No.

14  Q.   Now, when Special Agent Perry made his hand gestures, you

15  knew he was going to touch your body?

16  A.   Yes.

17  Q.   And at that time, you knew that bundle was attached to your

18  body?

19  A.   Yes.

20  Q.   And you became nervous?

21  A.   At that moment, yes, I was nervous.

22  Q.   And your hands began shaking?

23  A.   I don't remember.

24  Q.   Now, to change topics a little bit, have you been shown the

25  transcript of the audio recording in this case?

1   A.   I'm sorry, I didn't understand.

2           MR. PFIZENMAYER:  If you would please put up the Elmo

3   for me?  Thank you.

4   **(Equipment setup.)**

5   Q.   (By Mr. Pfizenmayer)  Have you seen this document before?

6   A.   No.

7   Q.   And, earlier, you said in your testimony you didn't remember

8   Special Agent Perry asking you in Spanish if he could speak with

9   you, right?

10  A.   Yes.

11  Q.   But then you listened to the recording and you recalled it?

12  A.   I honestly don't remember.

13  Q.   Fair to say you don't remember everything in this case?

14  A.   Well, it seems like it's an illness.  We're all feeling the

15  same way.

16  Q.   During this case -- sorry, this encounter, you also spoke

17  with Special Agent Zamarron?

18  A.   Yes.

19  Q.   In Spanish?

20  A.   A little.

21  Q.   And you had no issues understanding him?

22  A.   Hardly, no.

23  Q.   So when he asked you something, you understood what he was

24  saying?

25  A.   Some I did, some I didn't.

1  Q.   So, for example, when he asked you to go downstairs, you

2  understood what he was saying?

3  A.   When we were upstairs, yes.  We went downstairs.

4  Q.   And you indicated you understood what he was saying because

5  you walked with him?

6  A.   Yes.  Partly, yes.

7  Q.   So you showed that you agreed to go down there by your

8  actions?

9  A.   Yes, because they're police officers, and I thought that I

10  had to go downstairs with them.

11  Q.   Not the question I asked you.  The question I asked you was:

12  You showed -- you agreed to go with them, you showed, by

13  physically taking an action and going with them?

14          MS. JOHNSON:  Objection; asked and answered.

15          THE COURT:  Sustained.

16          MR. PFIZENMAYER:  Your Honor, I would -- permission to

17  respond?

18          THE COURT:  You may, of course.

19          MR. PFIZENMAYER:  It was a non-responsive answer.

20          THE COURT:  Well, I think it was his interpretation, I

21  think is what he's telling you.  Your question was that his

22  actions meant, to him, an agreement to go with them.  What he's

23  telling you is that his actions were an interpretation by him that

24  because they were police officers, he thought he had to go.

25      Now, you can clarify and ask him if that's incorrect, whether

1   he agreed to go or whether he went because they were police

2   officers.

3              MR. PFIZENMAYER:  Yes, Your Honor.

4              THE COURT:  Okay.

5   Q.   (By Mr. Pfizenmayer)  Taking a step back, when you left the

6   room so that the agents could search it, you demonstrated you

7   agreed to the search by leaving the room?

8   A.   Yes.  The room, yes.

9   Q.   And then when you came back up and Special Agent Perry asked

10  you and then showed you what he wanted to do, you turned in

11  response to that?

12  A.   No.

13  Q.   So just to be clear, when Special Agent Perry asked to pat

14  you down through hand gestures, you did not then turn?

15  A.   No.  No.  I remained sideways.  I did not turn.

16  Q.   You put up your arms?

17  A.   No.

18  Q.   So at no point in time in the search did you ever put up your

19  arms?

20  A.   No.

21  Q.   And when you were in LA, you purchased the train ticket?

22             MS. JOHNSON:  Objection; relevance and beyond the scope.

23             MR. PFIZENMAYER:  Your Honor, this goes to both -- I

24  mean, ultimately to probable cause.  This is one of the factors

25  that Jay Perry -- or, sorry, Special Agent Perry took into

1   consideration.

2           THE COURT:  But it is beyond the scope of direct.  So

3   the objection will be sustained.

4           MR. PFIZENMAYER:  Your Honor, if I may respond?  We did

5   start in his childhood.  So, really, it is a very broad scope here

6   with regard to background.

7           THE COURT:  But the questioning did not deal with the

8   purchase of the tickets.  So because of that, the objection is

9   being sustained.

10  Q.   (By Mr. Pfizenmayer)  You have eight years of school?

11  A.   Yes.

12  Q.   And you can read?

13  A.   Yes.

14  Q.   And prior to this trip, you had never had a law enforcement

15  encounter before?

16  A.   I'm sorry, I didn't understand.

17  Q.   Prior to starting on this journey in LA, prior to that, you

18  had never encountered law enforcement officers before, correct?

19  A.   Oh, no, never.  I've never had.

20  Q.   Not in the United States?

21  A.   No, nowhere.

22  Q.   Not in Mexico, either?

23  A.   No.

24  Q.   But in LA, you did have a law enforcement encounter?

25  A.   Not an encounter, because I was sitting down when I -- when I

1   purchased the tickets, and they came checking the check, but

2   nothing happened.

3   Q.    They ran -- they had a dog with them, correct?

4   A.    Yes.

5   Q.    And the dog searched the luggage?

6   A.    He came close by.

7   Q.    As did the agent who was with him?

8          MS. JOHNSON:  Your Honor, I'm going to object on the

9   grounds of relevance and, also, beyond the scope.

10          MR. PFIZENMAYER:  Your Honor, this goes to his

11   familiarity with law enforcement, at least in this trip, his

12   encounters with the agents.  This isn't his first encounter ever.

13   It's his second in about a day, and the first one went quite well

14   for him.

15          THE COURT:  So the relevance is?

16          MR. PFIZENMAYER:  It goes to contradict or impeach the

17   pending argument that he was very nervous or worried about the law

18   enforcement agents and that he had to cooperate because of that.

19   So it goes to voluntariness and the subjective characteristics of

20   this individual.

21          MS. JOHNSON:  Your Honor, I also object on the grounds

22   that it assumes facts not in evidence.  I don't believe that he

23   testified that he actually had an encounter with the officers in

24   LA.  They were -- he saw the officers running the dogs, but I

25   don't believe there was ever any testimony that he actually had an

1    encounter with those officers.

2              THE COURT:  The only -- I mean, we read about it in the

3    transcript, but there was no evidence about that from him.  There

4    was evidence about that communication, I think, from one of your

5    witnesses.  But he has not testified about that, and that was not

6    included in his direct examination.  Plus, he's admitted he was

7    nervous.

8              MR. PFIZENMAYER:  Yes, Your Honor.  However, he was

9    asked about prior law enforcement contacts by Ms. Johnson on

10   direct.  This -- and the reasonable basis for the Government

11   asking these questions is based on the information in the audio

12   file.  So the Government is merely establishing that this is not

13   the first law enforcement encounter he's had.  In fact, he had one

14   on this very same trip, and it went well for him.  It goes to --

15             THE COURT:  Okay.  So he's admitted that he -- that he

16   had an encounter with them just now, so tell me what else you

17   intend to get into.

18             MR. PFIZENMAYER:  That was it, Your Honor.

19             THE COURT:  Well, he's already answered your question.

20             MR. PFIZENMAYER:  Yes, Your Honor.  It was objected to,

21   so I just wanted to --

22             THE COURT:  Okay.  Okay.  I think he's answered it.

23             MR. PFIZENMAYER:  And just for clarification on the

24   record, because I don't recall off the top of my head, was the

25   objection sustained or overruled?

1          THE COURT:  Well, I think the objection was to getting

2     into it further, because he already answered the question.  So I

3     think the objection would have been sustained to getting into it

4     any further than that.  Let me go back, though, to --

5          Okay.  Your question was:  "And the dog searched the luggage?

6          "He came close by."

7          "As did the agent who was with him" -- oops.  What happened

8     here?  All right.  I don't know what happened to my realtime.

9          And then that's where the objection came to the question that

10    said:  "As did the agent that was with him."  I don't know if we

11    got all of your question.  The objection was:  "I'm going to

12    object on the grounds of relevance."  So you were getting into

13    something more.

14          MR. PFIZENMAYER:  I was going to ask whether he

15    encountered the agent, to what extent.

16          THE COURT:  Yeah, and I think that's the problem, is

17    we're getting into the -- into all of the aspects of the

18    encounter, whereas right now, you just said you wanted to get into

19    the record the fact that there was an encounter.  And he has

20    already admitted that, and he's gone beyond it and said that the

21    dogs searched the luggage.  I mean, in response to that, he said

22    that the dog came by.

23          MS. JOHNSON:  Your Honor, may I clarify?  I don't

24    believe he's testified that there was an encounter, because there

25    was no encounter in LA.  I just want --

1        THE COURT:  Well, that's what his answer was, "Not an
2   encounter, because I was sitting down when I purchased the
3   tickets, and they came checking the check, but nothing happened."
4        Then the question was:  "Then they ran a dog with them?"
5        And he said, "Yes."
6        "And the dog searched the luggage?"
7        Answer:  "He came close by."
8        And did the agent -- "As did the agent who was with him?"
9        And then that's as far as we got.  So did you want him to
10  answer the question whether the agent who was with him also come
11  nearby?
12       MR. PFIZENMAYER:  Yes, and I was going to ask if he
13  spoke with the agent.
14       THE COURT:  Okay.  How is that relevant?  I mean, what
15  I'm seeing developing here is a development of questions and
16  answers, what did he say, what did you say, how long did that
17  last, and all of that.  And that's why I sustained the objection,
18  because I thought we were getting into all of that.  And then you
19  said that you wanted to get into when he encountered the agent and
20  to what extent.
21       So what else is it that you're trying to seek and what is the
22  relevancy of getting into anything more?
23       MR. PFIZENMAYER:  Okay, Your Honor.  It's going to go to
24  a counter-argument with regard to Ms. Johnson's assertions that
25  this is his first time encountering law enforcement, and,

1    therefore, he was extra nervous through the encounter, or

2    something along those lines.

3            THE COURT:  But he said he was extra nervous.  I mean,

4    you already got -- counsel, it's 4:00.  What is it you're willing

5    to agree to, to get him to get into this area?  I see it as

6    something that he's not really contradicting.  He's already told

7    you why it was that he got nervous in his cross-examination.

8            MR. PFIZENMAYER:  I'll withdraw from there.

9            MS. JOHNSON:  Your Honor, I just want the record clear,

10   because I have discussed this with Mr. Garcia.  There was no

11   encounter in LA.  He saw officers running the dogs on the luggage,

12   and that's what he was referring to.  He did not have an encounter

13   with law enforcement in Los Angeles.

14           THE COURT:  So do you want him to answer these

15   questions?  I just didn't want to get into this thing given

16   what -- how late it is, and our interpreter has been interpreting

17   all day long without any assistance from another interpreter,

18   because this was supposed to take two to four hours max,

19   considering, you know, what you guys told Linda.  We would have

20   gotten another interpreter to help her.

21           MS. JOHNSON:  Your Honor, if we can just clarify without

22   getting into details, that it was not an encounter in Los Angeles.

23           THE COURT:  Well, that's already what he said.

24           MS. JOHNSON:  Okay.  I would object, then, to getting

25   into it further.  Because I believe that the Court and counsel

1    have been calling it an encounter, but there was no encounter.

2              THE COURT:  I wasn't there.  I don't know what it was.

3    Your client said it was an encounter.  But I think what counsel

4    for the Government is trying to ask is whether it was -- whatever

5    we want to call it, whether it was an event in which he chatted or

6    talked, had communication with law enforcement.  Is that correct?

7              MR. PFIZENMAYER:  Yes, Your Honor.

8              THE COURT:  Okay.  So can that question be asked?  Do

9    you have an objection to that?

10             MS. JOHNSON:  No objection to that.

11             THE COURT:  And then can we move on, please?

12             MR. PFIZENMAYER:  Yes, Your Honor.  That's where I was

13   going with this.

14             THE COURT:  I'm sorry to have made a bigger deal out of

15   this than I thought it was.  Sorry about that.

16             MR. PFIZENMAYER:  It's been a long day.

17             THE COURT:  Why don't you ask that question, then.

18   Q.   (By Mr. Pfizenmayer)  Mr. Garcia, in LA, did you personally

19   speak or interact with any law enforcement officers?

20             THE COURT:  At the station?

21             MR. PFIZENMAYER:  At the station.

22             THE WITNESS:  No.

23             MR. PFIZENMAYER:  That's all I have, Your Honor.  Thank

24   you.

25             THE COURT:  I'm so sorry.

1       All right.  Redirect?

2           MS. JOHNSON:  Just a couple of questions, Your Honor.

3               **REDIRECT EXAMINATION BY MS. JOHNSON**

4   Q.   Mr. Garcia, you were asked questions about you stepping out

5   of the room and letting the agent search, and then you going

6   downstairs.  Why did you agree to do that?

7   A.   Because I thought that I had to listen to them.

8   Q.   Why?

9   A.   Because they are police officers.

10  Q.   How many police officers did you see that day on March 13th,

11  on the train in Albuquerque?

12  A.   I saw three.

13  Q.   Where was the third one?  Do you remember where he was?

14  A.   He was outside the train.

15  Q.   And when did you see him?

16  A.   When they were searching the luggages downstairs, he was

17  already outside.

18  Q.   When Agent Perry -- you were asked questions about when Agent

19  Perry asked you, using his own hands, patting his body, if he

20  could do that to you, what did you understand he was asking?

21  A.   That he only wanted to touch me here, my chest.

22          MS. JOHNSON:  And for the record, Your Honor, the

23  witness motioned with both his hands on his upper chest.

24  Q.   (By Ms. Johnson)  Were you able to hear his words?

25  A.   No.

1  Q.   Where on your body did you think Agent Perry was going to

2  touch you?

3  A.   Like he told me, just here.

4       MS. JOHNSON:  And for the record, the witness used both

5  his hands to pat his upper chest.

6  Q.   (By Ms. Johnson)  At all times, were you able to hear

7  everything Officer Zamarron said to you in Spanish?

8  A.   No, some parts I didn't.

9       MS. JOHNSON:  I have no further questions, Your Honor.

10 Thank you.

11      THE COURT:  Okay.  I almost hate to ask this, but I'm

12 unsure, Mr. Garcia.  Only if you're sure, I don't want you to

13 guess and only if you actually remember, I want to know whether

14 the buttons on your vest, whether they were buttoned and your

15 zipper was zipped the day that you met both of these officers?

16      THE WITNESS:  Yes, Your Honor.  It was zipped all the

17 way up, and it also has buttons.  And the zipper cannot go all the

18 way down because it has buttons.

19      THE COURT:  Okay.  And is it your testimony today, under

20 oath, that you did not unzip your jacket that day on the train?

21      THE WITNESS:  Yes, Your Honor.

22      THE COURT:  Okay.  I think -- anything else?  Okay.

23 Either of you want to pursue those two questions, those areas that

24 I asked?

25      MR. PFIZENMAYER:  No, Your Honor.  Thank you.

1          MS. JOHNSON:  No, Your Honor.  Thank you.

2          THE COURT:  Okay.  All right.  Thank you very much for

3    answering our questions.  You may go ahead and resume your seat

4    with your attorney.  And -- any other witnesses, or is there any

5    other evidence?

6          MS. JOHNSON:  No, Your Honor.

7          THE COURT:  Okay.  All right.  Part of the motion to

8    suppress includes statements given by your client.  I don't have

9    any evidence of statements.

10         MS. JOHNSON:  May I have a moment, Your Honor?

11         THE COURT:  And let's see, I have the transcript and --

12   that we've -- that both sides have been using.  And I will listen

13   to it again.  Somebody recommended that I purchase those Bose,

14   those fancy set, that those would be helpful in my old age.  I can

15   hear less and less when I work with these audio recordings.  I

16   really have had a hard time with this, so I'm going to try to see

17   if I can get some of those.

18      But I'm going to listen to this transcript once again.  I

19   mean, listen to the audio with the transcript once again, and I

20   have -- let's see, both the government's and defendant's exhibits.

21         MS. JOHNSON:  Your Honor, as to the Court's question, I

22   think -- if I may have a moment to confer with Mr. Pfizenmayer?

23         THE COURT:  Yes.

24   **(Counsel confer.)**

25         MS. JOHNSON:  Your Honor, I just spoke with counsel and

1    you're right.  Neither one of us got into questions about a

2    post-arrest statement, but there was.  And the parties are willing

3    to stipulate that once at the DEA, and according to Officer

4    Zamarron's report, at 7:10 in the evening, Mr. Garcia-Guzman

5    was -- and I'm looking for that report to just give the specific.

6    I believe he was read his Miranda warnings at the DEA and

7    provided -- if I may just have a moment, Your Honor?

8              THE COURT:  Okay.  Agent Perry indicated that he was not

9    present.

10             MS. JOHNSON:  Officer Zamarron did.

11             THE COURT:  Officer Zamarron.

12             MS. JOHNSON:  Yes.  He testified that at the DEA, at

13   7:08 p.m., there was an interview.  And parties are willing to

14   stipulate that that is correct, that at 7:08 p.m., Officer

15   Zamarron and Officer Chavez conducted a post-arrest interview of

16   Mr. Garcia-Guzman.  And I'm trying to find the -- may I have a

17   moment to confer with counsel?

18             THE COURT:  Yes.

19   **(Counsel confer.)**

20             MS. JOHNSON:  Your Honor, I hate to do this, may we

21   supplement as far as whether or not he was Mirandized at the DEA

22   office?  The report does not seem to indicate, but I seem to

23   recall the video interview that there was.  But I just wanted to

24   verify that.  And if we can maybe submit a letter to the Court.

25        So the stipulation is he was interviewed.  He did provide a

1    statement at 7:08 p.m.  The question is, because it's not

2    specified in the report, if he was read his Miranda.  I remember

3    that I believe he was, but it's just not in the report.

4           THE COURT:  Okay.  So how is it that you wish to

5    supplement the record, in what form?

6           MS. JOHNSON:  Just provide a letter, a joint letter, to

7    the Court advising that there was an interview at 7:08 p.m.  After

8    Mr. Garcia-Guzman was advised of his Miranda warnings, he provided

9    a post-arrest statement.  It's just the Miranda warnings part that

10   is not clear from the report.  And I seem to recall he was

11   pursuant to the video, but it's been awhile, so I want to

12   double-check that.

13          THE COURT:  That seems to be an important piece of this

14   puzzle, and it goes to the question as to whether there were any

15   intervening acts here.

16          MS. JOHNSON:  It does, Your Honor.  And I apologize.  I

17   did not ask questions about that of the witnesses.

18          THE COURT:  And so I presume there's a waiver of Miranda

19   someplace?

20          MS. JOHNSON:  It was not a written waiver.

21          THE COURT:  There was no written waiver?

22          MS. JOHNSON:  No written waiver, Your Honor.  I have

23   the -- if the Court wants to give me a few minutes, I have the

24   actual interview.

25          THE COURT:  Okay.  Why don't you tell me when you're

1    ready.  We'll take another recess.

2    **(In recess at 4:07 p.m. until 4:15 p.m.)**

3             MS. JOHNSON:  Your Honor, he was advised.  The

4    stipulation is that at 7:08 p.m., on March 13th, 2019, at the DEA

5    office, Mr. Garcia-Guzman was interviewed.  Before he was

6    interviewed, he was read his Miranda warnings.  And according to

7    the video, he was asked if he wanted to speak with agents, and he

8    nodded in the affirmative, yes, and he was interviewed.  There was

9    no actual form, waiver form signed, but he was advised of his

10   rights.  And pursuant to the evidence that we were provided, he

11   did agree to speak with agents.

12       We raised the statements because as the fruit of -- under

13   *Wong Sun*, fruit of the poisonous tree, that everything after the

14   encounter should be suppressed.

15            THE COURT:  And how much time -- what time was the

16   arrest?

17            MS. JOHNSON:  Your Honor, I believe the testimony was it

18   varied from the agents.  It was around -- the train arrived around

19   5:00 or 5:30, and the encounter was approximately 11, 12 minutes

20   long.

21            THE COURT:  Okay.  Thank you.  If it's in the testimony,

22   I'll find it when I review the testimony.

23       All right.  Would you like to -- it's late.  Why don't we

24   submit written closing arguments.  Today is Friday.  Why don't you

25   submit them both by next Friday.

1        MS. JOHNSON:  Judge, I'm going to be out of the country

2   without any cell service or email service beginning this Sunday.

3   I won't be back until the 25th.  Is there any way the Court might

4   be willing to give us a little longer?

5        THE COURT:  Okay.  Well, today is the 15th.  You won't

6   be back until the 25th?

7        MS. JOHNSON:  Yes.

8        MR. PFIZENMAYER:  And, Your Honor, I'm in trial all next

9   week, so that would be wonderful for me as well.

10       THE COURT:  Okay.  So in terms of your preference, then,

11  you probably would both prefer to get -- have them to me by the

12  29th of November, which gives you a week.

13       MS. JOHNSON:  That would work, Your Honor.

14       MR. PFIZENMAYER:  Yes, Your Honor.  Thank you.

15       THE COURT:  Okay.  So the 29th, which is a Friday, then.

16    All right.  Counsel, thank you very much for your

17  presentations.  And Agents Zamarron and Perry, thank you very much

18  for your presentations, for being here all day long.  Thank you.

19  We'll be in recess.

20  **(Court in recess at 4:17 p.m.)**

21

22

23

24

25

```
 1                IN THE UNITED STATES DISTRICT COURT

 2                   FOR THE DISTRICT OF NEW MEXICO

 3   _____
                                    )
 4   UNITED STATES OF AMERICA,      )     No. 19-CR-01086 MV
             Plaintiff,             )
 5                                  )
         vs.                        )
 6                                  )
     EVERADO GARCIA-GUZMAN,         )
 7             Defendant.           )
     _____)
 8

 9            CERTIFICATE OF OFFICIAL COURT REPORTER

10        I, Carmela V. McAlister, CRR, RPR, New Mexico CCR #306,

11   Federal Official Realtime Court Reporter, in and for the United

12   States District Court for the District of New Mexico, do hereby

13   certify that pursuant to Section 753, Title 28, United States

14   Code, that the foregoing is a true and correct transcript of the

15   stenographically reported proceedings held in the above-entitled

16   matter on November 15, 2019, and that the transcript page format

17   is in conformance with the regulations of the Judicial Conference

18   of the United States.

19        Dated this 25th day of November 2019.

20

21

22

23   CARMELA V. McALISTER, CRR, RPR, NM CCR #306
     United States Court Reporter
24   106 S. Federal Place
     Santa Fe, New Mexico  87501
25   Phone:  505-992-3829
     Email: carmela_mcalister@nmd.uscourts.gov
```

USA v. EVERADO GARCIA-GUZMAN
19-CR-01086 MV
November 15, 2019