**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEW MEXICO**

UNITED STATES OF AMERICA,

    Plaintiff,

vs.               Crim. No. 19-1086 MV

EVERARDO GARCIA-GUZMAN,

    Defendant.

**<u>MEMORANDUM OPINION AND ORDER</u>**

**THIS MATTER** comes before the Court on Defendant Everardo Garcia-Guzman's Motion to Suppress Evidence and Statements and Memorandum in Support Thereof [Doc. 23]. The government responded [Doc. 28] and Mr. Garcia-Guzman replied [Doc. 29]. An evidentiary hearing was held on November 15, 2019. The Court took the motion under advisement, and both parties filed written closing arguments by the Court's deadline of November 29, 2019 [Docs. 39, 40]. The Court, having considered the Motion, briefs, relevant law, witness testimony, exhibits, and being otherwise fully informed, finds that the Motion is well-taken and will be **GRANTED**.

**FACTUAL BACKGROUND**

This motion centers on an encounter between Defendant Everardo Garcia-Guzman ("Mr. Garcia") and Drug Enforcement Agency ("DEA") agents on an Amtrak train during a brief stop in Albuquerque, New Mexico. In an effort to resolve the factual issues presented in the briefs and to gain clarity on the details of the dispute, the Court held an evidentiary hearing on the Motion. The following represents the Court's findings of fact, based on the parties' briefing, the testimony of witnesses, and the exhibits, including an audio recording of the encounter.

1

On March 13, 2019, DEA Special Agent ("SA") Jarrell Perry was conducting interdiction operations in Albuquerque, New Mexico. Doc. 37 at 5:21-6:13. DEA Task Force Officer ("TFO") Reydesel Zamarron was assigned to assist SA Perry. *Id.* at 86:13-16. SA Perry identified Mr. Garcia as a person of interest based on SA Perry's review of an Amtrak train Passenger Name Record ("PNR"). *Id.* at 7:20-8:2. SA Perry wished to speak with Mr. Garcia due to the following facts about the PNR: (1) it was paid for with $1,275 in cash; (2) it was a one-way ticket from Los Angeles, California to Philadelphia, Pennsylvania; (3) it was purchased approximately 29 minutes prior to the train leaving; (4) it was for a sleeper car; and (5) it did not list a contact telephone number for the passengers. *Id.* at 8:3-23; *See also* Gov't Exs. 8-1, 8-2.

The PNR in question lists three passengers: Guzman-Garcia, Maria Cebreros-Lopez ("Ms. Cebreros"), and Infant Santiago Ferardo-Cebreros. Doc. 37 at 9:18-25; Gov't Ex. 8-1. SA Perry and TFO Zamarron boarded the train in order to speak with the individuals listed on the PNR. Doc. 37 at 14:24-15:2. Two additional DEA employees waited on the platform. *Id.* at 15:4-6. SA Perry and TFO Zamarron were dressed in plain clothes and had concealed firearms. *Id.* at 15:10-16:7. SA Perry made an audio recording of the encounter, which was admitted as Gov't Ex. 1. SA Perry testified that this audio recording, as well as the transcript of the recording made by the defendant's attorney (admitted as Def. Ex. A), were both accurate. *Id.* at 7:13-18.

Mr. Garcia, Ms. Cebreros, and the infant were traveling in sleeper car 431, bedroom number 9.[1] *Id.* at 16:17-20; Gov't Ex. 8-1. The car is two levels. Doc. 37 at 17:1. There is a stairway

---

[1] Ms. Cebreros was identified both as Mr. Garcia's stepdaughter, *see, e.g.*, Doc. 37 at 22:22-25, and as his daughter. *See, e.g.*, *id.* at 136:22. The evidence regarding the relationship between Mr. Garcia and the infant was inconsistent. *See, e.g.*, Def. Ex. A ¶ 57 (identifying Mr. Garcia as the infant's foster parent); Doc. 37 at 136:24 (identifying the infant as Mr. Garcia's grandson); *Id.* at 143:12 (referring to the infant as Mr. Garcia's son). While the precise nature of the familial relationship between these individuals remains unclear, that has no impact on the Court's ruling.

in the middle of the car that connects the first level to the second. *Id.* at 17:6-7. There is an exit door in the middle of the first floor, through which all passengers must pass in order to board that car, unless they board another car and enter the car in question through the sliding doors that adjoin each car. *Id.* at 16:25-17:4. These sliding doors are located at both ends of the hallway that runs the length of the second level. *Id.* at 17:24-18:6. In the portion of the second level in which Mr. Garcia was traveling, the hallway was lined by small rooms on both sides. *Id.* at 17:14-15. The hallway is very narrow. As SA Perry explained, "[y]ou can pass in the hallway, but two people can't walk side by side. So if you meet someone, you have to turn, kind of, sideways to pass them." *Id.* at 20:18-21.

Upon boarding the train, SA Perry approached room number 9. *Id.* at 19:4-6. The room was occupied by Mr. Garcia, Ms. Cebreros, and the infant. *Id.* at 19:8-10. The sliding door was open and the curtain inside of the sliding door was "almost all the way shut." *Id.* at 19:16-18. When SA Perry approached the room, he stood to the left of the doorway. *Id.* at 20:3-7. TFO Zamarron waited by the stairs in the center of the hall, so that he had a view of SA Perry. *Id.* at 89:9-14.

SA Perry knocked on the frame to room number 9. *Id.* at 49:16. He showed his DEA badge, *id.* at 22:25, and stated in English: "Hi, I'm a police officer, and we check the train here." Def. Ex. A at ¶ 1.[2] Ms. Cebreros replied, "Chicago." *Id.* at ¶ 2. Realizing that Mr. Garcia and Ms. Cebreros were not fluent in English, SA Perry said in Spanish, "Yo soy policia" ("I'm a policeman"). *Id.* at ¶ 9.[3] SA Perry is not fluent in Spanish, and in his own words, he "could ask specific questions for

---

[2] The Court has listened carefully to Gov't Ex. 1, the audio recording of the encounter. To the extent that the Court cites to Def. Ex. A, a transcript of the recording, this represents the Court's findings that the transcript accurately reflects what can be heard on the audio recording.
[3] Parenthetical Spanish translations are taken from Def. Ex. A, a transcript of the recording prepared by Bety Ziman, a translator certified by the Administrative Office of the United States Courts.

what [he does] in interdiction, but [is] not fluent by any means." Doc. 37 at 27:24-25.

SA Perry then asked Mr. Garcia and Ms. Cebreros "¿Me permite hablar con usted?" ("May I speak with you?"). Def. Ex. A at ¶ 11. Mr. Garcia replied, "Sí" ("Yes"). *Id*. at ¶ 12. During the hearing, Mr. Garcia testified that he did not recall saying yes when SA Perry asked to speak with him, and even after the audio was played for him to refresh his recollection, he continued to testify that he did not recall saying yes. *Id*. at 139:18-140:3. The Court finds, based on the review of the audio and testimony of other witnesses, that Mr. Garcia did say "sí," meaning yes.

SA Perry responded, "Okey. Me permite ver su boleto, por favor" ("Okay. May I please see your ticket?") *Id*. at ¶ 13. Ms. Cebreros replied, "Sí" ("Yes"). *Id*. at ¶ 14. SA Perry continued in somewhat broken Spanish to ask Mr. Garcia and Ms. Cebreros questions about where they lived and their travels, and asked for identification. *Id*. at ¶¶ 15-54.

SA Perry then asked Mr. Garcia and Ms. Cebreros if they had any luggage. *Id*. at ¶ 65. Mr. Garcia responded, "Está abajo" ("It's down below"). *Id*. at ¶ 66. SA Perry asked for permission to search the bags below for contraband. Ms. Cebreros said, "Sí" ("Yes"). *Id*. at ¶ 76. No audible response from Mr. Garcia can be heard on the audio recording. Gov't Ex. 1 at 2:58. This is consistent with Mr. Garcia's testimony that it was his daughter who gave the agents permission to search the luggage. Doc. 37 at 157:1. In contrast, during the hearing, SA Perry testified that "they" consented to the search of the bags downstairs. *Id*. at 24:18-23. The Court finds that, contrary to SA Perry's testimony, it was in fact only Ms. Cebreros who responded to this request.

Ms. Cebreros had a diaper bag with her in the room, and Mr. Garcia had a backpack. Doc. 37 at 23:24-24:2. SA Perry asked for permission to search those bags, and Ms. Cebreros responded, "Sí" ("Yes"). Def. Ex. A at ¶ 78. Again, contrary to the recording and transcript, SA Perry testified that "he" provided consent to search the bag, referring to Mr. Garcia. Doc. 37 at 26:20-27:8. The

transcript and recording clearly indicate that it was Ms. Cebreros who provided consent, and not Mr. Garcia. *See* Def. Ex. A at ¶78; Gov't Ex. 1 at 3:04. Indeed, when confronted with the transcript during cross examination, SA Perry admitted that it was in fact only Ms. Cebreros who responded to both of these requests. *Id*. at 53:9-20.

Upon receiving Ms. Cebreros's consent, SA Perry searched the diaper bag and backpack in the hallway. Doc. 37 at 28:7-8; 28:23-29:2. He did not find any contraband in those bags. *Id*. at 31:6-9. SA Perry then motioned for TFO Zamarron to come over in order to assist SA Perry with Spanish translation. *Id*. at 27:9-22. SA Perry explained TFO Zamarron's presence by saying, "mi amigo mucho habla Espanol" ("my friend speaks a lot of Spanish"). Def. Ex. A at ¶ 88. SA Perry, through the use of TFO Zamarron as an interpreter, proceeded to ask Mr. Garcia and Ms. Cebreros several follow-up questions about their travel plans. *Id*. at ¶¶ 89-131.

Next, SA Perry asked TFO Zamarron to ask Mr. Garcia for permission to search the room for contraband. *Id*. at ¶ 135. TFO Zamarron stated to Mr. Garcia: "Y, uh, ¿le puede dejar permiso para que, uh, esculque" ("And, uh, can you give him permission to, uh, search"). *Id*. at ¶ 136. Mr. Garcia responded, "Uh, no se la verdad" ("Uh, I really don't know"). Def. Ex. A at ¶ 137.[4]

Despite Mr. Garcia's indication that he was unsure if he would give permission to search the room, TFO Zamarron continued to seek his consent, stating: "Ahi, su cuarto… ¿Cuarto?" ("there, your room… room?") *Id*. at ¶¶ 138, 140. TFO Zamarron still received no response from Mr. Garcia, but pressed forward, asking, "Okey, ¿Podemos entrar?" ("okay, can we come in?") *Id*. at ¶ 143. Mr. Garcia's answer was unintelligible. *Id*. at ¶ 144. SA Perry then said "Gracias, señor"

---

[4] TFO Zamarron testified that he disputes the translation of "Uh, I really don't know," and in his opinion, the translation should be "Uh, I don't know the truth." Doc. 37 at 109:19-110:6. The Court notes that TFO Zamarron is not a federally certified court interpreter. The Court credits the translation in Def. Ex. A, prepared by Bety Ziman, who is certified by the Administrative Office of United States Courts as a translator.

("Thank you, sir"). *Id*. at ¶ 145. TFO Zamarron testified that although SA Perry said, "Thank you, sir," there was no response from Mr. Garcia prior to that. Doc. 37 at 112:13-15. However, later in TFO Zamarron's testimony, he claimed that Mr. Garcia and Ms. Cebreros "verbally said yes." *Id*. at 125:6-7. Upon questioning from the Court, he admitted that this is not reflected in the transcript. *Id*. at 129:13. SA Perry also testified that he was provided permission to search the room. Doc. 37 at 29:17-18.

Mr. Garcia and Ms. Cebreros stepped out of the room and stood in the hallway while SA Perry searched the room. *Id*. at 29:21-25. SA Perry did not find any contraband. *Id*. at 31:10-12.

Next, SA Perry asked TFO Zamarron to request that Mr. Garcia show them the luggage downstairs. Def. Ex. A at ¶ 146. TFO Zamarron translated the request into Spanish. *Id*. at ¶ 147. Mr. Garcia responded, "Sí" ("Yes"), *id*. at ¶ 148, and TFO Zamarron informed him, "Ahi vamos con usted" ("We'll go over there with you"). *Id*. at ¶ 149. Mr. Garcia walked downstairs with SA Perry and TFO Zamarron, and showed them the bags that belonged to himself and Ms. Cebreros. Doc. 37 at 32:20-21. SA Perry searched the bags and found no contraband therein. *Id*. at 34:10-11.

SA Perry asked TFO Zamarron to ask Mr. Garcia to see his ticket again. Def. Ex. A at ¶ 225. TFO Zamarron asked Mr. Garcia if he had his ticket. *Id*. at ¶ 226. Mr. Garcia stated that he left his ticket upstairs. *Id*. at ¶ 227. TFO Zamarron, at SA Perry's instruction, asked Mr. Garcia: "Okey, Podemos ah, a ver, encontrar el… el boleto" (Okay, could we, ah, to see, find the… the ticket"). *Id*. at ¶¶ 232-34. Mr. Garcia responded, "Claro" ("Of course"). Def. Ex. A at ¶ 235.

Mr. Garcia led the way upstairs, followed by SA Perry and TFO Zamarron. Doc. 37 at 36:1-2; 63:12-15; 117:6-10. When they arrived at the room, Mr. Garcia retrieved his tickets from his backpack. *Id*. at 36:7-11. Mr. Garcia then exited the room and handed the tickets to SA Perry. *Id*. at 36:15-16. SA Perry looked at the tickets and then returned them. *Id*. at 36:16; 142:18-19.

Next, SA Perry sought Mr. Garcia's permission to pat him down. The format of SA Perry's question is of great significance. The transcript and audio recording reflect that while SA Perry was asking the question, the baby started crying, making it difficult to hear the question. Doc. 37 at 64:12-13. The transcript prepared by United States Courts certified translator Bety Zimerman reflects that SA Perry stated, "Okay, gracias senior [sondido de un bebe llorando], me permite [sonido de chequeo] gracias" ("Okay, thank you sir, [sound of a baby crying] may I [patting sounds] thank you." Def. Ex. A at ¶ 247. The government asserts in its briefing that the United States' interpreter was able to transcribe the portion of the audio fully, as follows: "Okay, gracias senor, Me permite registrar por contraband en su persona?" ("Okay, thank you, sir. Would you allow me to search you for contraband? Thank you"). Doc. 28 at 6, n.1.

During the hearing, this portion of the audio recording was played four times for SA Perry. Doc. 37 at 64:14-66:15. Even after hearing it multiple times, SA Perry testified that he could not remember which "exact words" he used when he asked Mr. Garcia for permission to search his person. *Id.* at 65:6-8. SA Perry testified that based on the audio, he could hear parts of it, and explained: "I can't hear every single word that I – I can understand me asking permission to search him for contraband." *Id.* at 65:12-14. SA Perry stated that from the audio, he heard the words "search," "contraband," "mi permite," "gracias," and "persona." *Id.* at 65:18-66:10. When asked if he would agree that what he said was not very clear because there is a baby crying, SA Perry stated, "[w]ell, if you're there in person, it might be different than listening to it now. So I don't know what he heard." *Id.* at 66:14-15. SA Perry's testimony appeared to be based on the recording and he had little independent recollection of what he said, or of how the noise level and sound quality was in person as compared with the audio recording.

On re-direct examination, SA Perry was asked whether he has a phrase that he generally

uses for when he asks permission to pat someone down. *Id*. at 73:25-74:4. SA Perry testified that

he does, as he does it on a daily basis. *Id*. at 74:5. He testified that the phrase he typically uses is

"Mi permite registrar por contraband on su persona," which he understands to mean, "Will you

give me permission to search your person for contraband?" *Id*. at 74:9-12. SA Perry then testified

that he did in fact recall saying that phrase to Mr. Garcia. *Id*. at 74:13-15. This testimony stands in

stark contrast with his earlier testimony that he could not recall which exact words he used.

SA Perry further testified that the patting sounds in the recording are the sounds of SA

Perry patting his own body in order to demonstrate to Mr. Garcia what he wanted to do. Doc. 37

at 41:6-8. SA Perry demonstrated for the Court the same general motions that he demonstrated to

Mr. Garcia. *Id*. at 42:1-4. In doing so, SA Perry made a two-handed patting motion, starting

towards the top of his chest and working down his torso towards his waistline. *Id*. at 42:6-9. SA

Perry testified that he only asked the question once, did not clarify it or ask it a second time despite

the background noise, and did not ask TFO Zamarron to translate the question into Spanish. *See*

*Id*. at 69:16-23.

TFO Zamarron's testimony offered a completely different account of this interaction. TFO

Zamarron testified that he translated SA Perry's question into Spanish in order to obtain Mr.

Garcia's permission for a pat down. *Id*. at 96:13-14. TFO Zamarron testified that he stated to Mr.

Garcia, "Le dije que si podia esculcar a la persona de el, le podia esculcar." *Id*. at 96:18-19. When

confronted with the fact that this was not in the audio recording or the transcript, TFO Zamarron

replied, "It was not audible – able to – intangible, maybe. I couldn't tell you. I don't know." *Id*. at

119:12-13. TFO Zamarron acknowledged that the audio does capture his voice saying, "Pasale.

Pasale" ("Go ahead. Go ahead") during this portion of the recording. *Id*. at 120:4-6; 22-23. TFO

Zamarron then doubled down on his testimony that he asked Mr. Garcia in Spanish if Agent Perry

could pat him down, but recalled using a completely different phrase: "Puede checarlo, puedes?" *Id*. at 120:15-17. That phrase also is neither heard on the recording nor reflected on the transcript.

The Court does not credit TFO Zamarron's testimony that he asked Mr. Garcia in Spanish for permission to pat him down. Not only was TFO Zamarron's testimony internally inconsistent, as he offered two different phrases that he recalled using to request permission to search Mr. Garcia, but it was also inconsistent with the audio recording, with the transcript, and with SA Perry's testimony that TFO Zamarron did not translate the question into Spanish. The fact that the audio reflects TFO Zamarron's voice saying "Pasale, Pasale," is indicative that the microphone did pick up his voice during this portion of the interaction. Therefore, the Court does not credit this testimony and finds that TFO Zamarron did not ask Mr. Garcia in Spanish for permission to pat him down.

Mr. Garcia testified that SA Perry "asked me if he could – if he could pat me down, and he was making these kind of gestures. And my son was crying a lot, but I don't recall what he told me." *Id*. at 143:10-12. Mr. Garcia testified that he could not hear SA Perry ask if he could search his person due to the baby crying, but rather, just saw SA Perry motion to indicate "if he could touch me up here," referring to his chest. *Id*. at 144:5-9.

In response to SA Perry's question fragment and gestures, Mr. Garcia said, "Sí" ("Yes"). Def. Ex. A. at ¶ 248. At the hearing, Mr. Garcia initially testified that he did not recall saying the word yes. *Id*. at 144:16-17; 144:25-145:1. After the audio recording was played for him twice, he acknowledged that he heard himself say yes. *Id*. at 145:5-6. He then testified that he said yes because he understood that SA Perry was going to check him "up here on [his] chest." *Id*. at 145:24-146:3.

The Court heard conflicting accounts of what transpired after Mr. Garcia said "Si" ("Yes").

SA Perry testified that in addition to his verbal answer of yes, Mr. Garcia turned away from SA Perry and raised his hands above his shoulders. Doc. 37 at 37:23-24. TFO Zamarron also testified that Mr. Garcia lifted his hands and allowed SA Perry to pat him down. *Id.* at 98:2-3. In contrast, Mr. Garcia testified that he did not move or turn around and at no point did he put up his arms. *Id.* at 146:13-25; 164:16-20. Mr. Garcia testified he was positioned "sort of sideways" because the hallway is very narrow, and he was in between the two officers. *Id.* at 146:13-20; 147:3-6.

Mr. Garcia testified that SA Perry grabbed his left arm and twisted it behind his back. *Id.* at 148:15-16; 149:6-20. According to Mr. Garcia's testimony, this is why Mr. Garcia said, "aye, aye, aye, aye." *Id.* 148:14-18. Although it is not reflected in the transcript, the Court has reviewed the audio recording and hears someone saying, "aye, aye, aye, aye." Gov't Ex. 1. at 11:03. Mr. Garcia testified that as SA Perry twisted his left arm, SA Perry started unzipping Mr. Garcia's vest.[5] Doc. 37 at 148:15-18. SA Perry could not fully unzip the vest because the zipper got stuck on the buttons, and was therefore only able to unzip the vest halfway. *Id.* at 148:15-18; 149:11-16. SA Perry then stuck one hand inside the vest while twisting Mr. Garcia's arm back with his other hand. *Id.* at 148:15-149:1. SA Perry's hand went all the way down to his waistline beneath his vest, and Mr. Garcia was handcuffed directly after that. *Id.* at 150:12-14. Mr. Garcia testified that at no time did he himself remove or unzip his vest. *Id.* at 150:4-6; 173: 19-21.

In contrast, SA Perry testified that he did not grab Mr. Garcia's arm or unzip the vest. *Id.* at 66:21-23. Rather, according to SA Perry, as he was trying reach around Mr. Garcia to pat him down in the front lower waist area, Mr. Garcia was turning his body from side to side, away from where SA Perry was trying to pat him down. *Id.* at 38:19-23. In response to Mr. Garcia moving

---

[5] During the hearing and in the briefing, the parties and witnesses used the words "jacket" and "vest" interchangeably to refer to the garment that Mr. Garcia was wearing over his shirt. The Court also uses both terms interchangeably.

his body away, SA Perry asked Mr. Garcia to unzip his jacket. *Id*. at 39:8. Mr. Garcia began to unzip his own jacket, and while he did so, his hand was visibly shaking and the zipper got caught. *Id*. at 39:16-17.

SA Perry testified that he completed the pat down after Mr. Garcia unzipped his jacket. *Id*. at 39:20-22. However, he later testified that Mr. Garcia did not unzip his vest all the way; rather, it remained partially zipped at the bottom. Doc. 37 at 70:2-3. SA Perry denied reaching underneath Mr. Garcia's vest, claiming that he only touched over the vest and felt hard bundles at Mr. Garcia's waist area. *Id*. at 70:10-17.

The Court sought clarification on this critical issue. In response to the Court's questioning, SA Perry testified that prior to the jacket being unzipped, SA Perry was unable to feel anything because he was unable to complete the pat down due to Mr. Garcia turning his body away. *Id*. at 76:1-17. He stated that when Mr. Garcia unzipped his jacket, he unzipped it "the majority of the way" and "[t]here was a small portion on the bottom that wasn't unzipped." *Id*. at 77:6-8. SA Perry explained: "[t]he vest was long, and the bottom portion was not unzipped. I patted him down inside of the vest, down around his waist. The bottom portion of it wasn't unzipped, so I didn't pat down the area that wasn't unzipped because it was hanging below his waist area." *Id*. at 77:13-17. The Court asked, "So your hands were inside the vest over his shirt?" *Id*. at 77:18-19. SA Perry responded in the affirmative: "[h]is shirt was untucked. Over the top of his shirt. Yes, ma'am." *Id*. at 77:20-21. SA Perry specified that it was not until this point that he was able to conclude that what Mr. Garcia had was contraband. *Id*. at 77:22-78:3. However, upon further questioning as to whether his hands were underneath Mr. Garcia's vest, SA Perry changed his testimony, stating: "[w]ell, they wasn't really underneath the vest. The vest was unzipped and opened, so my hands went straight to his shirt. The vest was hanging down below his waistline… the vest was opened.

It – my hands wasn't inside of the vest, because it was – it was opened. I could see his shirt." *Id.* at 78:6-12.

To be extremely clear about SA Perry's testimony, which had shifted multiple times on this issue, the Court stood up to demonstrate what SA Perry was describing:

> [T]he Honorable Judge Vázquez, underneath her judicial robe, has on what appears to be a blazer. And the way she had it on… was that if the edges of the blazer were running parallel to about the outside of her neck, down her center line. And she indicated that – to the portion of the questioning to which Special Agent Perry responded in the affirmative of how he patted down, was in the area between the two portions of her blazer on top of the shirt.

*Id.* at 79:7-15.

As a result of SA Perry's search, he felt a hard bundle that was partially at the top of Mr. Garcia's pants and protruded down into the inside of the pants. *Id.* at 39:24-40:2. SA Perry immediately recognized the object as bundles of illegal narcotics based on the way it felt, the size, the concealment method, and his experience. *Id.* at 40:3-10. Once he felt the bundles, he immediately handcuffed Mr. Garcia, placing him under arrest. *Id.* at 71:9-10.

Like SA Perry, TFO Zamarron testified that it was Mr. Garcia who unzipped his own jacket. *Id.* at 99:21; 100:2-4. TFO Zamarron testified that it looked like Mr. Garcia was trying to unzip the vest all the way, but was unable to, and ultimately it was unzipped "halfway, a little lower than halfway." *Id.* at 100:9-10. TFO Zamarron testified that after Mr. Garcia unzipped his jacket, he could see a box-looking item near Mr. Garcia's belt. *Id.* at 102:15-22. Regarding the timing of when he saw the box-like item, TFO Zamarron stated that he saw it "whenever the jacket came off." *Id.* at 102:24. The Court sought clarification as to whether or not the jacket was unzipped completely on the train. *Id.* at 103:17-18. TFO Zamarron's answer did not shed much light on the issue: "when Agent Perry was patting down Mr. Garcia… you could see the bulge of the item, you know, when the jacket was halfway already. I could already see it. But when he fully

took it off, it was obvious that something was there." *Id*. at 103:22-104:1. On cross-examination, TFO Zamarron was asked once again whether Mr. Garcia took off his jacket. TFO Zamarron stated, "I don't recall if he completely took it off or unzipped it all the way. I do – I do remember he unzipped it halfway, a quarter of the way off." *Id*. at 122:15-17.

SA Perry testified that Government's Exhibit 2, a photograph of Mr. Garcia, accurately reflects how Mr. Garcia was dressed during the encounter, prior to his arrest. Doc. 37 at 42:24-43:2. In that photograph, Mr. Garcia is wearing a vest which is zipped up to his chest. Gov't. Ex. 2. The bottom of the vest falls at Mr. Garcia's upper thigh area. *Id*. SA Perry testified that Government's Exhibit 3, depicting Mr. Garcia's torso with his vest fully unzipped and his shirt underneath untucked, depicts how Mr. Garcia appeared during the encounter. *Id*. at 34:8-11. SA Perry testified that Government's Exhibit 4, a photograph of Mr. Garcia's waist area showing his belt and pants with the bundle protruding slightly from the top of his waistband, was taken post-arrest and was a fair and accurate representation of where the drugs were situated when Mr. Garcia was arrested. *Id*. at 43:12-25.

When confronted with the audio recording, SA Perry testified that he heard someone say "eee" at approximately 11:03, and that he did not know who made that sound. *Id*. at 67:10-16. TFO Zamarron likewise acknowledged hearing "aye, aye, aye, aye" in the recording, and also stated that he did not know who made that sound. *Id*. at 121:18-21. However, TFO Zamarron testified that the only three people present at that time were TFO Zamarron, SA Perry, and Mr. Garcia, and that neither TFO Zamarron nor SA Perry made that sound. *Id*. at 121:22-122:6.

Mr. Garcia was arrested between 5:00 p.m. and 5:30 p.m. Doc. 37 at 123:1-7. After the arrest, SA Perry testified that he believes there was a "little bit of a time lapse" before Mr. Garcia was transported to the DEA office. *Id*. at 82:1-6. TFO Zamarron testified that he believes Mr.

Garcia was transported right away to the DEA office. *Id*. at 123:20. Approximately two hours after the arrest, at around 7:08 p.m., TFO Zamarron and another officer conducted a post-arrest interview of Mr. Garcia. *Id*. at 123:10-13. The following stipulation was read into the record:

> [A]t 7:08 p.m., on March 13th, 2019, at the DEA office, Mr. Garcia-Guzman was interviewed. Before he was interviewed, he was read his Miranda warnings. And according to the video, he was asked if he wanted to speak with agents, and he nodded in the affirmative, yes, and he was interviewed. There was no actual form, waiver form signed, but he was advised of his rights. And… he did agree to speak with the agents.

Doc. 37 at 177:3-11.

## CREDIBILITY FINDINGS

At this juncture, the Court is required to make a credibility determination, since the three witnesses provided three different accounts of the search of Mr. Garcia. The Court finds that there are credibility issues with all three witnesses. Notably, the two witnesses called by the government were unable to present a coherent or consistent account of SA Perry's search of Mr. Garcia.

Regarding SA Perry's credibility, the Court is concerned about the pattern throughout his testimony of exaggerating Mr. Garcia's consent. Specifically, SA Perry testified that "they" (referring to Mr. Garcia and Ms. Cebreros) consented to a search of the luggage downstairs, Doc. 37 at 24:18-23, when in fact the audio recording and transcript thereof clearly demonstrate that it was only Ms. Cebreros who gave a verbal "yes." Def. Ex. A at ¶ 76. SA Perry also testified that "he" (referring to Mr. Garcia) provided consent to search the bags in the room, when the transcript and audio recording clearly reflect that it was Ms. Cebreros who provided consent, not Mr. Garcia. *Id*. at ¶ 78. When confronted with the transcript, SA Perry retracted his earlier testimony on both points and admitted that it was only Ms. Cebreros who responded to both requests. Doc. 37 at 53:9-20. SA Perry continued to exaggerate the nature of the consent he received when he testified that he was provided permission to search the room. Doc. 37 at 29:17-18. This is a

mischaracterization of the interaction, given that when Mr. Garcia was asked if he would provide permission to search the room, he stated, "Uh, no se la verdad" ("Uh, I really don't know"), Def. Ex. A at ¶137, and at no time in the audio recording can he be heard giving verbal consent. Finally, the Court is very concerned about SA Perry's testimony that he did not have any recollection of who made the sound "eee" or "aye, aye, aye, aye" that can be heard on the audio recording during the pat down search. Doc. 37 at 67:10-16; Gov't Ex. 1. at 11:03.

TFO Zamarron's testimony was likewise problematic. Although TFO Zamarron acknowledged that the audio recording reflected someone saying "aye, aye, aye, aye," during the pat down, he claimed to have no knowledge of who made that sound. Additionally, the Court is concerned that TFO Zamarron, like SA Perry, exaggerated the extent to which the officers sought and received verbal consent for their actions throughout the encounter. For example, TFO Zamarron testified that Mr. Garcia and Ms. Cebreros "verbally said yes" to the search of their room [Doc. 37 at 125:6-7], although this is not reflected in the transcript and audio. The Court's most glaring concern with TFO Zamarron's credibility is his testimony that he translated SA Perry's request to pat down Mr. Garcia into Spanish. *Id.* at 96:13-14. Not only did TFO Zamarron offer two drastically different versions of what he claims he asked Mr. Garcia in Spanish, *compare id.* at 96:18-19 *with id.* at 120:15-17, but the audio and transcript bely that he did not in fact relay anything in Spanish seeking Mr. Garcia's permission for a pat down. SA Perry's testimony confirms that TFO Zamarron did not interpret this request. *Id.* at 69:16-23. Not only does the Court not credit TFO Zamarron's testimony that he translated the question into Spanish, but the Court finds that TFO Zamarron's claim that he did so undermines his overall credibility.

The Court also finds credibility issues with the third witness, Mr. Garcia. Specifically, Mr. Garcia testified that he could not remember SA Perry speaking to him in Spanish or asking for

permission to speak with him. Doc. 37 at 139:8-10, 18-20. He also testified that he did not recall saying "yes" to SA Perry's request to speak with him. *Id*. at 139:18-140:3. And finally, Mr. Garcia testified that he did not recall saying "yes" to SA Perry's request to pat him down until the audio recording was played for him three times during the hearing, at which point he finally acknowledged that he said "yes." *Id*. at 144:16-145:6. The Court is therefore concerned that, just as SA Perry and TFO Zamarron's testimony had a tendency to exaggerate the consent they received, Mr. Garcia's testimony had a tendency to deny the consent that was, in fact, given.

The Court finds that the truth lies somewhere in between the versions of events given by each of the three witnesses. Given the credibility issues with each witness and the inconsistencies in their testimony – particularly the inconsistencies between the events recounted by SA Perry and TFO Zamarron – the Court relies heavily on the objective evidence, such as the audio recording and the photographs, to determine what happened during the search of Mr. Garcia's person, and finds as follows.

At the time SA Perry sought permission to pat Mr. Garcia down, SA Perry, Mr. Garcia, and TFO Zamarron were in the narrow hallway of the train, which was not wide enough for two people to stand side by side. SA Perry was standing partially in room number 10, which was an empty room, because the hallway was so narrow. Doc. 37 at 38: 7-8. Mr. Garcia was in between the two officers. *Id*. at 146:13-20; 147:3-6; 97:14-17. The environment was not only crowded, but noisy. The infant was crying loudly. Gov't Ex. 1 10:40-10:54. In this context, SA Perry stated to Mr. Garcia, "Okay, gracias senior… me permite… gracias" ("Okay, thank you sir… may I… thank you." Def. Ex. A at ¶ 247. The Court is unable to discern from the audio the unintelligible parts of what SA Perry said. The Court finds it more likely than not that Mr. Garcia would also have been unable to make out the entirety of SA Perry's question, and credits Mr. Garcia's testimony that he

could not hear it. The question was not repeated or clarified by either SA Perry or TFO Zamarron.

While asking his question fragment, SA Perry made a patting motion on his torso, in order to physically demonstrate what he sought consent to do to Mr. Garcia. Doc. 37 at 42:6-9; 96:23-97:2. Mr. Garcia responded, "Sí" ("Yes"). Def. Ex. A at ¶ 248. Mr. Garcia raised his hands over his head. Doc. 37 at 37:23-24; 98:2-3. SA Perry attempted to begin his pat down by reaching around Mr. Garcia from behind, in order to pat down the front lower waist area. *Id*. at 38:14-39:1. When SA Perry attempted to do so, Mr. Garcia began moving away from SA Perry, "turning his body away from where [SA Perry] was trying to pat him down in the front." *Id*. at 38:19-23.

At this time, an unknown number of passengers walked by, leading to verbal and physical interruptions. Def. Ex. 1 at ¶ 249; 253. The infant continued to cry loudly. Gov't Ex. 1 at 10:40-10:54. Adding to the general din were overhead announcements from Amtrak employees on the loudspeaker. *Id*. at ¶¶ 254, 256. In this context, SA Perry asked TFO Zamarron, in English, to ask Mr. Perry to unzip his jacket. *Id*. at ¶ 251. However, TFO Zamarron never completely translated this question into Spanish, due to the interruptions. In total, with interruptions, TFO Zamarron stated, "Puedese [sic] quitarse el… se la puede quitar" (Could you take off the… you can take it off."). *Id*. at ¶¶ 252, 255. The Court credits Mr. Garcia's testimony that he did not hear TFO Zamarron ask him to take his vest off, *id*. at 148:19-21, given the chaos during the interaction and the fact that TFO Zamarron never translated the word "jacket" or "vest" into Spanish.

While it is not reflected in the transcript, at 11:03-04 on the audio recording, Mr. Garcia can be heard saying "aye aye aye aye." Gov't Ex. 1 at 11:03-04. Mr. Garcia says "aye aye aye aye" immediately after TFO Zamarron asks "Puedese [sic] quitarse el…" ("Could you take off the…"), *Id*. at 11:00, but before TFO Zamarron states, "se la puede quitar" (you can take it off"). *Id*. at 11:21. It is not until 11:44 in the audio recording that the sound of handcuffs is first heard. *See Id*.

at 11:44; Def. Ex. A at ¶ 257. At 12:02 in the audio recording, SA Perry tells Mr. Garcia to turn around, and asks TFO Zamarron to tell Mr. Garcia to relax. Gov't Ex. 1 at 12:02; Def. Ex. A at ¶ 260. This corresponds with Mr. Garcia being handcuffed. The Court confirmed the timing of Mr. Garcia's arrest, asking TFO Zamarron, "when [SA Perry] told you to tell [Mr. Garcia] to relax, what was Mr. Garcia doing, if you recall?" Doc. 37 at 128:3-4. TFO Zamarron testified, "From what I recall… Agent Perry was then going to handcuff Mr. Eduardo [sic] Garcia." *Id*. at 128:5-6. Based on the timing of this series of events, Mr. Garcia's exclamation of "aye aye aye aye" at 11:03-04 on the audio recording occurred at least 30 to 60 seconds prior to him being handcuffed and placed under arrest.

Mr. Garcia's testimony that SA Perry twisted his left arm behind his back and unzipped his jacket is the only testimony before the Court that accounts for his exclamation of "aye aye aye aye," which the Court hears clearly on the audio recording. The Court does not credit SA Perry or TFO Zamarron's testimony that they have no idea who made this sound. The Court has carefully reviewed the timing of Mr. Garcia's exclamation of "aye aye aye aye," and finds that it is consistent with the timing of his vest being unzipped, and inconsistent with the timing of him being placed under arrest. The Court credits Mr. Garcia's testimony that he said "aye, aye, aye, aye" because at that moment, SA Perry grabbed his left arm, twisted it, and began unzipping his vest. Doc. 37 at 148:11-18.

All three witnesses agreed that the zipper of Mr. Garcia's vest got stuck and could not be unzipped all the way. Based on the photographs of the vest (Gov't Exs. 2-4) the Court finds it incredible that if the vest were only partially unzipped, it would have flapped open enough to expose Mr. Garcia's belt area such that SA Perry could pat down that area without reaching inside the zipped portion of the vest. Therefore, the Court does not credit SA Perry's testimony that his

18

hands never went inside of the vest during the search. *Id*. at 78:6-12. Rather, the Court credits SA Perry's earlier testimony, *id*. at 77:13-17; 77:18-19, which was consistent with Mr. Garcia's testimony, *id*. at 148:15-18, that SA Perry reached inside the zipped portion of the vest, so that his hands were inside the vest, but over Mr. Garcia's shirt, in order to feel the bundle. After SA Perry felt the bundle, he immediately placed Mr. Garcia under arrest. *Id*. at 71:9-10.

## DISCUSSION

Mr. Garcia argues that the physical evidence should be suppressed because: (1) he was seized in violation of the Fourth Amendment [Doc. 39 at 7-8]; (2) the search of his person was not consensual [*Id.* at 8-9]; and (3) even if it was consensual, Agent Perry did not have probable cause to arrest after feeling a hard object in Mr. Garcia's abdominal area. Doc. 23 at 11. Mr. Garcia also argues that his statements should be suppressed as the "fruits" of the Fourth Amendment violation. *Id*. at 12-13. The government responds that Mr. Garcia validly consented to the encounter with SA Perry and to the searches SA Perry conducted [Doc. 28 at 8-13]; that Mr. Garcia was not seized prior to his arrest [*Id*. at 13-16]; that SA Perry had probable cause to arrest Mr. Garcia once he felt the bundle in Mr. Garcia's waistband [*Id*. at 16-18]; and that the statements should not be suppressed because there was no violation of Mr. Garcia's Fourth Amendment rights. *Id*. at 18-19.

As explained below, the Court now finds: (1) Mr. Garcia was seized in violation of the Fourth Amendment when SA Perry searched him; (2) there was no clear and unequivocal consent for the search; (3) even if there was consent, the search exceeded the scope of any such consent; and (4) that the search illegally persisted after Mr. Garcia withdrew any such consent. The Court also finds that the taint of the Fourth Amendment violation was not purged prior to Mr. Garcia's statements. Accordingly, the physical evidence and statements must be suppressed.

## I.     Fourth Amendment Seizure

The Fourth Amendment protects "the right of the people to be secure in their ... effects, against unreasonable searches and seizures," U.S. Const. amend. IV. This protection extends to unreasonable investigatory stops or detentions. *United States v. Jones*, 701 F.3d 1300, 1312 (10th Cir. 2012) (citations omitted). Not all encounters between police officers and citizens involve seizures within the meaning of the Fourth Amendment. *Florida v. Bostick*, 501 U.S. 429, 434 (1991). The Supreme Court has recognized three types of police-citizen encounters: arrests, investigative stops, and consensual encounters. *Jones*, 701 F.3d at 1312. Consensual encounters are not seizures within the meaning of the Fourth Amendment, and need not be supported by suspicion of criminal wrongdoing. *Id.* (citation omitted). "Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred." *Bostick,* 501 U.S. at 434.

Police officers do not implicate the Fourth Amendment by posing questions, asking for identification, or requesting consent to search, even when they have no particular reason to suspect an individual has violated the law. *United States v. Easley*, 911 F.3d 1074, 1079 (10th Cir. 2018) (citing *United States v. Drayton*, 536 U.S. 194, 200–01 (2002)). As long as a reasonable person would feel free to terminate the encounter, then there is no seizure. *Drayton*, 536 U.S. at 201. This must be assessed under the totality of the circumstances and from the perspective of the objective, reasonable person. *Easley*, 911 F.3d at 1079 (citations omitted).

When an encounter with police occurs on a bus or train, the relevant inquiry is not whether a reasonable passenger would feel free to leave the bus or train, but rather, whether a "reasonable person would feel free to decline the officers' requests or otherwise terminate the encounter."

*Bostick*, 501 U.S. at 436. Courts look to the totality of circumstances to determine whether the police conduct would "have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business." *Id*. at 437 (citations omitted).

*Bostick* recognized the following non-exhaustive factors as relevant to the Fourth Amendment determination of whether a reasonable person would feel free to terminate an encounter with police: (1) whether the agent advised the individual that he had the right to refuse consent, (2) whether the agent in any way threatened the individual, and (3) the particular location of the encounter. 501 U.S. at 437. In addition to the factors set forth in *Bostick*, the Tenth Circuit has set forth its own list of non-exhaustive factors to be considered in determining whether an individual has been seized:

> (1) the threatening presence of several officers; (2) the brandishing of a weapon by an officer; (3) physical touching by an officer; (4) aggressive language or tone of voice by an officer indicating compliance is compulsory; (5) prolonged retention of an individual's personal effects; (6) a request to accompany an officer to the police station; (7) interaction in a small, enclosed, or non-public place; and (8) absence of other members of the public.

*Jones*, 701 F.3d at 1313 (citation omitted). Courts also may consider whether an officer indicated to the person that he is free to leave. *Id.* "[N]o single factor is dispositive." *Id.* These factors are not exhaustive, and courts may consider other relevant factors. *See United States v. Hernandez*, 847 F.3d 1257, 1264 (10th Cir. 2017).

A non-consensual pat down search can transform a consensual encounter into a Fourth Amendment seizure. *United States v. Chavez*, 429 Fed. Appx. 807, 812 (10th Cir. 2011) (citations omitted). Because the three categories of police encounters (consensual encounters, investigative stops, and arrests) are "not static and may escalate from one to another…, a reviewing court must analyze each stage of the police-citizen encounter, ensuring that the requisite level of suspicion or cause is present at each stage." *Jones,* 701 F.3d at 1312 (citations and alterations omitted).

The encounter between Mr. Garcia and SA Perry can be broken down into four stages: (1) the initial encounter in Mr. Garcia's sleeper cabin; (2) the portion of the encounter in which Mr. Garcia accompanied the agents to the luggage area downstairs; (3) the portion of the encounter in which the agents accompanied Mr. Garcia back upstairs to his room; and (4) the search of Mr. Garcia's person. Because the Court's analysis of the nature of the interaction during first three stages does not change, those stages are addressed together.

The Court finds that Mr. Garcia was not seized during the first three stages of the encounter. First, since only SA Perry and TFO Zamarron were present, there was no "threatening presence of several officers." *Jones*, 701 F.3d at 1313.[6] Second, neither officer brandished a weapon. Third, during the first stages of the encounter, neither officer physically touched Mr. Garcia. Fourth, the officers did not use aggressive language and their tones of voice remained polite and non-threatening throughout the encounter. Fifth, there was no prolonged retention of Mr. Garcia's personal effects, since Mr. Garcia's tickets and luggage were promptly returned after they were searched. Sixth, there was no request to accompany an officer to a police station. The seventh factor is more ambiguous. Although the encounter occurred in the cramped confines of the Amtrak hallway, staircase, and luggage area, these were in public areas of the train. While this factor may weigh slightly in favor of a finding that Mr. Garcia was seized, it does not outweigh all of the other factors. Eighth, other members of the public were present throughout the interaction, as evidenced by the voices of other passengers that can be heard throughout the audio recording.

---

[6] The Court is not persuaded by the government's argument, unsupported by any source of authority, that when TFO Zamarron joined the encounter as a translator, this actually *decreased* the coercive nature of the encounter because having a translator provided a clear understanding between the parties. Doc. 28 at 9. Even so, the Tenth Circuit has held that the presence of two officers is insufficient to establish the threatening presence of several officers. *See United States v. Benard*, 680 F.3d 1206, 1211 (10th Cir. 2012).

However, SA Perry and TFO Zamarron never informed Mr. Garcia that he was free to leave or to discontinue the interaction. While this is a relevant factor, it alone is not dispositive. *Jones*, 701 F.3d at 1313. Overall, under a totality of the circumstances, a reasonable person would have felt free to terminate the interaction during the first three portions of the encounter and therefore Mr. Garcia was not seized. *See Bostick*, 501 U.S. at 436.

However, this analysis changes during the fourth stage of the encounter, in which SA Perry searched Mr. Garcia's person. If Mr. Garcia did not consent to this search, the encounter became a seizure at that time. *See Terry v. Ohio*, 392 U.S. 1, 19 (1968) ("there can be no question, then, that Officer McFadden 'seized' petitioner and subjected him to a 'search' when he took hold of him and patted down the outer surfaces of his clothing."); *Chavez*, 429 Fed. Appx. at 814 ("When [the agent] performed a nonconsensual pat-down of Chavez's person, the encounter likely became a seizure.") (citing *United States v. Crandell*, 554 F.3d 79, 88 n.7 (3d Cir. 2009) ("An officer must place his hands on an individual to conduct a pat-down search, which leads logically to the contention that this act constitutes a seizure.")); *United States v. Davis*, 202 F.3d 1060, 1062 (8th Cir. 2000) ("*Terry* leaves no doubt that a pat-down search is a seizure."). Hence, whether Mr. Garcia was seized at the time of the physical search hinges on whether Mr. Garcia validly consented to a search of his body.[7]

## II.    Validity of Consent

"If the government seeks to validate a search based on consent, the government bears the

_____

[7] The government has not argued that the search was justified based on either reasonable suspicion or probable cause. Instead, the government offers consent as the only justification for the search. The Court finds that prior to the search of Mr. Garcia's person, SA Perry had neither probable cause that Mr. Garcia was committing a crime, nor reasonable suspicion that Mr. Garcia was armed and dangerous. *See United States v. House*, 463 F. App'x 783, 788 (10th Cir. 2012) ("before an officer effectuates a limited frisk for weapons ... the officer must have a reasonable belief that the suspect is both (1) armed, and (2) dangerous."). Therefore, whether the search was justified hinges upon whether SA Perry had valid consent for the search.

burden of proving that the consent was freely and voluntarily given." *United States v. McRae*, 81 F.3d 1528, 1536 (10th Cir. 1996); *see also United States v. Mendenhall*, 446 U.S. 544, 557 (1980). The Tenth Circuit has established a two-part test for determining the validity of consent: (1) the government must proffer clear and positive testimony that consent was unequivocal and specific and freely and intelligently given; and (2) the government must prove that this consent was voluntarily given without implied or express duress or coercion. *McRae*, 81 F.3d at 1537. *See also United States v. Guerrero*, 472 F.3d 784, 789 (10th Cir. 2007). Because the Court finds that the government has not proffered clear and positive testimony that consent was unequivocal and specific and freely and intelligently given, the Court does not reach the second prong of the test.

To satisfy the first prong of the test, a defendant's consent must be clear, but need not be verbal. *Guerrero*, 742 F. 3d at 789. A defendant impliedly consents to a search if he does or says something that would permit law enforcement to form a reasonable belief that consent was granted. *Jones*, 701 F. 3d at 1321. In *United States v. Benitez-Arreguin*, 973 F.2d 823 (10th Cir. 1992), the Tenth Circuit considered whether consent was unequivocal, specific, freely and intelligently given in the context of a language barrier. *Benitez-Arreguin* involved an English-speaking police officer who made gestures and motions to a Spanish-speaking defendant to indicate that the officer wanted to search his suitcases. *Id*. at 825. In response, the defendant opened his bags and handed one of them to the officer. *Id*. The district court found that there was no clear and unequivocal or specific permission given for the search and that "pantomime gestures were not sufficient to produce a consent to search." *Id*. at 826. The Tenth Circuit agreed with the district court's finding that there was "no clear and unequivocal consent given" due to the language barrier, and stated, "the record amply supports the finding that the… search… was not consensual." *Id*. at 829.

SA Perry's attempt to seek consent for a pat-down search is analytically similar to the consent sought by the agent in *Benitez-Arreguin*. Here, as in *Benitez-Arreguin*, SA Perry sought consent for a search based on pantomime gestures in the face of a language barrier. SA Perry, who is not fluent in Spanish, stated to Mr. Garcia, "Okay, gracias senior… me permite… gracias" ("Okay, thank you sir… may I… thank you"). Def. Ex. A at ¶ 247. While asking this question fragment, SA Perry made a patting motion on his chest, in order to physically demonstrate what he sought consent to do to Mr. Garcia.

The Court is not persuaded by SA Perry's testimony that he asked a coherent question which was not picked up on the audio recording, nor by the government's claim that its transcriptionist could hear the entire question. In *United States v. Amezcua-Aguirre*, a district court considered whether a defendant stated "okay" after SA Perry asked for consent to pat her down. No. 15-CR-627 JAP, 2015 WL 5090649 (D.N.M. July 24, 2015). In that case, SA Perry testified that he heard the defendant say "okay," and the government's transcript echoed that testimony. *Id.* at *8. The district court reasoned that the evidence fell "well short" of the "clear and positive testimony" required to show consent because the audio recording of the encounter, which did not reflect that the defendant said "yeah," was the best evidence of what was said as it suffered "none of the vagaries and latent biases of human recollection." *Id.* Similarly, here, the audio recording is the best evidence not only of what SA Perry asked, but also of what Mr. Garcia would have been able to hear – and it does not reflect that SA Perry asked a coherent, complete, or comprehensible question in order to seek consent for a pat down.

Although SA Perry attempted to request verbal consent in addition to making a patting motion, a reasonable officer in his position would have realized that this was a feeble attempt given the obvious language barrier. SA Perry did not repeat or clarify his question. Doc. 37 at 69:16-23.

Even more significantly, he did not ask TFO Zamarron to translate the question into Spanish, which he had done at numerous other times during the encounter in order to gain clear and unequivocal consent to search. *See, e.g.*, Def. Ex. A at ¶ 135 (SA Perry asks TFO Zamarron to ask Mr. Garcia for permission to search the room for contraband); *Id*. at ¶ 146 (SA Perry asks TFO Zamarron to ask Mr. Garcia for permission to look at the luggage downstairs); *Id*. at ¶ 160 (SA Perry asks TFO Zamarron to ask for permission to search the luggage downstairs; *Id*. at ¶ 225 (SA Perry asks TFO Zamarron to ask Mr. Garcia to see his ticket one more time). The fact that SA Perry neglected to ask TFO Zamarron to ask Mr. Garcia in Spanish for permission to search him stands in stark contrast to these requests for consent earlier in the interaction, in which SA Perry did not impermissibly rely on pantomime gestures, but rather, relied on TFO Zamarron to translate the questions into Spanish. A reasonable officer in SA Perry's position would have asked TFO Zamarron to ask Mr. Garcia, in Spanish, for consent to conduct a search of his person. Indeed, SA Perry's use of TFO Zamarron as an interpreter throughout the encounter up until that point demonstrates that SA Perry, too, found this to be a reasonable way to ensure that he had communicated his requests for consent and received clear responses from Mr. Garcia.

In addition to the language barrier, the absence of clear and unequivocal consent was compounded by the background noise – the infant was crying loudly in the background. A reasonable officer would have recognized that, while the language barrier made it difficult to communicate clearly, this difficulty was exacerbated by the loud and chaotic environment. In *United States v. Vaughn*, a district court suppressed evidence based on the court's finding that the defendant "did not hear or comprehend Perry's request for… permission to perform a pat down search, because she was distracted by her cell phone conversation and the multiple overlapping conversations in the train car occurring around her." No. 1:11-CR-01235-MCA-1, 2013 WL

12333588, *4 (D.N.M. Jan. 7, 2013). Even though that defendant said "yes" in response to SA Perry's request, the court interpreted the word "yes" "as an acknowledgment that Perry had spoken to her, rather than consent to submit to a search…" *Id*. at *8.

The government attempts to distinguish *Vaughn* by arguing that in the instant case, "there are no obvious distractions when the defendant consents to the pat-down." Doc. 28 at 12-13. The government asserts that "[t]he only argument for distraction is when a voice comes over the loud speaker while TFO Zamarron is translating SA Perry's request for Mr. Garcia to open his jacket." *Id*.  However, contrary to the government's argument, the Court finds that there were numerous distractions during and immediately preceding the search: in addition to the loudspeaker announcement, there is a crying baby and disruptions from other passengers passing by in the narrow hallway in which the interaction took place. These repeated distractions and disruptions, especially in the context of the language barrier between SA Perry and Mr. Garcia, lead the Court to the conclusion that Mr. Garcia was unable to hear or comprehend what SA Perry was attempting to communicate to him. Like the court in *Vaughn*, this Court concludes that "[u]nder [the] circumstances, a reasonable officer in Perry's position would not have constructed Defendant's response as clear and unequivocal consent and would have, at the very least, sought further clarification before proceeding with a pat down search." 2013 WL 12333588 at *8.

The fact that Mr. Garcia responded to SA Perry's question by saying, "sí" ("yes") and raising his arms over his head does not change this analysis. In *Benitez-Arreguin*, despite the fact that the defendant responded to the agent's pantomime gestures by opening his bags and handing one of them to the agent, the Tenth Circuit agreed with the district court's finding that the pantomime gestures were an insufficient method by which to gain clear and unequivocal consent when there was a language barrier. 973 F.2d at 827-29. Although in other cases, the Tenth Circuit

has held that a defendant may be deemed to have impliedly consented to a search if he said or did something that would allow a reasonable officer to believe there was consent, those holdings were unlike *Benitez-Arreguin* because they did not involve scenarios in which a reasonable officer would have known that the question posed was not comprehensible to the defendant given a language barrier. *See, e.g. United States v. Coulter,* 461 Fed. Appx. 763, 767 (10th Cir. 2012) (unpublished) (looking at an officer and walking into a house after the officer explained he did not want defendant to go into the house alone for officer safety reasons constituted non-verbal consent to the officer entering the house); *United States v. Gordon*, 173 F.3d 761, 765 (10th Cir. 1999) (handing a key to an officer in response to the officer asking "Can you open that?" constituted non-verbal consent to a search of a locked bag).

Just as the Tenth Circuit in *Benitez-Arreguin* found that the defendant's act of opening his bags and handing one to the agent did not constitute clear and unequivocal consent in the face of an incomprehensible question, the district court in *Vaughn* found that the defendant's statement "do you want me to get up" and her action of rising to her feet did not constitute consent. 2013 WL 12333588 at *8. Rather, the court in *Vaughn* found that those actions were "equally indicative that she understood she had no choice but to get up…" *Id*. As the court noted, "acquiescence which is resignation – a mere submission in an orderly way to the actions of arresting agents— is not that consent which constitutes an unequivocal, free and intelligent waiver of a fundamental right." *Id*. (citing *United States v. Gregory*, 204 F. Supp. 884, 885 (S.D.N.Y. 1962)) (defendant's acquiescence to allow officers to search his hotel room after he was placed under arrest was not valid consent). *See also Johnson v. United States*, 333 U.S. 10, 12-13 (1948) (defendant "stepp[ing] back and acquiescently" admitting police into her hotel room was submission to authority rather than understanding and intentional waiver of her Fourth Amendment right); *United*

*States v. Manuel*, 992 F.2d 272, 275 (10th Cir. 1993) ("Mere submission to lawful authority does not equate to consent.")

In the instant case, as in *Benitez-Arreguin* and *Vaughn,* Mr. Garcia's statement of "sí" and his act of raising his hands over his head are consistent with mere submission to a claim of lawful authority and do not remedy SA Perry's failure to procure clear and unequivocal and intelligent and freely given consent for a search. Therefore, the Court concludes that the government did not meet its burden to proffer clear and positive testimony that consent was unequivocal and specific and freely and intelligently given. *McRae*, 81 F.3d at 1537.

## III.    Scope of Consent

The Court additionally finds that, even if Mr. Garcia did clearly and unequivocally consent to a pat down search, SA Perry's search exceeded the scope of consent.

To admit evidence obtained in a consent search, a court must find that the search did not exceed the scope of the defendant's consent. *United States v. Price*, 925 F.2d 1268, 1270 (10th Cir. 1991). "The scope of a citizen's consent to search is defined by the search's express object and is limited by the breadth of the consent given." *United States v. Freeman*, No. CR 01-496 JP, 2002 WL 35650115, at *4 (D.N.M. Feb. 13, 2002) (citing *United States v. Elliott*, 107 F.3d 810, 814-15 (10th Cir. 1997)). "The standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of 'objective' reasonableness—what would the typical reasonable person have understood by the exchange between the officer and the suspect." *Elliott,* 107 F.3d at 815.

The Tenth Circuit has "consistently and repeatedly… held [that] a defendant's failure to limit the scope of a **general authorization to search**, and failure to object when the search exceeds what he later claims was a more limited consent, is an indication the search was within the scope of consent." *United States v. Gordon*, 173 F.3d 761, 766 (10th Cir. 1999) (emphasis added).

However, a defendant's failure to object to a search does not indicate that a search is within the scope of consent if there was no general authorization to search to begin with. For example, in *Elliot*, the officer asked for permission to look through the trunk of the defendant's car, but explained that he did not want to "look through each item," and instead just wanted to see how things were "packed" or "packaged." 107 F.3d at 815. The Tenth Circuit ruled that the officer exceeded the scope of consent by unzipping one of the bags in the trunk and looking inside of it, since a "typical reasonable person would have construed these additional statements as expressly limiting the scope of [the officer's] request." *Id*. at 815-16. Because the officer's question inherently limited the scope of the request to search, there was no "general authorization" to search and the defendant did not need to object in order to limit the scope.

*Elliot* can be contrasted with cases in which there was nothing about the nature of the officer's request for consent that would reasonably be construed to limit the scope of the consent that the officer sought. *See, e.g.*, *United States v. Pena*, 143 F. 3d 1363, 1367-68 (10th Cir. 1998) (holding that defendant's consent for the officer to have "a look in" defendant's motel room authorized officers to look in small bathroom attached to main room); *United States v. McRae,* 81 F.3d at 1537-38 (concluding that defendant's consent to officer's request to "look in" his car gave officer authorization to search the car, including lifting up carpeting in the trunk of the car).

Other circuits have specifically considered the scope of consent in the context of consensual pat down searches. In *United States v. Russell*, the Ninth Circuit considered a case in which the defendant granted an officer permission to search his person, and the defendant consented verbally and spread his arms and legs to facilitate the search. 664 F.3d 1279, 1281 (9th Cir. 2012). During the search, the officer used his "standard operating procedure" for a frisk, squeezing the shin, knee, and thigh, working his way up to the groin area, at which time he "lifted

up to feel" and felt something hard and unnatural. *Id*. The Ninth Circuit upheld the search as within the scope of consent because the defendant never objected as the officer worked his way up towards the defendant's groin. In holding that the search was reasonable, the court specifically noted that the search "did not extend inside the clothing." *Id*. at 1282. *See also United States v. Rodney*, 956 F.2d 295, 298 (D.C. Cir. 1992) (holding that the defendant's consent to a "body search" authorized the kind of "traditional frisk search" undertaken in which the officer made a "continuous sweeping motion over [the defendant's] outer garments").

Turning to the instant case, to the extent that it can be said that SA Perry's request for consent to search Mr. Garcia's person was clear, a typical reasonable person would have construed his request as cabined to a pat down over Mr. Garcia's clothing. SA Perry specifically demonstrated a patting motion on his torso. This demonstration of what he wanted to do to Mr. Garcia, combined with his statement of "Okay, gracias señor… me permite… gracias" ("Okay, thank you sir… may I… thank you"), limited the request for consent to a pat down search. SA Perry never requested "general authorization" to perform a search of Mr. Garcia's person; rather, his demonstration indicated that the search would not involve actions such as removing, reaching into, or reaching under articles of clothing. SA Perry's request to perform a pat down search was more analogous to the officer's request to perform a limited search in *Elliot* than to officers' requests for general, unlimited authorization to perform searches in other cases.

Courts have consistently recognized a substantive difference between pat down searches and more invasive searches that go beyond patting down an individual's outer clothing. In *Terry*, the Supreme Court noted that "[e]ven a limited search of the outer clothing for weapons constitutes a severe, though brief, intrusion upon cherished personal security, and it must surely be an annoying, frightening, and perhaps humiliating experience." 392 U.S. at 24-25. *Terry* recognized

a "distinction in purpose, character, and extent between a search incident to an arrest and a limited search for weapons" – the former is justified by the probable cause and can involve a "relatively extensive exploration of the person," whereas the latter is confined to a pat down of the suspect's outer clothing. *Id*. at 25-26. Applying this standard to the facts before it, the *Terry* court concluded that the officer's search comported with the limitations of a pat down search because the officer "did not place his hands in their pockets or under the outer surface of their garments until he had felt weapons." *Id*. at 29-30. *See also Sibron v. New York*, 392 U.S. 40, 65 (1968) (contrasting the search approved in *Terry*, which consisted "solely of a limited patting of the outer clothing," with the search in *Sibron*, in which the officer "thrust his hand" into the defendant's pocket); *Minnesota v. Dickerson*, 508 U.S. 366, 378 (1993) (squeezing, sliding, and manipulating contents of a pocket and reaching into the pocket exceeded the scope of a valid pat-down search); *United States v. Santillanes*, 848 F.2d 1103, 1109 (10th Cir. 1988) (reaching into defendant's pockets exceeded the scope of a permissible frisk because the detective "went beyond patting of the outer clothing" and "[t]he detective's conduct in this case cannot be considered minimally intrusive.")

The search that SA Perry conducted exceeded the scope of a pat down of Mr. Garcia's outer clothing. By partially unzipping Mr. Garcia's vest, SA Perry exceeded the scope of any consent he had received to perform a pat down search of Mr. Garcia's outer garments. By reaching inside the zipped portion of the vest, so that his hands were underneath the vest but over Mr. Garcia's shirt, SA Perry again exceeded the scope of a consensual pat down search over Mr. Garcia's outer garments.

To the extent SA Perry had consent to conduct a search, that scope of that consent was limited to a pat down search. Because the search that SA Perry conducted was outside the scope of the consent he received, that search was an unlawful search, unjustified by consent.

**IV.     Whether Consent was Withdrawn**

Even if the Court were to find that a reasonable person would have interpreted Mr. Garcia's statement of "sí" and his action of raising his hands over his head as providing a general, unlimited authorization to search his person, Mr. Garcia withdrew his consent, rendering the continued search unlawful.

During a consensual encounter, a defendant is free to limit or withdraw his prior consent. *United States v. Manjarrez*, 348 F.3d 881, 888 (10th Cir. 2003). "Any withdrawal or limitation, however, must be expressly and explicitly made." *Id. See also United States v. Sanders*, 424 F.3d 768, 774 (8th Cir. 2005) ("[C]onduct withdrawing consent must be an act clearly inconsistent with the apparent consent to search, an unambiguous statement challenging the officer's authority to conduct the search, or some combination of both.") (quoting *Burton v. United States*, 657 A.2d 741, 746-47 (D.C. App. 1994)).

*Sanders* concerned a defendant who withdrew consent to a pat down search after the search had begun. 424 F.3d at 775. In *Sanders*, the defendant consented to a search of his person, but when the officer attempted to reach into one of his front pants pockets, the defendant repeatedly lowered his hands to block the officer, although he did not verbally withdraw consent. *Id*. at 771-72. The court found that the defendant's "actions clearly communicated to an objective observer he did not want [the officer] searching his pockets," thereby withdrawing consent, and the resulting search was unlawful. *Id*. at 775-76. Conversely, when a defendant's actions are ambiguous, they do not constitute a withdrawal of consent. For example, the D.C. Circuit considered a case in which the defendant, after consenting to a pat down, "twisted away slightly." *United States v. Jones*, No. 90–3001, 1990 WL 142342, *1 (D.C. Cir. Oct. 1, 1990) (unpublished). The court found that this slight twisting was not sufficient to withdraw consent to the search. *Id*. at *3.

In the instant case, Mr. Garcia clearly and unambiguously withdrew his consent not once, but twice. First, Mr. Garcia withdrew his consent by moving his body away from SA Perry so as to prevent SA Perry from searching his lower abdominal area. SA Perry testified that when he attempted to pat down Mr. Garcia's lower waist area, it was "difficult" to pat him down "because he was moving his body away from me." Doc. 37 at 76:5-7. SA Perry reiterated that he "couldn't complete the pat down because he was turning his body away from me." *Id.* at 76:11-13. TFO Zamarron described this as well: "When Agent Perry began patting down [Mr. Garcia's] waist area, I observed Mr. Garcia kind of move his body in the opposite direction of his hands as… Agent Perry attempted to pat down the center portion of… Mr. Garcia's body. Mr. Garcia began to sway or move away and what not." *Id.* at 98:8-15. TFO Zamarron further explained that Mr. Garcia was moving away from SA Perry's hands, and that Mr. Garcia "move[d] back and forth several times." Mr. Garcia's actions of repeatedly moving back and forth in the opposite direction of SA Perry's hands were similar to the defendant's conduct in *Sanders*, who "repeatedly tried to block [the officer's] hands from going into his pockets." 424 F.3d 768. Here, as in *Sanders*, a reasonable observer would have interpreted Mr. Garcia's attempts to thwart SA Perry's search of his lower abdominal area as a clear communication that he withdrew consent to the search of that portion of his body.

In response to this withdrawal of consent, rather than stopping the search, SA Perry pressed forward, twisting Mr. Garcia's arm and unzipping his vest. Mr. Garcia again objected to the search, this time through his exclamation of "aye aye aye aye." Gov't Ex. 1 at 11:03-04. In making a vocal cry of objection, Mr. Garcia manifested conduct indicating that he wanted the search to be ceased. *See United States v. Evans*, 937 F.2d 1534, 1538 (10th Cir. 1991) (upholding a pat down as consensual in part because "after the pat down by both officers had commenced, [the defendant]

did not request the officers to cease the pat down, nor did he manifest any conduct indicating he wanted the pat down to be ceased"). Because Mr. Garcia objected to the continuation of the search, Mr. Garcia's case is distinguishable from cases in which a defendant's failure to object indicated that the search was within the scope of consent. *See, e.g.*, *United States v. Pena*, 920 F.2d 1509, 1515 (1990) (holding that officer did not exceed scope of consent to "look inside" defendant's car when officer removed the car's rear quarter panel vent, given that defendant "never attempted to limit or retract his consent."); *United States v. Wacker*, 72 F.3d 1453, 1470 (holding that, where defendant granted permission to search the car and the trooper searched the truck's bed, the officer did not exceed the scope of search since the defendant "placed no limits of the search [and] [n]either did he later object when the search extended to the bed of the truck.")

For these reasons, the Court finds that to the extent that any consent provided by Mr. Garcia was valid, not only did the search unlawfully exceed the scope of that consent, but the search persisted unlawfully after Mr. Garcia had unambiguously withdrawn consent.

## V.        **Fruit of the Poisonous Tree**

"[A]s a general rule any evidence obtained as a result of [an unlawful] detention must be excluded as fruit of the poisonous tree." *United States v. Guerrero-Espinoza*, 462 F.3d 1302, 1310 (10th Cir. 2006) (citations omitted). In *Brown v. Illinois*, the Supreme Court considered whether statements made after a defendant was unlawfully arrested "were to be excluded as the fruit of the illegal arrest, or were admissible because the giving of the Miranda warnings sufficiently attenuated the taint of the illegal arrest." 422 U.S. 590, 591-92 (1975) (citing *Wong Sun v. United States*, 371 U.S. 471 (1963)). The Supreme Court held that "Miranda warnings… do not alone sufficiently deter a Fourth Amendment violation." *Id.* at 601. The court identified factors that courts must look to in order to determine whether the taint of the initial Fourth Amendment

violation was purged: the temporal proximity of the arrest and the confession, the presence of intervening circumstances, and the purpose and flagrancy of the official misconduct. *Id*. at 603-604. The prosecution bears the burden of showing admissibility. *Id*. at 604. "This is a heavy burden." *United States v. Fox*, 600 F.3d 1253, 1259 (10th Cir. 2010).

Applying these factors to the instant matter, the Court finds that the statements should be suppressed because the taint of the Fourth Amendment violation was not purged. Regarding temporal proximity of the arrest and confession, Mr. Garcia made his statements approximately two hours after his illegal arrest. In *Brown*, the Supreme Court noted that "Brown's first statement was separated from his illegal arrest by less than two hours, and there was no intervening event of significance whatsoever," and suppressed the statements. 422 U.S. at 604-05.

Regarding the presence of intervening circumstances, there were none. The Tenth Circuit has held that "examples of intervening circumstances include carefully explaining a consent form and advising an individual of the right to withhold consent, release from custody, an appearance before a magistrate, or consultation with an attorney, to name a few." *Fox*, 600 F.3d at 1261 (internal citations, quotation marks, and alterations omitted). No such circumstances are present in the instant case. Although Mr. Garcia was read his Miranda warnings, no waiver form was signed. He did not consult with an attorney or appear before a magistrate and was not released from custody. Being advised of his Miranda warnings alone is insufficient to purge the taint of the unlawful arrest. *Brown*, 422 U.S. at 601-02.

Regarding the purpose and flagrancy of the official misconduct, the Tenth Circuit has specified that "purposeful and flagrant misconduct is generally found where: (1) the impropriety of the official's misconduct was obvious or the official knew, at the time, that his conduct was likely unconstitutional but engaged in it nevertheless; and (2) the misconduct was investigatory in

design and purpose and executed in the hope that something might turn up." *Id.* (citation and internal quotation marks omitted). In *Vaughn*, the court held that official misconduct was "significant" where the defendant's consent was not "unequivocal and freely and intelligently given and was obtained through coercion." 2013 WL 12333588, at *10–11. Here, SA Perry deliberately overlooked Mr. Garcia's communications that he did not consent to the search of his person, including Mr. Garcia's action of moving his body away from SA Perry and his vocal exclamation of pain. SA Perry knew, or should have known, that it was unconstitutional for him to continue the search despite Mr. Garcia's protestations, and to expand the search to include underneath Mr. Garcia's jacket. Yet SA Perry persisted in the search in a deliberate manner in order to achieve an investigatory purpose. Therefore, the Court finds that the official misconduct in this case was significant, and weighs this factor in favor of suppression.

For the reasons stated above, the Court finds that Mr. Garcia's statements, in addition to the physical evidence seized from him, must be suppressed.

## CONCLUSION

For the foregoing reasons, the Court **HEREBY ORDERS** that Mr. Garcia-Guzman's Motion to Suppress Evidence and Statements [Doc. 23] is **GRANTED**.

Dated this  7ᵗʰ day of January, 2020.

_____
MARTHA VÁZQUEZ
UNITED STATES DISTRICT JUDGE

Erlinda Johnson                                    Mark Pfizenmayer
*Attorney for Mr. Garcia-*                         *Assistant United States Attorney*
*Guzman*